# ATTACHMENT A

1

Volume I
Pages 1 to 200
Exhibits 1 to 27

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
TIMOTHY TURLEY,                  :
          Plaintiff,             :
                                 :
     vs.                         :  C.A. No.
                                 :  1:14-cv-14755-LTS
DANIEL ZIVKOVICH,                :
Individually and as Executive    :
Director of the MPTC; CURTIS     :
McKENZIE, Individually and as    :
Director of the WMRPA; ROBERT    :
POWERS; DELILAH YEE; SEAN        :
SHATTUCK; MUNICIPAL POLICE       :
TRAINING COMMISSION; and         :
WESTERN MASSACHUSETTS            :
REGIONAL POLICE ACADEMY,         :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x

     DEPOSITION OF TIMOTHY M. TURLEY, a witness
called on behalf of the Defendants Daniel Zivkovich,
Individually and as Executive Director of the MPTC;
Curtis McKenzie, Individually and as Director of the
WMRPA; Robert Powers; Delilah Yee; Municipal Police
Training Commission; and Western Massachusetts
Regional Police Academy, taken pursuant to the
Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Office of the Attorney General, One Ashburton
Place, 18th Floor, Boston, Massachusetts, on
Thursday, September 8, 2016, commencing at 10:34 a.m.



PRESENT:

    Sinsheimer & Associates
        (Wesley Stoker, Esq., and Robert S.
        Sinsheimer, Esq.)
        92 State Street, 9th Floor,
        Boston, MA 02109,
        wstoker@sinsheimerlaw.com;
        rsinsheimer@sinsheimerlaw.com
        617.722.9954
        for the Plaintiff.

    Office of the Attorney General
        (by Andrew W. Koster, Assistant Attorney
        General, and Nicole Eldredge, Assistant
        Attorney General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Andrew.Koster@state.ma.us;
        Nicole.Eldredge@state.ma.us
        617.963.2246
        for the Defendants Daniel Zivkovich,
        Individually and as Executive Director of
        the MPTC; Curtis McKenzie, Individually and
        as Director of the WMRPA; Robert Powers;
        Delilah Yee; Municipal Police Training
        Commission; and Western Massachusetts
        Regional Police Academy.

    Reardon, Joyce & Akerson, P.C.
        (by Andrew J. Gambaccini, Esq.)
        4 Lancaster Terrace,
        Worcester, MA 01609,
        agambaccini@rja-law.com
        508.754.7285
        for the Defendant Sean Shattuck.

ALSO PRESENT:  Robert Powers and Ellen Duffy

* * * * *

1                       I N D E X

2

WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3

4    TIMOTHY M. TURLEY

5     BY MR. KOSTER            6

6

7                         *  *  *  *

8                       E X H I B I T S

9
     NO.                 DESCRIPTION                    PAGE
10
      1      Copy of document entitled "Plaintiff       18
11           Timothy Turley's Response to
             Defendant Massachusetts Police
12           Training Commission's First Set of
             Interrogatories"
13
      2      Copy of memorandum to Marylou Powers       20
14           from Curtis McKenzie dated 12/31/13,
             Bates Nos. COMMONWEALTH 000573-000577
15
      3      Copy of Complaint and Jury Demand,         23
16           with attachments

17    4      Copy of Action Notice dated 8/20/13,       61
             Bates No. COMMONWEALTH 000518
18
      5      Copy of Action Notice dated 9/30/13,       64
19           Bates No. COMMONWEALTH 000572

20    6      Copy of document entitled "49th ROC        68
             Format of To/From Report," Bates
21           No. COMMONWEALTH 000221

22    7      Copy of report to Curtis McKenzie          70
             from Timothy Turley dated 8/19/13,
23           Bates No. COMMONWEALTH 000593

24

1                    E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 8 | Copy of report to Curtis McKenzie from Timothy Turley dated 10/31/13, Bates No. COMMONWEALTH 000587 | 73 |
| 9 | Copies of reports to Curtis McKenzie from Timothy Turley dated 11/1/13 and 11/4/13, Bates Nos. COMMONWEALTH 000588-000589 | 74 |
| 10 | Copies of reports dated 8/23/13, Bates Nos. COMMONWEALTH 000594-000596 | 77 |
| 11 | Copies of reports to Curtis McKenzie from Timothy Turley, Bates Nos. COMMONWEALTH 000590, 000597, 000601 and 000602 | 81 |
| 12 | Copy of Action Notice dated 11/11/13, Bates No. COMMONWEALTH 000528 | 100 |
| 13 | Copy of document entitled "Municipal Police Training Committee Recruit Firearms Training," Bates Nos. COMMONWEALTH 002914-002918 | 108 |
| 14 | Copy of document entitled "Range Safety Guidelines," Bates No. COMMONWEALTH 002949 | 126 |
| 15 | Copy of Separation Notice, Bates No. COMMONWEALTH 000527 | 128 |
| 16 | Copy of document entitled "Acknowledgment," Bates No. COMMONWEALTH 000584 | 130 |
| 17 | Copy of document entitled "Student Officer's Statement of Compliance," Bates No. COMMONWEALTH 000586 | 130 |

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 18 | Copy of document entitled "550 CMR: Municipal Police Training Committee," Bates Nos. COMMONWEALTH 000113-000122 | 132 |
| 19 | Copy of Action Notice dated 10/31/13, Bates No. COMMONWEALTH 000571 | 135 |
| 20 | Copy of Exam #2, Bates No. COMMONWEALTH 000613 | 136 |
| 21 | Copy of Exam #2 Re-Test, Bates No. COMMONWEALTH 000546 | 138 |
| 22 | Copy of Action Notice dated 12/10/13, Bates No. COMMONWEALTH 000519 | 138 |
| 23 | Copy of document entitled "DWI Detection and Standardized Field Sobriety Testing, Post-Test," Bates No. COMMONWEALTH 000651 | 141 |
| 24 | Copy of document entitled "DWI Detection and Standardized Field Sobriety Testing, March 2013 Edition, Participant Guide," Bates Nos. COMMONWEALTH 000704-000708 | 142 |
| 25 | Copy of document entitled "Municipal Police Training Committee, DWI Detection and Standardized Field Sobriety Testing (SFST) Student Manual," Bates Nos. TURLEY000293-000297 | 143 |
| 26 | Copy of letter to Chief Lavendure from Timothy Turley dated 12/13/13, Bates Nos. COMMONWEALTH 610-612 | 144 |
| 27 | Copy of portion of SFST Guide Book, Bates Nos. COMMONWEALTH 001050-001055 | 150 |

```
 1                   P R O C E E D I N G S
 2            MR. KOSTER:  For the record, we have agreed
 3      to the usual stipulations.  The witness will have
 4      30 days to read and sign.  We can waive the notary.
 5      We will reserve all objections, except those as to
 6      form.
 7                   TIMOTHY M. TURLEY
 8      a witness called for examination by counsel for the
 9      Defendants Daniel Zivkovich, Individually and as
10      Executive Director of the MPTC; Curtis McKenzie,
11      Individually and as Director of the WMRPA; Robert
12      Powers; Delilah Yee; Municipal Police Training
13      Commission; and Western Massachusetts Regional
14      Police Academy, having been satisfactorily
15      identified by the production of his driver's license
16      and being first duly sworn by the Notary Public, was
17      examined and testified as follows:
18                   DIRECT EXAMINATION
19        BY MR. KOSTER:
20        Q.   Mr. Turley, thank you for coming in this
21      morning.  I'm Andrew Koster.  I'm an Assistant
22      Attorney General here at the Massachusetts Attorney
23      General's Office in the Trial Division.  As you may
24      know, I represent all the Defendants in this case
```

9

```
 1        Q.    Documents that you had produced in
 2   connection with this litigation?
 3        A.    Correct.
 4        Q.    Did you speak to anybody outside the
 5   presence of counsel to prepare for today?
 6        A.    My wife.
 7        Q.    Other than your wife?
 8        A.    No.
 9        Q.    Would you please state your address.
10        A.    12 Greaton Road, West Roxbury, Mass.
11        Q.    How long have you lived there?
12        A.    12 years roughly.
13        Q.    Who do you live with?
14        A.    My wife and three children.
15        Q.    What is your date of birth?
16        A.         /67.
17        Q.    How old does that make you now, 49?
18        A.    I'm 48.  I'll be 49 soon.
19        Q.    You said you have three kids.  How old are
20   your kids?
21        A.    My kids are 11, 10 and 9.
22        Q.    Did you graduate from high school?
23        A.    Yes.
24        Q.    Which high school?
```

1    A.    Catholic Memorial High School.

2    Q.    Where is that located?

3    A.    West Roxbury.

4    Q.    What year?

5    A.    1986.

6    Q.    Did you attend college?

7    A.    Some college.

8    Q.    Which college?

9    A.    I went to Massasoit Community College

10   briefly, and technically I'm still enrolled at UMass

11   Amherst, their on-line university.

12   Q.    Did you attain any degree at Massasoit

13   College?

14   A.    No.

15   Q.    And where is that located?

16   A.    That is I believe in Canton.

17   Q.    Do you have any degrees beyond a high

18   school diploma?

19   A.    No.

20   Q.    Do you have any professional licensures?

21   A.    I have an academy -- it was the Criminal

22   Justice Training Council at the time for corrections

23   officers.  That would have been in 1990.

24   Q.    What does that entail?

1    A.    It's like a basic training academy for

2  corrections officers.

3    Q.    Did you attend any other technical training

4  schools?

5    A.    Over the course of my career, I went to

6  several trainings.  I believe I provided you my

7  records.

8    Q.    What I'm referring to is, did you attend

9  any educational training to be licensed in a trade?

10  For example, that would be like plumbing,

11  electricity, anything like that.

12    A.    No.

13    Q.    Did you ever serve in the military?

14    A.    No.

15    Q.    Do you have any other educational

16  background other than what we just discussed?

17    A.    No.

18    Q.    Where you are currently employed?

19    A.    Massachusetts General Hospital.

20    Q.    When did you start working at MGH?

21    A.    February 2015.

22    Q.    What is your position there?

23    A.    I'm a security officer.

24    Q.    What is your salary there?

1      A.   I'm not either.

2      Q.   Were you charged with verbally assaulting a

3   police officer?

4      A.   No.

5      Q.   Resisting arrest?

6      A.   No.

7      Q.   Do you recall enrolling as a cadet at the

8   Western Mass. Regional Police Academy?

9      A.   I do.

10     Q.   I'll refer to that institution as "the

11   academy."   Is that okay with you?

12     A.   Yes.

13     Q.   You'll understand that?

14     A.   Yes.

15     Q.   I'm also going to refer to the Municipal

16   Police Training Commission as "the MPTC," okay?

17     A.   Understood.

18     Q.   Am I correct you were a member of the 49th

19   Recruit Class?

20     A.   That's correct.

21     Q.   When did your training course begin?

22     A.   It would have been August 19, 2013.

23     Q.   What town is the academy located in?

24     A.   It's in the City of Springfield, I believe

1    within the city limits.

2        Q.    In connection with your involvement as a

3    cadet, were you sponsored by any police department?

4        A.    I was.

5        Q.    Which department?

6        A.    The Clinton Police Department.

7        Q.    Who is the chief there that sponsored you?

8        A.    His name is Mark Lavendure, I believe is

9    the name.

10       Q.    Levenger?

11       A.    Lavendure.  I could be saying it wrong.

12       Q.    Where were you living at the time you

13    started at the academy in August of 2013?

14       A.    I actually had a dual residency.  On the

15    weekends I would be at my current address at

16    12 Greaton Road, and I stayed at Church Street in

17    Clinton.  I forget the exact address.

18       Q.    Let's mark these, which are your responses

19    to the interrogatories that were served by the MPTC.

20    You will receive a copy by the reporter.

21                (Document marked as Turley

22                Exhibit 1 for identification)

23       Q.    I ask you to turn to No. 18.

24       A.    (Examines document)

1     Q.    Are you there?

2     A.    Yes.

3     Q.    The last paragraph on the page is your

4 response.  It's not in bold text.  It says, "During

5 my time at WMRPTA I lived at home but stayed the

6 weeknights with Phillip and Allison Duffy at

7 260 Church Street, Clinton, MA," do see where I just

8 read?

9     A.    Yes.

10    Q.    Did I read that correctly?

11    A.    Yes.

12    Q.    Who are Phillip and Allison Duffy?

13    A.    My brother-in-law and sister-in-law.

14    Q.    Related to your wife?

15    A.    Correct.

16    Q.    Is that their address that we just read?

17    A.    I believe it is.

18    Q.    You testified you stayed in West Roxbury on

19 the weekends?

20    A.    Yes.

21    Q.    But you stayed at the Church Street address

22 during the week?

23    A.    That's correct.

24    Q.    Where did you stay on Sunday nights?

1      A.    I would return to Clinton on Sunday

2   evenings.

3      Q.    Then you would drive to the academy on

4   Monday morning?

5      A.    I would ride with another student mostly.

6      Q.    Did you always stay with your in-laws, with

7   your brother-in-law and your sister-in-law, during

8   the week?

9      A.    Pretty much.  This was the routine during

10  the week.

11     Q.    Was there ever a time when you stayed at

12  your home in West Roxbury during the week?

13     A.    I can't recall any.

14     Q.    Can you think if there was ever an instance

15  when you stayed in West Roxbury during the week?

16     A.    I can't recall.

17     Q.    Did you have a part-time job while you were

18  a cadet at the academy?

19     A.    No.

20                    (Document marked as Turley

21                    Exhibit 2 for identification)

22     Q.    Exhibit 2 is a memorandum to Marylou Powers

23  from Curtis McKenzie dated December 31, 2013.  What

24  I would like you to do is turn to the fourth page,

1      A.    I can't speak for him, but I believe that's

2  the correspondence that he's referring to.

3      Q.    Did you ask for permission to work --

4      A.    At a part-time job, yes.

5      Q.    And then ultimately you decided not to work

6  a part-time job?

7      A.    Yes.  If you read the next sentence, he

8  advised me not to.  I followed his advice.

9      Q.    So he told you not to, and you followed his

10 advice?

11     A.    Well, I believe permission denied.  I don't

12 remember the exact words.

13     Q.    I understand.  On what date were you

14 dismissed from the academy?

15     A.    That would have been on December 10th of

16 2013.

17     Q.    So you were at the academy from August to

18 December 10, 2013?

19     A.    That's correct.

20                 (Document marked as Turley

21                 Exhibit 3 for identification)

22     Q.    This is your complaint, sir.  What we are

23 going to do for a few minutes is just go through

24 some of the allegations in your complaint.  I want

1    to start on Paragraph 18.

2         A.    (Examines document)

3         Q.    Are you on Paragraph 18?  Do you see that?

4         A.    No. 18, yes.

5         Q.    So I'll ask you some questions.  It says,

6    "Mr. Turley and only Mr. Turley was ordered to

7    perform the degrading task of kneeling down and

8    placing socks on the bare feet of another student

9    officer.  This occurred in front of the entire class

10   in the presence of several MPTC staff instructors

11   under the supervision of Sgt. Powers," did I read

12   that correctly?

13        A.    Yes.

14        Q.    Who ordered you to put socks on the bare

15   feet of another cadet?

16        A.    I don't know.

17        Q.    Where did the order come from?

18        A.    It would have been one of the people under

19   Sergeant Powers' direction that day.  He was the

20   lead instructor.  He was responsible for all

21   instructors.

22        Q.    How did you receive this order?

23        A.    I was shouted at to get moving.  I had to

24   leave my position in the formation.  I had to go to

1   the other side of the formation in front of the

2   formation, so very close to Sergeant Powers.  I had

3   to -- then Officer Latino -- well, later identified

4   as Officer Latino.  I didn't know who he was at the

5   time.  I was ordered -- I believe he showed up with

6   black socks.  That was inappropriate for Day 1 at

7   the academy.  I was ordered to change his socks for

8   him.

9        Q.   But my question was, who gave you the order?

10       A.   I don't know.

11       Q.   How did you receive the order?

12       A.   It would have been one instructor -- two

13  instructors followed me over to Latino.  I don't

14  know what their names were.  I didn't know anybody's

15  name when I arrived out there.

16       Q.   Did you hear it verbally from an instructor?

17       A.   Shouted very loudly, yes.

18       Q.   An instructor shouted the order at you?

19       A.   Very loudly.

20       Q.   Was it a male or female?

21       A.   It was two male instructors.

22       Q.   You don't know who it was, though?

23       A.   I don't.

24       Q.   You testified you had to put socks on

1   Student Officer Latino?

2      A.   Nicholas Latino, yes.

3      Q.   Do you know the date on which this happened?

4      A.   That would have been August 19, 2013.

5      Q.   Who else was present when you were told to

6   put socks on Latino's feet?

7      A.   That would have been the entire 49th.  I

8   don't believe anyone had -- the entire class that

9   started that day.  I don't believe anyone had

10   dropped out by that point.

11      Q.   So all of your classmates would have heard

12   it as well?

13      A.   Yes.  It was frequently discussed after

14   that date.

15      Q.   You wrote that, "Mr. Turley and only

16   Mr. Turley was told to put socks on another cadet,"

17   correct?

18      A.   Yes.

19      Q.   Sorry?

20      A.   I said yes.

21      Q.   Is it your testimony you were the only

22   cadet in the whole 49th class that was told to put

23   socks on another cadet's feet?

24      A.   Yes.

1      Q.    During the entire academic year?

2      A.    Correct.

3      Q.    How do you know you were the only one over

4 the course of the entire academic year?

5      A.    It was a frequent topic of discussion

6 amongst myself and the other students.

7      Q.    How do you know it never happened again

8 outside of your presence?

9      MR. STOKER:  Objection.

10     A.    That's impossible to know.

11     Q.    So you recognize, then, that it might have

12 happened again and you were just not aware of it?

13     MR. STOKER:  Objection.  You can answer.

14     A.    It's impossible for me to know what

15 occurred outside of my presence.

16     Q.    Paragraph 19 says, if you will read along

17 with me, "On another occasion, Sgt. Powers ordered

18 Mr. Turley to write the entire 'Use of Force' model

19 on the white board every day for several weeks

20 during his lunch break.  This punishment was ordered

21 for misspelling the word 'volatile.'  Thus,

22 Mr. Turley was deprived of the right to eat his

23 lunch on several occasions during this physically

24 demanding training," did I read that correctly?

1      A.    Yes.

2      Q.    You wrote "every day for several weeks"

3  there, right?

4      A.    Yes.

5      Q.    How many weeks are we talking about?

6      A.    I'm guessing about four.

7      Q.    So you didn't have lunch once for four

8  weeks?

9      A.    That's not what I wrote.

10     Q.    You wrote "every day for several weeks,"

11 right?

12     A.    Yes.

13     Q.    Then you just said it lasted four weeks?

14     A.    Yes.

15     Q.    So that means every day for four weeks you

16 didn't have lunch.

17     A.    No.

18     Q.    So please correct me.  That's not a good

19 question.  Is this statement in the complaint

20 incorrect?

21     A.    This is correct.

22     Q.    So how many days were you deprived of lunch

23 over that four-week period?

24     A.    Several.

1    Q.   How many?

2    A.   I can't recall exactly.

3    Q.   More or less than five days?

4    A.   Probably more.

5    Q.   More or less than ten days?

6    A.   Probably around that number, roughly

7    between five and ten.

8    Q.   So approximately ten days over that

9    four-week period you were deprived of your lunch?

10   A.   Roughly.

11   Q.   Is it your testimony that Sergeant Powers

12   would not let you eat your lunch?

13        MR. STOKER:  Objection.

14   A.   As a result of his standing order, that

15   would be correct, on a number of occasions.

16   Q.   Did he specifically tell you that you could

17   not eat your lunch?

18   A.   No.

19   Q.   So how did he deprive you of the right to

20   eat your lunch?

21        MR. STOKER:  Objection.

22   Q.   You can answer.

23   A.   His standing order was enforced by the

24   squad leaders and the class leaders.  Even in his

1   absence I was required to write this thing.  And

2   other things were going on in the class where the

3   white board was not always available, but I would

4   have to -- other things would be going on during

5   lunch, class organizational things.

6       Q.   And what was his standing order?

7       A.   The standing order was to write the entire

8   use of force model on the white board at lunch every

9   day until the class as a whole passed the use of

10  force exam.

11      Q.   How long was the lunch period?

12      A.   I don't recall.  It was roughly 30 to

13  40 minutes.

14      Q.   How long is the use of force module in

15  terms of pages?

16      A.   It's probably one page.

17      Q.   How long does it take you to write that one

18  page on the white board?

19      A.   It would vary because of other things on

20  the white board that couldn't be removed.  Like, an

21  instructor would leave it up there.  I would have to

22  find another place to write it or write it really

23  small in a corner or something.  There was different

24  problems logistically with getting that on the white

1   board.

2       Q.    If you were to write it out on a piece of

3   paper right here, would it take you more or less

4   than ten minutes to write it?

5           MR. STOKER:   Objection.

6       Q.    Assuming that you still knew it by heart.

7           MR. STOKER:   Objection.

8       A.    I don't know.

9       Q.    Do you think it would take you more or less

10  than ten minutes?

11      A.    Probably more.

12      Q.    Do you think it would take you more or less

13  than 20 minutes?

14      A.    Probably 10, 15 minutes.

15      Q.    It would take you 10 to 15 minutes to write

16  it out?

17      A.    Probably.

18      Q.    And your lunch period was 30 to 40 minutes

19  long?

20      A.    Yes, but we had other activities we had to

21  perform sometimes during lunch.

22      Q.    Do you deny that you misspelled the world

23  "volatile"?

24      A.    I do not.

1      Q.    Were you instructed to memorize the use of

2  force module?

3      A.    I was.

4      Q.    Did any of your classmates fail to memorize

5  it to the best of your memory?

6      A.    Yes.

7      Q.    How many?

8      A.    Well, that is why it took so long.  The

9  entire class had to pass or everyone failed.  My

10  misspelling the word "volatile" resulted in the

11  entire class failing.  Every week we were tested on

12  it.  Different little errors would occur, and that's

13  why it took five weeks.  That was the one I was

14  responsible for.  That continued until the entire

15  class passed.

16      Q.    And your mistake was spelling the word

17  "volatile"?

18      A.    Correct.

19      Q.    Were your other classmates also required to

20  write the use of force module?

21      A.    No.

22      Q.    How were they required to remediate the

23  mistakes that they made?

24      A.    It was not anything I would have seen of,

1    like, writing things on the board.

2         Q.    So it could have been something different?

3         A.    I don't know.

4              MR. STOKER:   Objection.

5         Q.    Would you turn to Paragraph 20.  It says

6    that the academy "required Mr. Turley to endure

7    incessant jokes about his age.  Staff instructors

8    including Sergeant Robert Powers, Instructor Delilah

9    Yee and others repeatedly ridiculed Mr. Turley about

10   his use of Viagra, rotary phones, and numerous other

11   age-related topics," did I read that sentence

12   correctly?

13        A.    Yes.

14        Q.    You wrote that age jokes were made by

15   Sergeant Powers, Delilah Yee and others.  When you

16   say "and others," who are you talking about there?

17        A.    Different instructors that would come in.

18        Q.    Who?

19        A.    I don't remember all their names.

20        Q.    Do you remember any of their names?

21        A.    No.  It would happen during defensive

22   tactics.  Palmaram -- I forget his name.  It was his

23   thing.  That was interesting because he was

24   corrected for it.  Palmaram maybe -- I can't think

1  of his name -- in defensive tactics.   There was

2  another instructor.   Figgy comes to mind, Sue Figgy.

3  She made several comments about my age.

4       Q.   Figgy?

5       A.   I believe that was her name, Susan Figgy or

6  Sue Figgy.

7       Q.   Anyone else?

8       A.   There was an Asian chief of police.   I

9  forget his name exactly.

10      Q.   Did Curt McKenzie ever make any age-

11  related jokes about you?

12      A.   He made references to my age.

13      Q.   What?

14      A.   Something about me being his age, something

15  along those lines; he expected me to excel; that

16  somehow I was representing him or his generation.

17  He wanted more from me or something like that.   I

18  don't remember exactly what he said, but he made

19  age-related comments.

20      Q.   Did you feel that that was an inappropriate

21  comment?

22      A.   I felt I shouldn't be -- yes, I did.

23      Q.   Why?

24      A.   I should not be held to any different

1    standard than any other student.

2         Q.    For how many years were you a corrections

3    officer?

4         A.    I was a corrections officer for 21 and a

5    half years I believe.

6         Q.    Would you say that that counts as some

7    experience in law enforcement?

8              MR. STOKER:  Objection.

9         Q.    You can answer.

10         A.    Yes.

11         Q.    Do you believe you should have been held to

12    a higher standard than everyone else given your

13    lengthy experience in law enforcement?

14              MR. STOKER:  Objection.

15         Q.    You can answer.

16         A.    No.  I believe there should be one standard

17    for performance, not separately.

18         Q.    Regardless of your own experience?

19         A.    I believe a standardized performance

20    criteria is important with anyone, in any situation.

21         Q.    You wrote that they made comments about

22    Viagra, rotary phones, and other age-related topics.

23    Which topics are those, if you recall?

24         A.    It would be geriatric related.  We reviewed

1  crime scene photos in one of the classes, and there
2  was a wheelchair.  Someone mentioned, "That's
3  Turley's chair."
4      Q.   A cadet or instructor?
5      A.   An instructor.  There was a toilet with --
6  like, I don't know what they call it -- the
7  handlebar things to assist an elderly person.  That
8  was supposedly my thrown.  It was jokes like that
9  all throughout the academy, all by instructors.
10     Q.   Any comments from cadets about
11 age-related topics?
12     A.   Not that I can recall.
13     Q.   Would you turn to Paragraph 24.  It says,
14 "In a module of motor vehicle law, Instructor
15 Sgt. Powers clearly expressed his pleasure that
16 Turley's class was not 'ethnically diverse' because
17 the class was made up of apparently 'white'
18 recruits."  Now, what exactly did Powers say?
19         MR. STOKER:  Objection.
20     A.   He said, This is not an ethnically diverse
21 group, and he expressed his pleasure that it was not
22 ethnically diverse.
23     Q.   We will come back to that in a minute.  Is
24 that a direct quote from him or are you paraphrasing

```
 1   that to the best of your ability?
 2        A.   I'm paraphrasing.
 3        Q.   Who witnessed this statement?
 4        A.   That would be the entire 49th ROC.
 5        Q.   When you wrote that the entire class was
 6   made up of apparently white recruits, were every one
 7   of your classmates white?
 8        A.   I can't say for certain, apparently.
 9        Q.   What do you mean "apparently"?
10        A.   Apparently they were all Caucasian.
11        Q.   Why do you say "apparently," though?
12        A.   Well, sometimes...
13        Q.   Is that your belief?
14        A.   That's my belief.  That's how it appeared
15   to me.
16        Q.   You just testified that Sergeant, now
17   Lieutenant, Powers clearly expressed his pleasure?
18        A.   Yes.
19        Q.   What do you mean by that?
20        A.   He either said -- he may have said it, but
21   he definitely expressed it, an exaggerated smile.
22   He may have said that he likes it like that, that's
23   it not ethnically diverse.  He expressed pleasure at
24   it.
```

1      Q.    He may have said that he likes it that it's

2   not ethnically diverse?

3      A.    Yes.  I don't remember an exact quote.  I

4   remember being mad about it.

5      Q.    Is it your testimony that he said he likes

6   it like that?

7      A.    No.  I can't say directly.

8      Q.    So that's not your testimony?

9      A.    He expressed pleasure.  I don't know

10  exactly how he expressed it.  I know he had an

11  exaggerated smile on his face.

12     Q.    What's an exaggerated smile?

13           MR. STOKER:  Objection.

14     A.    Smiling from ear to rear.

15     Q.    Ear to ear?

16     A.    Yes.

17     Q.    Was his mouth wide open?

18     A.    No.

19     Q.    Were his teeth showing?

20     A.    Yes.

21     Q.    Was his tongue hanging out?

22     A.    No.

23     Q.    Was he laughing?

24     A.    No.

1    Q.    But you would describe it as an exaggerated

2 smile?

3    A.    Yes.

4    Q.    Did he tell you that he -- strike that.

5    A.    Possibly.

6    Q.    Sorry?

7    A.    Nothing.   Continue.

8    Q.    Again, you put in your complaint the words

9 "white" and "ethnically diverse" in quotes.   Were

10 those your words or Sergeant Powers' words?

11    A.    "White" in this context would have been

12 mine.   "Ethnically diverse" was a direct quote of

13 his.

14    Q.    Would you turn to Paragraph 25.   This

15 reads, "When student officer Nick Latino described

16 his experience in this class of being pulled over

17 just outside of his own driveway for no apparent

18 reason, Sgt. Powers asked him, 'Is your vehicle

19 ethnically modified,' continuing, 'that could be the

20 reason for the stop.'   Sgt. Powers then went on to

21 advise the student officers that Massachusetts

22 police officers could issue citations to 'ethnically

23 altered vehicles all day long.'   Sgt. Powers later

24 admitted to this commentary and confirmed that he

1   vehicles with equipment violations, correct?

2       A.   That's correct.

3       Q.   Turning to Paragraph 28, I want to look at

4   the third line from the bottom of the paragraph.

5   There are some derogatory terms here that I will

6   read from the complaint.  It says, "Firearms

7   instructors routinely referred to Student Officers

8   as:  faggots, homos and queers among other

9   derogatory terms in the presence of several MPTC

10  Staff Instructors."

11      A.   Yes.

12      Q.   Can you name the firearms instructors that

13  used those homophobic slurs?

14      A.   Primarily it was two.  It would have

15  been -- I believe the name was Bob Cady.  I forget

16  the jurisdiction he works for -- and Sean Shattuck.

17  He's a named defendant.

18      Q.   You said the comments were made in front of

19  several MPTC staff instructors.  Who were those

20  staff instructors?

21      A.   I believe Sergeant Williams was present on

22  the range.  I don't know who was in the classroom.

23  It would have been whatever sergeant was assigned to

24  it.  There was a staff instructor assigned to us

1    each day.  I don't know who exactly would have been

2    assigned to the classroom portion.

3         Q.   You are not sure who the other staff

4    instructors were?

5         A.   No, but they were usually present.  It was

6    so common.  They to be present.

7         Q.   You are not sure which ones they were,

8    though?

9         A.   With the exception of Sergeant Williams,

10   I'm not.  Maybe Sergeant Baran was at the range as

11   well.

12        Q.   To the best of your knowledge, which cadets

13   witnessed this conduct?

14        A.   In the classroom portion at the academy,

15   that would have been the entire class present at the

16   time.  I know there were a few dropouts by the time

17   we came to firearms training.  At the range the

18   class was split in two groups.  It would be the

19   group I was assigned to.

20        Q.   If you look at Paragraph 29, it reads, "By

21   way of example only, during the initial classroom

22   portion of the firearms class training, Instructor

23   Shattuck repeatedly told the class to 'stand like

24   you are getting fucked in the ass, you should be

1    used to it,'" did I read that correctly?

2         A.    You did.

3         Q.    Who did he say that to?

4         A.    The entire class.

5         Q.    The entire 49th class?

6         A.    Yes.  That should have included Bob Cady as

7    well.  Because that was done in the classroom.

8         Q.    Who was the comment directed towards?

9         A.    It was directed towards the entire class.

10        Q.    How many times was this comment made, to

11   the best of your knowledge.

12        A.    That was one they used quite a bit.  They

13   seemed to like that one.  They thought it was

14   instructive in how to hold a firearm in front of

15   you.  This was like their mantra for how to properly

16   hold a firearm, what your body stance should be.

17   This is what they instructed us.

18        Q.    Paragraph 30 says, "At another point

19   Instructor Shattuck placed two fingers under the

20   nose of a student officer and asked, 'Does this

21   smell like your wife?'  When Shattuck noticed that

22   Turley was watching, he turned and asked, 'What is

23   your of fucking problem,'" did I read that

24   correctly?

1    A.    Yes.

2    Q.    Who witnessed this incident?

3    A.    That would have been Nick Latino.  He was a

4    classmate in close proximity.  I believe William

5    Cavanaugh.  There would have been several others

6    that were in close proximity when that occurred.

7    Q.    So to the best of your knowledge, it would

8    have been yourself, Cavanaugh, Nick Latino, and was

9    there somebody else?

10   A.    Maybe Curt Wilkins, possibly Paul Burns.  I

11   know that they were all present in the class.  It

12   would have been the entire class present.  He was a

13   loud guy.  I'm pretty sure he was well heard.

14   Q.    When Shattuck asked, "What is your fucking

15   problem," who was that question directed towards?

16   A.    My issue with this is in this instance when

17   that occurred, I was drilling -- we were doing a

18   firearms retention --

19   Q.    Well, my question was not open-ended.

20   A.    I'm sorry.

21   Q.    I'll ask it again.  When he asked, "What is

22   your fucking problem," who was that directed towards?

23   A.    Me.

24   Q.    Anybody else?

1      A.    No.  It was directly towards me.

2      Q.    You testified that Cavanaugh and Latino

3   were both present with you as well?

4      A.    Yes.

5      Q.    The statement or the question was not

6   directed towards either of them?

7      A.    No.  It was directed towards me.

8      Q.    How do you know that?

9      A.    The comment stands like -- the vulgarity,

10  anyway, it triggered a nervous laughter from some of

11  the classmates.  It didn't trigger it from me.

12         I was with Latino.  I was in close

13  proximity to him.  He was either in restraints at

14  the time wearing my handcuffs or I had just released

15  him from my cuffs when that occurred.  I was right

16  with Latino.  I didn't think it was funny.

17         The others in class, they didn't now how --

18  I don't know why, but it triggered nervous laughter.

19  We discussed it afterwards, especially with Latino.

20     Q.    My question is how do you know it was

21  directed towards you and not --

22     A.    He was very close to me, Shattuck.  He was

23  facing me when he said, "What's your fucking

24  problem?"

1      Q.    So the other people were laughing, and you

2 were the only one who was not laughing?

3      A.    I can't speak for everyone.   I know there

4 was nervous laughter triggered, and he was close and

5 facing me.

6      Q.    Was he looking directly at you?

7      A.    Yes.   We had eye contact.

8      Q.    Did he say your name?

9      A.    No.   At least I don't remember it.   He may

10 have.

11      Q.    Did you say anything to him in response?

12      A.    I don't recall.   I may have.

13      Q.    Paragraph 31 says, "Shattuck's abuse

14 culminated at the academy shooting range in West

15 Springfield.   When a student officer stood in front

16 of one of the firing tables, Instructor Shattuck

17 grabbed his buttocks behind the genitals at the

18 anus, forced his finger into the victim's anus (over

19 the clothing) and proceeded to rub his own genitals

20 against the victim simulating sexual intercourse,"

21 did I read that correctly?

22      A.    Yes.

23      Q.    Did you observe this entire incident as

24 described in Paragraph 31?

1     A.    Yes.

2     Q.    Who else was present for this?

3     A.    That would have been my firearms group.  I

4 can't speak to what everybody saw.  It would have

5 been half the class of the 49th.

6     Q.    Half the 49th class was in firearms with

7 you?

8     A.    Yes.

9     Q.    And that half was present, but you were not

10 sure who saw what?

11    A.    Yes.

12    Q.    But you witnessed the entire incident?

13    A.    I did.

14    Q.    Paragraph 32, "Mr. Turley noticed the

15 student officer was clearly distressed by his sexual

16 assault and walked towards the table to stop it.

17 Again, Mr. Turley acted to interrupt or otherwise

18 interfere with the academy faculty's harassment and

19 discriminatory remarks directed at student

20 officers," did I read that correctly?

21    A.    You read it correctly.

22    Q.    How did you notice that the student officer

23 was clearly distressed?

24    A.    He had the look of terror on his face.  He

1    was a young officer.  He looked clearly distressed

2    to me.

3        Q.   How did you act to interrupt or otherwise

4    interfere with the conduct?

5        A.   I was heading over quickly to stop it.

6        Q.   Did you say anything?

7        A.   I don't recall.

8        Q.   Did you physically remove Shattuck from the

9    cadet?

10       A.   No.  He released him as I approached.

11       Q.   He released him before you could get to

12   him?

13       A.   Yes.

14       Q.   What did you do to interfere, then?

15       A.   I don't know if my presence or my approach

16   is the reason why he released him.  I have no way of

17   knowing.  I believe it might have been a factor.  I

18   don't know.

19       Q.   Paragraph 33 reads, "Seeing Mr. Turley's

20   approach, Shattuck released the victim from but" --

21   there's a typo there -- "then shouted, 'Don't you

22   have a fucking sense of humor Turley?'  Shattuck

23   expressed his intention to retaliate against

24   Mr. Turley when he threatened, 'If you ever

1   graduate, then you can tell me to fuck myself,'" did

2   I read that correctly?

3       A.   You did.

4       Q.   I think you already testified you

5   approached Shattuck, correct?  You walked towards

6   him?

7       A.   Yes.

8       Q.   Paragraph 34 reads, "In retaliation for

9   Mr. Turley's attempt to aid this officer, Instructor

10  Shattuck, who was responsible for scoring the

11  qualifying target for the Program's firearms test,

12  'failed' Mr. Turley," did I read that correctly?

13      A.   Yes.

14      Q.   So you testified that you walked towards

15  Mr. Shattuck, correct?

16      A.   Yes.

17      Q.   And that before you reached him, he

18  released the student officer?

19      A.   That's correct.

20      Q.   So is it your testimony that as a result of

21  your walking towards Officer Shattuck, he failed you

22  on the firearms exam?

23      A.   Yes.  That's my conclusion.

24      Q.   But you didn't do anything other than walk

1  towards him?

2      A.    I had words with Shattuck.

3      Q.    What words were those?

4      A.    When he asked, "Don't you have a fucking

5  sense of humor, Turley," I replied, "This isn't

6  funny." Then when he threatened, "If you ever

7  graduate, then you can tell me to go fuck myself," I

8  told him that I would definitely keep that in mind.

9      Q.    You said, "This isn't funny" and "I will

10  keep that in mind"?

11      A.    Yes.  Anyway, it was difficult to

12  communicate in that environment because of the

13  discipline.

14      Q.    It's your belief that as a result of you

15  walking towards Officer Shattuck and saying, "This

16  isn't funny" and "I will keep that in mind," you

17  believe that he failed you on the firearms exam?

18      A.    In addition to other things.

19      Q.    Which other things?

20      A.    I was pretty loud.  At the range I kind of

21  reached the point where the nervous laughter by my

22  fellow students was no longer acceptable to me.  I

23  spoke to them about it.  I told them quite

24  forcefully, "Don't do it.  You are encouraging more

1    of this behavior."  I was very concerned about Danna

2    at that point.  I knew we would have that instructor

3    again at APP.

4        Q.    You told the cadets not to laugh?

5        A.    Yes.  I spoke to my classmates and told

6    them not to laugh at staff's behavior.  I believe

7    that's the reason why Shattuck retaliated and failed

8    me.

9        Q.    Was Shattuck present for those conversations?

10       A.    I don't know.  I know a staff member was

11   listening.

12       Q.    Who?

13       A.    I don't know.

14       Q.    How do you know a staff member was

15   listening, then?

16       A.    I was told by Student Officer Cunningham

17   that staff was listening to me admonish the students

18   and that I should keep it down.  He was worried

19   about me receiving discipline.  I believe it was a

20   squad leader as well.

21       Q.    So Student Officer Cunningham told you that

22   a staff instructor overheard you telling the other

23   cadets not to laugh at Shattuck's conduct?

24       A.    Plural.  He said, "They are listening.  You

1    better keep it down."

2        Q.    Where were you when you had this

3    conversation with the cadets?

4        A.    Outside at the range.

5        Q.    Who was present for that conversation?

6        A.    It would have been my half of the class.

7        Q.    Were there any instructors present?

8        A.    There were instructors present at the range.

9        Q.    Wouldn't you have known if they were

10   standing near you as you had this conversation with

11   the other cadets?

12           MR. STOKER:   Objection.

13       A.    Well, they were at the range.   They may

14   have been in the shed or off in the range area.   We

15   were off having lunch, which is right at the range

16   kind of.   It's not that big of an area.

17       Q.    So they might have been in the shed while

18   you were having this conversation?

19           MR. STOKER:   Objection.

20       A.    Cunningham indicated that they were

21   listening.   I believed him.

22       Q.    Did he tell you who was listening

23   specifically?

24       A.    No.

1      Q.    Did he tell you how he knew that somebody

2    was listening?

3      A.    He was at the back of the group.  I guess

4    he could see.  I don't know.  I don't know how he

5    came to that conclusion.

6      Q.    And you didn't ask him?

7      A.    I didn't.

8      Q.    Even after you were dismissed, you didn't

9    want to know?

10      A.    I had no contact with Cunningham.

11      Q.    You said that Shattuck was responsible for

12    scoring the firearms exam?

13      A.    Yes.

14      Q.    Was he the only instructor that scored your

15    exam?

16      A.    That I recall.

17      Q.    There was no other instructor that scored

18    your exam?

19      A.    Possibly.  I don't know who looked at my

20    exam.  I don't know.

21      Q.    If you don't know, then why did you write

22    he was responsible for scoring your exam?

23            MR. STOKER:  Objection.

24      A.    I saw him scoring my exam.

1      Q.    But you don't know if anybody else was

2  involved?

3      A.    There were several staff members.

4      Q.    Who?

5      A.    I believe Gaynor would have been in charge.

6  She was the lead.  I believe the title is

7  supervising instructor.

8      Q.    Anybody else?

9            (Robert S. Sinsheimer, Esq., enters)

10     A.    Present that day would have been Bob Cady.

11 I don't know which sergeants from the MPTC would

12 have been assigned to us that day.  It could have

13 been Mark Baran.  I'm not sure.

14     Q.    Could you turn to Paragraph 40, please.

15 Here you wrote, "On November 26th, Sergeant Powers

16 singled out Mr. Turley and ordered him to get a

17 'doctor's note' for a minor back strain and forbid

18 Mr. Turley from attending further police training

19 courses until he did so," do you see that?

20     A.    Yes.

21     Q.    Why is this a problem?

22           MR. KOSTER:  Let the record show that

23 Attorney Sinsheimer just joined us.

24           MR. SINSHEIMER:  Can we take a short recess

1            MR. KOSTER:  We can pause here if you would

2    to take a break.

3            MR. SINSHEIMER:  Thank you.

4            (Recess at 11:30 a.m.)

5            (Wesley Stoker, Esq., exits)

6            MR. KOSTER:  (11:37 a.m.)  So the record is

7    clear, 30 days to read and sign.  We will reserve

8    all objections, except as to form.  We can waive the

9    notary.

10            We were just going through the Plaintiff's

11    complaint, which was marked as Exhibit No. 3.  We

12    will continue to walk through that.  We have just a

13    handful of paragraphs to get through before we

14    finish up with that.

15        BY MR. KOSTER:

16        Q.   The next paragraph, Mr. Turley, is

17    Paragraph 46 of the complaint.  I'll read that to

18    you.  You can read along with me.  It says,

19    "The immediate pretext for Mr. Turley's expulsion

20    from the program was a third 'action notice' issued

21    to Mr. Turley on a quiz testing officers' knowledge

22    of the Standard Field Sobriety Test ('SFST')," did I

23    read that correctly?

24        A.   You did.

1      Q.    We will back to that one.  Other than

2  everything that we just discussed -- well, you know

3  what?  Let's do it this way.  I want to just exhaust

4  this.  Take a look at Paragraph 48.

5      A.    (Examines document)  Yes.

6      Q.    Here you are referring to -- and you can

7  read along with me -- the SFST test, and you wrote,

8  "This twenty-question quiz was administered on the

9  morning of Day 2 of a 3-day course, and prior to the

10  classroom presentation of a majority of the

11  material, although MPTC policy states that 'the

12  passing score on all tests shall be 70 percent,'

13  just prior to Mr. Turley's test, the academy

14  instructors told him that he was required to score

15  80 percent to pass.  Mr. Turley scored 75 percent.

16  The academy now stated that it considered 75 percent

17  a failure; an arbitrary and capricious testing

18  practice," did I read that correctly?

19      A.    Yes.

20      Q.    Is there anything else you want to add to

21  the answer?

22          MR. SINSHEIMER:  Objection to form.  You

23  can answer.

24      A.    Yes.  I believe it was a four-day class,

1    and it says it was a three-day class.  I may have

2    been incorrect when I responded.  It was Day 2 of a

3    four-day class.

4        Q.    So having just reviewed the complaint --

5    sorry, did you have something else you wanted to

6    add?

7        A.    No.

8        Q.    Did you experience any other harassment,

9    again, other than what we just discussed in

10   reviewing your complaint this morning?  Is there

11   anything else that you would like to add?

12       A.    Sorry, the question is was I harassed when

13   I reviewed my complaint?

14       Q.    No.  I'll ask a better question.  We just

15   reviewed your complaint.  This morning we walked

16   through most of the allegations.  The question is,

17   is there any other harassment that you suffered that

18   we did not talk about here this morning?

19       A.    Possibly.  Nothing comes to mind.

20       Q.    Did you experience any other discrimination

21   other than what we discussed this morning to the

22   best of your recollection?

23       A.    Yes.

24       Q.    Could you describe that discrimination to

1    me, please.

2        A.    During physical training, PT, like, the

3    theme of it was my use of Viagra, my age.

4        Q.    When you say during PT, do you mean during

5    the entire year or during just certain PT classes?

6        A.    Pretty much during the entire thing.

7        Q.    Every day?

8        A.    Yes.  That was a daily class.  There might

9    have been a few days where we didn't have it where

10   we were off site.  Like, I don't think we had it

11   during swimming training and things like that.

12       Q.    Any other discrimination?  Anything else

13   that you would like to add, again, to the best of

14   your recollection?

15       A.    Without reviewing further documents,

16   nothing comes to mind.

17       Q.    Did you experience any retaliation other

18   than what we talked about this morning, to the best

19   of your recollection?

20       A.    Well, you know, it became difficult.  It

21   was a difficult environment for me, asking questions

22   in class and being shouted down.  Things like that

23   were occurring.  I mean, it was a very difficult

24   environment.

1     Q.    So at this point have we discussed all of

2    your factual allegations to the best of your

3    recollection?

4     A.    Possibly.

5     Q.    Possibly?

6     A.    Without reviewing further documents, I

7    don't know if we've covered everything.

8     Q.    That's fine.  How would you rate your

9    performance at the academy?

10     A.    Given the circumstances I was in, I would

11    say very good.

12     Q.    Do you know how your exam scores compared

13    to the scores of your classmates?

14     A.    I would have no way of knowing that.

15     Q.    Would you say that you followed

16    instructions while you were at the academy?

17     A.    Yes.

18     Q.    Did you ever fail to follow any instructions?

19     A.    Yes.

20     Q.    When?

21     A.    I didn't shave on Day 2.  I had technical

22    issues with a printer.  I had formatting problems.

23    It was on reports we were required to submit.

24

1                    (Document marked as Turley

2                    Exhibit 4 for identification)

3       Q.    What is an action notice?

4       A.    It's a form of progressive discipline I

5    guess.  It's the training academy's progressive

6    discipline I guess.

7       Q.    Did you receive more than one of these

8    while you were at the academy?

9       A.    Well, they are categorized.  I believe this

10   is the only action notice for disciplinary.  I

11   believe I received one.

12      Q.    Is it your testimony that there are

13   different kinds of action notices to the best of

14   your recollection?

15      A.    Yes.

16      Q.    And this is the only disciplinary action

17   notice that you received?

18      A.    Yes, to my memory.

19      Q.    And we're talking about Exhibit 4.  Just

20   for the record, this is Bates labeled COMMONWEALTH

21   518.  Do you recognize this document?

22      A.    Yes.

23      Q.    What is it?

24      A.    It is an action notice from Sergeant Mark

1    Baran.

2        Q.    Do you see your name and your signature at

3    the bottom?

4        A.    I do.

5        Q.    What date do you see?

6        A.    This would have been the second day of the

7    academy, August 20th.

8        Q.    Of 2013?

9        A.    2013, yes.

10        Q.    Was it a requirement that cadets like

11    yourself be clean shaven every day?

12        A.    Yes.

13        Q.    So let's look at the paragraph in the

14    middle here.  It reads, "On Tuesday, August 20,

15    2013, as part of the daily uniform and personal

16    inspection, it was determined that Student Officer

17    Turley had not shaven that morning as required by

18    the MPTC's Student Officer Guide.  The fact that

19    this was the second day of the academy shows a

20    blatant disregard for the academy rules," did I read

21    that correctly?

22        A.    You did.

23        Q.    Do you deny that you failed to shave that

24    day?

1       A.   I don't.

2       Q.   Why didn't you shave that day?

3       A.   Well, the reason why was I just -- I

4  received, like, little sleep.  I had other equipment

5  issues I had to address.  I had a long commute.  I

6  just didn't get to it.

7       Q.   You had a long commute?

8       A.   Yes.

9       Q.   Where were you commuting from?

10       A.   Clinton.

11       Q.   Is that a long commute to the academy in

12  Springfield?

13       A.   Yes.

14       Q.   So you just didn't get around to shaving?

15       A.   Yes.  I neglected to shave.

16       Q.   Did you think that you were exempt from the

17  shaving requirement?

18       A.   No.

19       Q.   Do you believe it's important for cadets to

20  follow all the rules, even the rules regarding

21  personal appearance?

22       A.   I do.

23       Q.   Do you think you deserved to receive this

24  action notice for failing to shave?

```
1        A.    I do.

2              (Counsel confers with witness)

3              MR. KOSTER:  This is Bates No.

4   COMMONWEALTH 572.  We can mark it.

5                    (Document marked as Turley

6                    Exhibit 5 for identification)

7        Q.    Do you recognize this document?

8        A.    (Examines document)  Yes.

9        Q.    What is it?

10       A.    It's a disciplinary notice.

11       Q.    Another action notice?

12       A.    Yes.

13       Q.    Is that your name at the bottom?  Is that

14  signature?

15       A.    Yes.

16       Q.    Dated September 30, 2013?

17       A.    Yes.

18       Q.    In the middle it says, "On Monday,

19  September 30, 2013, Student Officer Turley stood in

20  PT formation and failed to apply his run cadence to

21  his water bottle as directed by PT staff.

22  Twenty-Six of his fellow Student Officers understood

23  and followed the instructions as given," do you see

24  that?
```

1    A.    Yes.

2    Q.    What is a run cadence?

3    A.    The class runs in formation.  There's a

4    cadence.  It's like a song to keep pace.  You may

5    have seen it in military movies.  There's different

6    cadences.  Every student was to come up with a

7    cadence for the run, and we'd use them during our

8    class runs.

9    Q.    So when it says you were supposed to apply

10   your cadence, does that mean -- I'm a civilian so

11   I'm just asking -- does that mean you would have to

12   put your cadence in writing and tape it to your

13   water bottle?

14   A.    Yes.

15   Q.    Were you instructed to do that?

16   A.    I don't believe I was.  I believe the

17   instructions were ambiguous.  I did have my cadence.

18   It was just not affixed to my water bottle.  I was

19   confused about that.

20   Q.    Do you see where it says, "Twenty-six of

21   his fellow Student Officers followed the

22   instructions"?

23   A.    Yes.

24   Q.    So you didn't understand it, but 26 other

```
1     students did understand the instructions?

2            MR. SINSHEIMER:   Objection.

3        A.   That's not correct.

4        Q.   Which part is not correct?

5        A.   There were 26 other students, but Justin

6     Kuras, I believe was the name, also did not have his

7     affixed to his bottle.  There were two of us that

8     were reprimanded for this.

9        Q.   So two out of 26 didn't understand the

10    instructions?

11       A.   We were confused about the instructions,

12    yes.

13       Q.   What didn't you understand about the

14    instructions?

15       A.   I just didn't understand it was supposed to

16    be affixed to the water bottle.  I knew we had to

17    have it, and I had it.

18       Q.   You testified as to your last action notice

19    regarding shaving that you were really tired and

20    that that was one of the reasons why you didn't

21    shave.  Did any fatigue contribute to your failure

22    to understand the instructions here?

23       A.   No.

24       Q.   What is a To/From Report?
```

1    To/From on this topic, and this is how long it needs

2    to be"?

3         A.    Yes.

4         Q.    These To/From Reports, were they supposed

5    to be in a specific format?

6         A.    Yes.

7         Q.    How do you know what the right format is?

8         A.    It was specified by the academy.

9              MR. KOSTER:  This next document will be

10   marked as Exhibit No. 6.  It's labeled

11   COMMONWEALTH 221.

12                        (Document marked as Turley

13                        Exhibit 6 for identification)

14        Q.    What we just premarked as Exhibit 6, Page

15   221, is this how the To/From format was specified?

16        A.    Yes.  That looks familiar.

17        Q.    Did you follow this format when you were

18   writing To/From memos?

19        A.    Yes.  I had difficulty with it.  I had some

20   issues with the formatting.

21        Q.    What issues did you have?

22        A.    I had technical issues and financial ones.

23   I had a really old computer and old printer.  I

24   didn't anticipate -- I really couldn't afford to buy

1    a new printer or computer.  I had several problems

2    with the formatting, but I ultimately overcame it by

3    basically e-mailing my stuff to another student for

4    printing.

5        Q.   What kind of computer was it?

6        A.   My computer?

7        Q.   Yes, that you were working on.

8        A.   I'm going to say a Dell.

9        Q.   Was it running Windows as an operating

10   system?

11       A.   Yes, an old version of Windows.

12       Q.   Do you know which version?

13       A.   No.

14       Q.   Was it really old?

15       A.   Old.

16       Q.   Was it, like, Windows '95?

17       A.   Possibly.

18       Q.   Did you have Microsoft Word on the computer?

19       A.   I did.

20       Q.   As a general matter with these To/Froms,

21   did you proofread them for spelling mistakes?

22       A.   Yes.

23       Q.   And grammar mistakes?

24       A.   I wrote so many of them.  There may have

1   some issues with that as well.

2      Q.   Did you do your best to proofread them

3   generally?

4      A.   Generally.  I proofread better with paper.

5   Then I would go back and make the adjustments.

6      Q.   I do the same thing.  That's why I'm

7   sitting here with paper.

8      A.   It's an old habit, and with the printer

9   issues, it made some of my editing difficult.

10     Q.   But to the best of your ability, you

11  proofread your work before you submitted it?

12     A.   Correct.

13     Q.   What would happen if you submitted a

14  To/From Report that failed to comply with this

15  format that we see in Exhibit 6?

16     A.   That was common.  We would rewrite it.  We

17  would be required to rewrite it and make the

18  necessary corrections.

19     Q.   Did you ever submit any To/From Reports

20  that failed to comply with this format in Exhibit 6?

21     A.   Yes.

22              (Document marked as Turley

23              Exhibit 7 for identification)

24     Q.   Mr. Turley, this document is Bates labeled

1    officers, generally speaking?

2        A.    With some exceptions, yes; generally

3    speaking, yes.

4        Q.    So here we have this To/From Report that

5    was marked as Exhibit 7.   Do you see any formatting

6    mistakes here?

7        A.    Not offhand.   Oh, it looks like a double

8    space there.   Yes, I double spaced it there at the

9    top.

10       Q.    The heading was double spaced?

11       A.    Yes.

12       Q.    Did you proofread this one before you

13   submitted it?

14       A.    I believe I did.

15       Q.    How did you miss that?

16       A.    Again, I had some technology issues.   This

17   is very early on in the academy.   Those issues would

18   not have been resolved at this point.   This is for

19   the shaving incident.

20       Q.    You said you had Microsoft Word on your

21   computer?

22       A.    Yes.

23       Q.    That has formatting capabilities, doesn't

24   it?

1      A.    Yes.

2            MR. KOSTER:   The next document is labeled

3   COMMONWEALTH 587.

4                    (Document marked as Turley

5                    Exhibit 8 for identification)

6      Q.    This is a To/From Report dated October 31,

7   2013, correct?

8      A.    (Examines document)  Yes.

9      Q.    Do you see any mistakes in this short

10   paragraph?

11      A.    Yes.

12      Q.    What do you see?

13      A.    "Of" was used in place of "for."

14      Q.    So it's a typographical error?

15      A.    Yes.

16      Q.    Do you know if you proofread this one

17   before you submitted it?

18      A.    I don't.

19      Q.    Even if you did, it looks like you missed

20   that typo, correct?

21      A.    I did.

22      Q.    Didn't you just testify attention to detail

23   is important in policing?  That was your testimony,

24   right?

1      A.     Yes.

2             MR. KOSTER:  For the record, our next

3      exhibit is going to be two documents together, 588

4      and 589.

5                       (Document marked as Turley

6                       Exhibit 9 for identification)

7      Q.     The first page, Bates labeled COMMONWEALTH

8      588, is dated November 1, 2013.  The second page is

9      dated November 4, 2013.  Both are called "Study

10     Plan."  If you look at the first page, Mr. Turley,

11     do you see any mistakes here?

12     A.     (Examines document)  Yes.

13     Q.     What do you see?

14     A.     The margin is incorrect.

15     Q.     What else?

16     A.     I improperly referred to an exam.

17     Q.     You wrote "first exam"?

18     A.     Yes.

19     Q.     But you should have wrote second exam; is

20     that right?

21     A.     That's correct.

22     Q.     Any other mistakes?

23     A.     Oh, the "faithfully submitted" I guess

24     should have been respectfully submitted, which was

1    not picked up on the one the day before.

2        Q.    You wrote "faithfully submitted," but you

3    should have wrote respectfully submitted?

4        A.    Yes.   That may not be a problem.

5        Q.    Let's look back at the To/From sheet marked

6    as --

7        A.    I only say that because the day before

8    "faithfully submitted" was not indicated as a

9    problem on the previous exhibit.

10       Q.    Let's look back to Exhibit 6.

11       A.    (Examines document)   Yes, yes.   I received

12   it, yes.

13       Q.    That's the To/From template.   What it does

14   it say you are supposed to write?

15       A.    Respectfully.   Yes, so it would have been

16   incorrect.

17       Q.    And it looks like you fixed all of those

18   problems on the second page of Exhibit 9, correct?

19       A.    Yes.

20       Q.    The first page is dated November 1st.   Did

21   you have your new computer by then?

22       A.    No.   I had a separate issue on this one.

23       Q.    What was that issue?

24       A.    October 31st I actually returned to the

1    city to Trick or Treat with my kids.  I was in an

2    extreme time crunch to get bet back up to

3    Springfield.  I neglected to correct this or

4    properly proofread it.

5        Q.   What day of the week was Halloween?

6        A.   I don't remember.

7        Q.   Was it a weekday as opposed to the weekend?

8        A.   I am assuming it was -- I don't know.  I

9    don't know when it was in 2013.

10       Q.   You testified you were under a time crunch?

11       A.   Yes.  Like, I had a lot going on.

12       Q.   What things did you have going on?

13       A.   My kids were very young.  Every year I was

14   the Incredible Hulk.  That required a lot of green

15   makeup.  My kids were missing me.  I was away from

16   the home.  I put the green makeup on.  Then I had to

17   get it off.  I could not show up at the academy with

18   green makeup on.  I was under a time crunch.

19       Q.   And you were missing the family and wanting

20   to spend time with them for Halloween; is that

21   right?

22       A.   Yes.

23       Q.   I can understand.

24       A.   Yes.  It's big holiday for the kids.

1     Q.    Then you submitted this report the next

2  day?

3     A.    This was November 1st.  Yes.

4     Q.    Did you proofread this one?

5     A.    Yes, I did, but not adequately apparently.

6     Q.    Not thoroughly?

7     A.    Not thoroughly.

8     Q.    The next exhibit will be these three

9  documents, Mr. Turley.

10              (Documents marked as Turley

11              Exhibit 10 for identification)

12     Q.    Here we have three To/From Reports stapled

13  together.  They are all dated August 23, 2013.  They

14  are Bates labeled COMMONWEALTH 594, 595 and 596.

15  Let's look at the first page here.  The subject line

16  is "Differences Between Unlawful and Illegal."  Do

17  you see any mistakes on this one, Mr. Turley?

18     A.    (Examines document)  Yes.

19     Q.    What do you see?

20     A.    The margin and some typos.

21     Q.    How many typos do you see?

22     A.    I see four.  Four are indicated.

23     Q.    If you look at the last sentence, it reads,

24  "The ability to speak calmly, and uses the language

1   with confidence, will many times deescalate the

2   chaotic atmospheres they often find themselves in,"

3   do you see that?

4       A.   Yes.

5       Q.   Is that a mistake there when you use the

6   words "uses the language with confidence"?

7       A.   Yes.

8       Q.   Turn to the next page, COMMONWEALTH 595.

9   The context is the same.  The date is the same.  Do

10  you see any mistakes here?

11      A.   Yes.

12      Q.   What do you see?

13      A.   A margin issue.

14      Q.   Did you proofread this one?

15      A.   Yes.

16      Q.   But you missed the margin issue?

17      A.   Apparently, yes.

18      Q.   Look at the third page, Page 596.  Do you

19  see any mistakes here?

20      A.   (Examines document)  No.

21      Q.   So it took you three tries to draft a

22  To/From Report that complied with the requirements?

23      A.   Yes.  Again, this was early in the academy.

24  I still had those technical issues at the time

1    "use"?

2         A.    Oh, no.  My ability to edit was hindered by

3    not having a printed copy in front of me, as I

4    explained earlier.

5         Q.    You couldn't just read that sentence on the

6    screen?

7         A.    I could.

8         Q.    But you didn't?

9         A.    I probably did.  I missed the typo I guess.

10   I edit better with a printed copy.

11              MR. KOSTER:  This next exhibit is going to

12   be No. 11.  Here we have four pages together, Bates

13   labeled COMMONWEALTH 590, 597, 601, 602.

14                    (Documents marked as Turley

15                    Exhibit 11 for identification)

16        Q.    Let's look at the first page, COMMONWEALTH

17   590.  Take a moment to read this report, please,

18   just the first page of this exhibit.  Let me know

19   when you are finished.

20        A.    (Examines document)  Okay.

21        Q.    This document is called "Equipment

22   Deficiency."  Am I correct to say you wrote this

23   because you were told to write this because you

24   didn't write your name on your dictionary on the

1    front cover as you were instructed to do?

2         A.    No, no.  We were instructed to write our

3    name on the dictionary.  I'm pretty sure no matter

4    how you wrote your name on the dictionary, it would

5    have been incorrect.  I wrote it on the side of the

6    dictionary.  It was not specified.  And then it was

7    at Day 1, and so it was identified...

8         Q.    Day 1 was August 19?

9         A.    Yes.

10        Q.    And this says, "Friday, August 23."

11        A.    Oh, oh.  Sorry, sorry, sorry.

12        Q.    Let's look at the second one where --

13        A.    Oh, right, right, right.

14        Q.    -- it says, "My dictionary did not have my

15   last name on the front cover, as I was instructed to

16   do."

17        A.    Correct, correct.

18        Q.    So you were instructed to write your name

19   on the front cover?

20        A.    Right, right.  I would have received that

21   instruction on Day 1.

22        Q.    And you failed to write your name on the

23   front of the dictionary?

24        A.    Apparently.

1    Q.   And you failed to do so?

2    A.   Yes.

3    Q.   The next document is Bates labeled

4 COMMONWEALTH 597, the second page, if you turn the

5 page, please.  It's also called "Equipment

6 Deficiency."  Here the first sentence says -- well,

7 first let me ask you, do you see any formatting

8 mistakes here?

9    A.   (Examines document)  Yes.

10    Q.   What do you see?

11    A.   There should be a space after "sir."

12    Q.   You left out the space after "sir" in the

13 first paragraph?

14    A.   Yes.

15    Q.   The first sentence says, "On August 19,

16 2013 I was made aware of my failure to properly

17 place my name onto my law books," did I read that

18 correctly?

19    A.   Yes.

20    Q.   Were you instructed to write your name on

21 your law books?

22    A.   Possibly.

23    Q.   Why do you say, "possibly"?

24    A.   I don't remember.

1      Q.    You wrote here that you failed to properly

2   place your name on your law books, correct?

3      A.    Yes.

4      Q.    How do you know it was proper or improper

5   if you were not told to do it?

6      A.    It must have been pointed out to me at some

7   point.

8      Q.    Why didn't you write your name on your law

9   books?

10      A.    I'm sure I did, but it may not have been in

11   the right location.

12      Q.    You wrote here, "I was made aware of my

13   failure to properly place my name onto my laws

14   books."

15      A.    Correct.

16      Q.    "I understand this matter is not acceptable

17   and reflects poorly on my ability to process details

18   and instructions.  I have corrected this by writing

19   my name onto the equipment."

20      A.    Oh, on the face of the law books, yes.

21   Yes, my name -- I don't know.  I didn't -- this

22   refers to Day 1 instruction.  It's an intense day of

23   instruction.  It's, you know -- this is common to

24   everyone, these types of deficiencies.

1    Q.    Did you see anything in the To/From format

2    that said that the rules didn't apply on the first

3    day?

4    A.    What rules?

5    Q.    On the To/From formatting that we marked as

6    Exhibit 6, do you see anything that says -- was it

7    6?  Yes, Exhibit 6.  Do you see anything in there

8    that says the formatting rules, for example, don't

9    apply on the first day or that they only take effect

10   starting the second day?

11   A.    No, I don't see that.

12   Q.    Still turning your attention to

13   COMMONWEALTH 597, do you see where you put a comma

14   after "sir"?

15   A.    Yes.

16   Q.    Is that proper?

17   A.    You mean 601?

18   Q.    No, 597.  You wrote "sir" with a comma, do

19   you see that?

20   A.    Yes.

21   Q.    Was it proper to use a comma?

22   A.    Grammatically or format-wise?

23   Q.    Format-wise.

24   A.    No.

1      Q.    You should have used a colon, correct,

2  according to Exhibit No. 6?

3      A.    Yes.

4      Q.    On the third page of the same exhibit,

5  COMMONWEALTH 601, called "Equipment Deficiency

6  Raincoat," do you see any formatting mistakes on

7  this one?

8      A.    (Examines document)  Yes.

9      Q.    What do you see?

10     A.    The heading is double spaced.

11     Q.    How about the comma after "sir," is that a

12  mistake?

13     A.    Yes.  By the instructions, it's a mistake.

14     Q.    Did you proofread this one?

15     A.    Yes.

16     Q.    But you still missed those mistakes?

17     A.    I did.

18     Q.    At the bottom we see handwritten language

19  that says, "Duty belt set up?  Patches wrong

20  sleeves?  No documentation addressing these issues,"

21  all handwritten.  Do you know what that means?

22     A.    "Duty belt set-up," I believe that is my

23  gun belt and my equipment on the gun belt.  I

24  believe I set it up prior to the academy based on my

1    previous training, and they didn't want that.  It

2    was not written in the rules anywhere, but they

3    didn't like it.

4        Q.   What wasn't written in the rules?

5        A.   We were required to have all the equipment

6    for our duty belt, but whether or not it was set up,

7    I don't think there was any instruction to us prior

8    to Day 1.  I think we had to have it.  They wanted

9    it in individual pieces, not set up on the belt.  I

10    think I made a mistake.

11        Q.   I understand.

12        A.   The patches, we wore two patches on the

13    khaki uniform.  One would be our sponsoring

14    department.  The other would be the academy patch.

15        I believe the dry cleaning, I didn't

16    inspect it, and the dry cleaners had reversed it.

17    They were on the wrong sleeves.  They would specify

18    which patch goes which way on which sleeve.

19        Q.   Were they Velcro?

20        A.   No.

21        Q.   Were they sewn on?

22        A.   Yes.

23        Q.   The dry cleaners unsewed them and then

24    sewed them back on the wrong sleeves?

1     A.    No, no.  When you purchase a uniform, it
2  doesn't come with patches on it.  You are issued
3  patches.  Then you take it to the cleaners.
4     Q.    So you asked the cleaners to put them on?
5     A.    Yes.
6     Q.    I understand.  Go to the next page, please,
7  COMMONWEALTH 602.  Do you see any formatting
8  mistakes in this one?
9     A.    (Examines document)  Yes.
10    Q.    What do you see?
11    A.    Spacing on the heading.
12    Q.    If you look at the second paragraph, the
13 last sentence in the second paragraph reads, "An
14 officer's inattention to detail could, to only to a
15 botched investigation, but result in personal injury
16 or death as well," do you see that?
17    A.    Yes.
18    Q.    Did I read that as you wrote it?
19    A.    Yes.
20    Q.    There are some typographical mistakes in
21 that sentence, right?
22    A.    Correct.
23    Q.    You testified that it's essential -- and
24 that's the word you used -- for police to pay

1    attention to detail; is that correct?  That's what

2    you said today?

3         MR. SINSHEIMER:  I think you asked that

4    three times now.  You don't get to ask that for

5    every single question.  I object on the grounds that

6    it was asked and answered.  I will let him answer

7    one more time.

8         Q.   You can answer.

9         MR. SINSHEIMER:  You can answer.

10        A.   Yes, details are important.

11        Q.   Do you believe that report writing is an

12   important skill for a police officer?

13        A.   Yes.  It's essential.

14        Q.   You made formatting or grammatical mistakes

15   in multiple reports here; isn't that right?

16        A.   The first week of the academy, that's

17   correct.

18        Q.   Only in the first week of the academy?

19        A.   That was my most difficult period.

20        Q.   None of these reports were dated after the

21   first week of the academy?

22        A.   I don't know.

23        Q.   How about the report marked as Exhibit 9

24   and dated November 1, 2013?

1    A.    I don't know.  I don't have the whole

2    curriculum in front of me.  There's many topics that

3    we were tested on.

4    Q.    So there's other topics that should be

5    included here, but you just don't know what they

6    are?

7    A.    Not offhand.

8    Q.    What would you have to look at to be able

9    to determine what else should be here?

10         MR. SINSHEIMER:  Objection to form.

11   Q.    You can answer.

12   A.    I don't know, MPTC documents and what we

13   were tested on I guess.

14   Q.    Do you recall the firearms exam on

15   November 8, 2013?

16   A.    I recall a firearms exam, if that's the

17   date.  Yes, roughly that date.

18              (Document marked as Turley

19              Exhibit 12 for identification)

20   Q.    This is Exhibit 12, Bates labeled

21   COMMONWEALTH 528.  Do you recognize this document,

22   Mr. Turley?

23   A.    (Examines document)  I do.

24   Q.    What is it?

1     A.   It's an Action Notice in the performance

2 category.

3     Q.   Do you see your name and signature at the

4 bottom?

5     A.   I do.

6     Q.   If you look at the first sentence in the

7 box, the big box in the middle of the page, if you

8 read that along with me, it says, "On November 8,

9 2013, SO Turley did not satisfactorily obtain a

10 passing score on the mandatory firearms

11 qualification," did I read that correctly?

12     A.   You did.

13     Q.   Why did you fail the firearms test?

14     A.   I did not fail the firearms test.

15     Q.   And why do you say you didn't fail the

16 firearms test?

17     A.   I don't believe I failed.

18     Q.   Why not?

19     A.   Because I thought my grouping of bullet

20 holes in the target was consistent with every other

21 firearms test that was taken.  It was a tight,

22 slightly left group of bullet holes.  I was told

23 that one round was unaccounted for out of 50.  I

24 believe I passed that test, though.

1       Q.    How many attempts did it take for you to --
2   how many tries did -- how many attempts did you
3   undertake in the firearms exam?   Sorry.
4       A.    I don't remember.
5       Q.    It's your testimony that you looked at your
6   target?
7       A.    I looked at my target every time.
8       Q.    And all of your rounds were accounted for?
9       A.    I didn't have the opportunity to count my
10  rounds.
11      Q.    So how do you know they were all accounted
12  for?
13      A.    I know based on my prior experience.
14      Q.    What do you mean?
15      A.    I fired the same weapon for 20 years.  We
16  may have had a different weapon when I first
17  started.  I never had a problem with firearms
18  qualification before or since, though.
19      Q.    So it's your testimony that because you
20  never had a problem in the past, you didn't have a
21  problem here?
22          MR. SINSHEIMER:   No.  He said, "before or
23  since."
24      A.    That's correct.

1     Q.   What score would you have gotten if you

2  hadn't not been allegedly wrongfully failed?

3     A.   I was not in a position to score the

4  target.  I don't know.  I've always scored very

5  high.

6     Q.   So you would have scored very high?

7     A.   I believe, yes.

8     Q.   And what is that based on?

9     A.   We received the same -- it's a 50-round

10  course with the Suffolk County Sheriff's Department.

11  I trained with that exact same weapon for many

12  years.

13     Q.   Is it possible you just didn't perform well

14  enough to pass?

15     A.   Unlikely.

16     Q.   It's unlikely?

17     A.   (Witness nods)

18     Q.   Would you say it's impossible that you

19  didn't perform well enough to pass?

20     MR. SINSHEIMER:  Objection to form.  You

21  can answer.

22     A.   Nothing is impossible.

23     Q.   So are you at all to blame for your failure

24  to pass the firearms test?

1          MR. SINSHEIMER:  Objection.  Hold on a

2     second.

3          MR. KOSTER:  I can ask him a different

4     question.

5     Q.    Are you at all to blame for the results of

6     the firearms exam?

7          MR. SINSHEIMER:  Hang on one second.  You

8     mean for the report that -- I object to that.  I

9     think that's a bad question.  He can answer, but I

10    object to form.

11    A.    Again, I don't believe I failed the

12    firearms exam.

13    Q.    Do you believe that your performance was

14    flawless?

15    A.    Firing a weapon?

16    Q.    Yes.

17    A.    I'm pretty good.  No one is flawless.

18    Q.    After you were told you failed -- and I

19    know you say you really didn't fail -- who at the

20    academy did you complain to about this?  Who did you

21    tell?

22    A.    Nobody.

23    Q.    Did you tell anybody at the MPTC?

24    A.    No.  Sorry.  What's the time frame for that

1    passed in -- it took two attempts?

2        A.    Roughly half, I guess.

3        Q.    Going back to the row under Comments, what

4    do you see written there?

5        A.    (Examines document)

6        Q.    Do you see where it says, "Turley failed to

7    qualify unaccounted for rounds each attempt"?

8        A.    Yes.

9        Q.    Do you deny that you had unaccounted rounds

10   on each attempt?

11       A.    Yes.

12       Q.    So do you believe that whoever wrote this

13   is lying?

14           MR. SINSHEIMER:  Object to form.  You are

15   not allowed to ask that.

16       Q.    You can answer.

17           MR. SINSHEIMER:  Hold on one second here.

18   No.  You can ask it.  In a deposition maybe you can

19   do so.

20           MR. KOSTER:  I can ask that here.  We are

21   not at trial.

22           MR. SINSHEIMER:  Yes.  I won't instruct him

23   not to answer.  You can answer.

24       A.    I believe this is inaccurate.

1       Q.    Because you don't believe you shot any

2   accounted for rounds?

3       A.    I don't have faith in this document.

4       Q.    Still looking at your row, do you see the

5   column called "Round Accountability"?

6       A.    Yes.

7       Q.    Do you see where it says, "5 UN"?

8       A.    Yes.

9       Q.    Do you know what that means?

10      A.    I don't.

11      Q.    Do you think that means unaccounted for

12  rounds?

13      A.    Possibly.

14      Q.    Turning to the second page of the exhibit,

15  please, 2915, you will see in the top left it says,

16  "49th MPC Qualification Score Sheet, November 8,

17  2013."  At the bottom you will see first -- at the

18  very bottom right it says, "First Attempt" in

19  handwriting, do you see that, where the words "First

20  Attempt" were handwritten?

21      A.    (Examines document)  No.  I'm sorry.

22      Q.    Are you on Page 2915?

23      A.    Right.

24      Q.    At the bottom right "First Attempt" is

1   this document, why didn't you pass the first attempt

2   of the firearms qualification?

3         MR. SINSHEIMER:   Object to the form of the

4   question.

5         Q.   You can answer.

6         A.   If those are indicating misses, it would be

7   for unaccounted rounds.   This would indicate, yes,

8   they were for unaccounted for rounds.

9         Q.   Do you dispute you had unaccounted for

10  round in the first attempt?

11        A.   Yes, I would dispute it.

12        Q.   If you look through here, you will see --

13  well, let's look at the top row.   The name is

14  redacted.   You will see under 10 yards, there's

15  9 hits and 1 U.   Below that there's 9 hits and 1 U.

16  Let me ask a better question.   There were cadets

17  that had unaccounted for rounds; is that right?

18        A.   Yes.

19        Q.   In fact, the only cadets that did not have

20  unaccounted for rounds were the cadets that actually

21  passed; isn't that right?   Strike that question.

22        I would like to turn to the third page of

23  Exhibit 13.   Do you see at the bottom handwritten

24  "Second Attempt"?

1      A.    Yes.

2      Q.    Do you see your name on this document?

3      A.    Yes.

4      Q.    Let's look at it again.   15 yards has

5    6 hits, 2 unaccounted and 2 miss.   10 yards has

6    9 hits, 1 miss; 7 yards:   10 hits; 5 yards:

7    10 hits; 3 yards:   10 hits; Pistol Score 0;

8    Remedial, yes, do you see that?

9      A.    Yes.

10     Q.    Did I read that correctly?

11     A.    Yes.

12     Q.    According to this document, why did you

13   fail the second attempt?

14          MR. SINSHEIMER:   Objection to the form of

15   the question.

16     A.    According to this document, there are

17   unaccounted for rounds.

18     Q.    At 15 yards?

19     A.    Yes.

20     Q.    Do you deny that you shot two unaccounted

21   for rounds at 15 yards in your second attempt?

22     A.    I would dispute the accuracy of this entire

23   document.

24     Q.    Would you turn to the fourth page,

1    Page 2917.  This indicates 15 yards -- well, at the

2    bottom it says, "Third Attempt."  It indicates

3    15 yards:  6 hits, 1 unaccounted for round; 3

4    missed; 10 yards:  10 hits; 7 yards:  9 hits,

5    1 miss; 5 yards:  9 hits, 1 unaccounted for;

6    3 yards:  9 hits, 1 miss; Pistol Score 0; Failed to

7    qualify, did I read that correctly?

8         A.   Yes.

9         Q.   Am I correct to assume that you dispute

10   that you shot any unaccounted for rounds in your

11   third attempt?

12        A.   I would dispute anything the firearms staff

13   recorded on my behalf.

14        Q.   All of them?

15        A.   Yes.

16        Q.   I think you testified that you were given a

17   second chance to pass the firearms qualification; is

18   that right?

19        A.   Yes.

20        Q.   And you ultimately did pass?

21        A.   That's correct.

22        Q.   Let's turn to the last page of this

23   exhibit, please, COMMONWEALTH 2918.  Do you see the

24   date?  It's a little cut off, but I think it has

1    November 21, 2013 in the top left corner?

2        A.    (Examines document)  Yes.

3        Q.    At the bottom right it's typed Remediation/

4    Requalification, do you see that?

5        A.    Yes.

6        Q.    How many times did it take you to pass the

7    second attempt?  How many attempts did you have?

8        A.    Two.  It looks like two.

9        Q.    Looking at your first attempt, we see at

10   15 yards you had 4 hits, 5 misses and 1 unaccounted

11   for rounds.  At 10 yards you had 8 hits and 2

12   misses.  At 7 yards you had 5 hits and 2 misses.  At

13   5 yards you had 10 hits.  At 3 yards, 10 hits.

14   Pistol Score is 0.  Remedial is passing, did I read

15   that correctly?

16       A.    Yes.

17       Q.    On your remedial exam, did you have a

18   chance to look at the target?

19       A.    Sorry?

20       Q.    On November 21, 2013, when you took the

21   remedial exam, the score sheet we are looking at

22   right now, did you have the opportunity to review

23   your target that day?

24       A.    This would indicate two targets.  I don't

1   remember looking at either one of them.

2       Q.   Do you dispute that you shot an unaccounted

3   for round at 15 yards on your first attempt in your

4   second qualification?

5       A.   I would dispute anything the firearms staff

6   recorded on my behalf.

7       Q.   It looks like you had a perfect score on

8   your second attempt, right?

9       A.   (Witness nods)

10      Q.   Do you dispute that too?

11      A.   I would consider that entire staff

12  unreliable.

13      Q.   That's not what I asked you.

14      A.   Yes.  I would dispute all of it.

15      Q.   So you dispute that you got a perfect store

16  on the second attempt?

17      A.   (No response)

18      Q.   It's a yes or no question.

19      A.   Yes.  I consider this all unreliable.

20      Q.   So you think you scored less than perfect?

21      MR. SINSHEIMER:  It's a trick question.

22  You can answer the question any way you want.

23      A.   I believe I'm a good shot.  That's probably

24  the most closely aligned with the truth that they

1    recorded.

2         MR. SINSHEIMER:   Off the record.

3         (Discussion off the record)

4    Q.   Who scored you on the remediation on

5    November 21st?

6    A.   I believe I was the only shooter there, and

7    there was three instructors present or at least two

8    instructors present, and the academy director was

9    present.

10   Q.   Who scored you?

11   A.   I believe it would have been Sean Shattuck

12   and Nicole Gaynor on the remediation.

13        MR. KOSTER:   We can take a lunch break at

14   this point.

15        (Recessed for lunch at 1:00 p.m.)

16

17

18

19

20

21

22

23

24

1          AFTERNOON SESSION   (1:37 p.m.)

2              TIMOTHY M. TURLEY, Resumed

3      BY MR. KOSTER:

4      Q.   Back on the record.  Mr. Turley, we were

5  just talking about the firearms.  I have a few more

6  questions about that before I move on.

7           Which is your dominant shooting hand?

8      A.   That would be my right hand.

9      Q.   Turning back to your complaint, which I

10  think we marked as Exhibit 3, please, if you could

11  turn to Paragraph 34 on Page 7.

12     A.   (Examines document)

13     Q.   Are you there?

14     A.   Yes.

15     Q.   Paragraph 34, looking at the third line

16  down starting with "Mr. Turley has trained," it

17  says, "Mr. Turley has trained in the use of firearms

18  for over 20 years and has never previously had

19  difficulty passing a firearms exam - yet.

20  Instructor Shattuck found Mr. Turley's performance

21  inadequate," do you see that?

22     A.   Yes.

23     Q.   What did you mean by that statement?

24     A.   I'm experienced with a firearm.  I had to

1  qualify for my employment for many years, and this

2  is the first time I ever had difficulty.

3      Q.   Does that mean that you never shot an

4  unaccounted for round in your life?

5      A.   Does this mean that?

6      Q.   Does that mean that when you say that?

7          MR. SINSHEIMER:  I'm going to object.  I

8  didn't object because Wes had started this.  I

9  signed the complaint.  He didn't.  It's not a

10 verified complaint.  The questions used to refresh

11 his testimony are fine.  He can testify as to the

12 facts he knows from his own life, though.

13         MR. KOSTER:  I can ask a different question.

14         MR. SINSHEIMER:  It's not a big deal

15 objection.  I don't want a guy to get on the witness

16 stand and impeach him with a complaint that someone

17 else signed.  It's not verified.  I've been a

18 stickler on that throughout my career.

19         MR. KOSTER:  I understand.  What I am doing

20 is kind of using the complaint to --

21         MR. SINSHEIMER:  Yes, I kind of got that.

22 This time you crossed it, but unintentionally I

23 think.  Go ahead.  Ask the question.

24     Q.   Have you ever shot an unaccounted for round

1    in your entire life?

2              MR. SINSHEIMER:  That's a good question.

3        A.   I don't remember.

4        Q.   Even when you were first learning how to

5    shoot firearms, do you recall if you ever shot an

6    unaccounted for round in your life?

7        A.   It's possible.

8        Q.   You testified that you never had any

9    difficulty passing firearms exams in the past; is

10   that right?

11       A.   That's correct.

12       Q.   You testified that you have 20 years of

13   firearms training?

14       A.   Roughly.

15       Q.   So is it your position that you don't need

16   any further training because you've been shooting a

17   weapon for 20 years?

18       A.   That's not my position.

19       Q.   Well, do you mean that your performance on

20   all firearms qualifications should be perfect based

21   on the fact that you have 20 years of experience?

22       A.   Could you ask that question again.  I'm

23   sorry.

24       Q.   Do you expect that you will never miss your

1    target because you have 20 years of experience?

2        A.    Oh, no, that's not my expectation.

3        Q.    Do you recognize that you could miss your

4    shots from time to time?

5        A.    That's possible.

6        Q.    Do you consider yourself an expert

7    marksman?

8        A.    I do not.

9        Q.    Staying in Paragraph 34 of your complaint,

10   the last two sentences read, "Additionally,

11   Mr. Turley qualified in firearms certification on

12   March 8, 2014 by MPTC Instructor Fred Leland," do

13   you see that?

14       A.    Yes.

15       Q.    "This certification utilized the same

16   weapon and standards as the WMRPA, and Mr. Turley

17   qualified in his first attempt with a perfect

18   score," do you see that?

19       A.    Yes.

20       Q.    Why were you tested in firearms on March 8,

21   2014?

22       A.    Fred Leland is a Walpole Police lieutenant.

23   He was hired by Lockheed Martin to train us in

24   firearms.   I believe their insurance carrier

1      A.    Yes.

2      Q.    What date do you see there?

3      A.    November 8th.

4      Q.    2013?

5      A.    2013.

6      Q.    You wrote that you had a right elbow injury

7    on November 8, 2013?

8      A.    Yes.

9      Q.    Can you describe that injury to me.

10      A.    I just had a sore elbow.  We were required

11    to report all minor aches.

12      Q.    Why was it sore?

13      A.    From training.

14      Q.    Did your elbow injury affect your exam

15    performance, firearms qualification?

16      A.    No, I don't believe it did.

17      Q.    Did it contribute in any way to your

18    performance that day?

19      A.    I believe it was not a factor.

20      Q.    But you do recognize that you reported a

21    right elbow injury on the day of the firearms

22    qualification, correct?

23      A.    Yes.

24      Q.    You testified earlier that you were

1                    (Document marked as Turley

2                    Exhibit 21 for identification)

3       Q.    This is your retest.  What did you score on

4  this?

5       A.    It indicates 81 percent.

6       Q.    I want to turn back to the Separation

7  Notice now, which is Exhibit 15.  Do you see that it

8  says that you failed the written SFST examination,

9  allegedly?

10      A.    The first one is testing components:

11  Firearms and SFST.

12      Q.    So whatever the SFST is, it says that you

13  failed it?

14      A.    That's what it indicates.

15      Q.    When I say "SFST," do you understand that

16  that means standard field sobriety testing?

17      A.    Yes, that's my understanding.

18                   (Document marked as Turley

19                   Exhibit 22 for identification)

20      Q.    This is Exhibit 22, Bates labeled

21  COMMONWEALTH 519.  If you look at the first sentence

22  of the box in the middle, it says, "On 12/10/13, SO

23  Turley failed a written SFST exam with a score of

24  75%.  The minimum passing score is 80% for this

1    discipline," do you see that?

2        A.    I do.

3        Q.    Do you dispute that you failed the SFST?

4        A.    I do.  I dispute it, yes.

5        Q.    What is the basis for that dispute?

6        A.    Several.  The date of this document that

7    says I failed -- the course of instruction was still

8    ongoing, so the class hadn't even been taught yet in

9    its completion.  It was continuing for another two

10   days after the date of this notice.

11       Q.    Had you already taken the test by

12   December 10th?

13       A.    I believe it was a quiz.  The passing score

14   for a quiz is 70.

15       Q.    Let's turn back to your complaint for a

16   minute.  I want to look at Exhibit 50 (sic) of your

17   complaint, which is Exhibit 3.

18       A.    Sorry, 50?

19       Q.    Of your complaint.

20             MR. SINSHEIMER:  He meant Paragraph 50.

21       Q.    Sorry.  It's Paragraph 50, Exhibit No. 3.

22   Tell me when you are there.

23       A.    (Examines document)  I'm there.

24       Q.    Are you at Paragraph 50?

1    A.    Yes, I am.

2    Q.    Paragraph 50, if you look at the second

3    sentence, it says, "The SFST quiz was reclassified

4    as the final exam to effectuate Mr. Turley's

5    wrongful dismissal from the academy," did I read

6    that correctly?

7    A.    You did.

8    Q.    I'm asking for your understanding here.

9    Was the SFST classified as a quiz or an exam?

10   A.    I believe it was a quiz.

11   Q.    Why?

12   A.    Well, it was a small subject matter, much

13   like radar or some of the other smaller subjects

14   that we did.  The test for that would be in the

15   comprehensive exam itself, which would have been,

16   like, a week away from this date.

17        The subject matter test would have been at

18   the completion of instructions, like the course

19   outline indicates, not on the morning of Day 2.

20   Q.    Did anyone tell you that it was a quiz?

21   A.    No.  We basically had the first day of

22   instruction, which was an introduction to the

23   subject, the history of how it was developed and the

24   science behind it.  We were getting into the -- we

1    were having people actually drunk in the class or

2    under the influence of alcohol.  We were getting

3    into the practical instruction when I was given this

4    notice.  So I believe it was a quiz.

5                    (Document marked as Turley

6                    Exhibit 23 for identification)

7         Q.    Exhibit 23 is Bates labeled COMMONWEALTH

8    651.  Do you see your name on here, Mr. Turley, at

9    the top?

10        A.    I do.

11        Q.    This is the first page of the SFST.  I'll

12   call it a test.  You can call it a quiz.  Do you see

13   the heading on this document?

14        A.    "Post Test"?

15        Q.    Yes.

16        A.    Yes.

17   *Q.    Does it say, "Post Quiz"?

18   *A.    It does not.

19   *Q.    Why do you think it's a quiz, then?

20             MR. SINSHEIMER:  Hold on.  Take out the

21   word "then," which is argumentative.  If you want to

22   ask it again -- because he already told you why he

23   thinks it's a quiz -- you can ask it again, even

24   though it was asked and answered.

1          MR. KOSTER:  Can you read back the last

2     question and answer.

3          *(Questions and answer read)

4          MR. KOSTER:  Let's move on.

5          MR. SINSHEIMER:  That was the question.  I

6     objected to the next question.  He withdrew it.

7          Don't say a word.

8               (Document marked as Turley

9               Exhibit 24 for identification)

10     Q.    This is Bates labeled COMMONWEALTH 704

11     through 708.  This is a document called "DWI

12     Detection and Standardized Field Sobriety Testing,

13     March 2013 edition, Participant Guide."  This is the

14     cover and four pages of this document.  It was

15     produced to counsel in its entirety, though.

16          I want to turn your attention to Page 706.

17     Do you see Section 16?

18     A.    (Examines document)  Yes.

19     Q.    What does it say there in Section 16?

20     A.    "Written Examination and Program Conclusion."

21     Q.    Does it say anything about "quiz"?

22     A.    (No response)

23     Q.    Your answer?

24          MR. SINSHEIMER:  On that page?

```
1              MR. KOSTER:  Yes.
2         A.   It does not.
3              (Counsel confers with witness)
4                   (Document marked as Turley
5                   Exhibit 25 for identification)
6         Q.   This is the SFST Student Manual, Bates
7    labeled TURLEY293 to 297.  I would like to turn your
8    attention to the second page of this document, which
9    is Bates labeled TURLEY294.  If you look at the
10   bottom portion of the second page, do you see where
11   it says, "Learning Activities"; do you see that?
12        A.   Yes.
13        Q.   What do you see two lines beneath that?
14        A.   "Pretest."
15        Q.   What is next to that?
16        A.   "Written Examination."
17        Q.   Is there any mention of a quiz?
18        A.   I would assume the pretest would be a quiz.
19        Q.   Do you see the word "quiz" on this page
20   anywhere, putting your assumptions aside?
21        A.   I do not see the word "quiz."
22        Q.   Have you yourself ever characterized the
23   SFST exam or quiz, have you yourself ever
24   characterized it as an exam or a test?
```

1     A.     Maybe mistakenly.  The one I received?

2     Q.     The test that you allegedly failed.

3     A.     The one in question?  No.  I don't believe

4  I did, but maybe mistakenly.  I sometimes "use "quiz

5  and "test" interchangeably.

6                    (Document marked as Turley

7                    Exhibit 26 for identification)

8     Q.     This is a letter that you wrote to Chief

9  Lavendure on December 13, 2013.  I want to turn to

10  the last page, Bates labeled COMMONWEALTH 612.  The

11  second full paragraph starting with, "On

12  December 9th," I want to go to the third line down.

13  Do you see that?

14     A.     (Examines document)  Yes.

15     Q.     You see where you wrote, "I scored

16  75% on the field sobriety exam"?  Did I read that

17  correctly?

18     A.     You did.

19     Q.     You used the word "exam" there, right?

20     A.     Yes.

21     Q.     You didn't call it a quiz?

22     A.     Not in this document, no.

23     Q.     The next sentence says, "Normally this

24  would be passing, but we were informed just prior to

1    the test that passing is 80% for this particular

2    test," do you see you that?

3         A.    Yes.

4         Q.    Again, you used the word "test," correct?

5         A.    Yes.  I misused it.

6         Q.    In fact, you used the word "test" twice in

7    the sentence?

8         A.    Yes.

9         Q.    You used the word "exam" in the sentence

10   before that?

11        A.    Yes.

12        Q.    Did you use the word "quiz" in this paragraph?

13        A.    No, I did not.

14        Q.    Why not?

15        A.    Sometimes I use "exam" and "quiz" or "test"

16   interchangeably.  It was just a word choice.

17        Q.    So does it mean the same thing to you?

18        A.    In a lot of circumstances, they do.

19        Q.    How about when the test says "test" on it,

20   is that a test or a quiz?

21        A.    It depends.

22        Q.    On what?

23        A.    Well, like this indicated "pretest."  I

24   would consider that a quiz.

1      Q.    How about a post-test?

2      A.    Post-test is like a post-instruction test.

3      Q.    Would that be a test or quiz?

4      A.    It would be a post-instruction test.

5      Q.    Turning back to Exhibit 23, Exhibit 23

6    says, "Post-Test," doesn't it?

7      A.    Yes.

8          MR. SINSHEIMER:  You already asked that.  I

9    object on the grounds that it was asked and

10   answered.

11         Look, you made a very good point.  There's

12   a dispute about whether it's a quiz or a test.  You

13   will try to prove it's a test.  There will be some

14   evidence it's a quiz.  You can ask him anything you

15   want factually about what he knows about the

16   distinction and what he thinks about it, but you

17   can't argue with him.

18         MR. KOSTER:  Are you finished?

19         MR. SINSHEIMER:  Yes.

20     Q.    So based on what you just described, this

21   post-test was some sort of test.  So since

22   Exhibit 23 is a post-test, is Exhibit 23 a test?

23     A.    No.

24     Q.    Let's go back to the complaint, Exhibit 3,

1    Paragraph 48.  You don't have to read it.  Tell me

2    when you are there.

3         A.    I'm there.

4         Q.    The second line of 48 says, "Although MPTC

5    policy states that the passing score on all tests

6    shall be 70 percent, just prior to Mr. Turley's

7    test, WMRPA instructors told him that he was

8    required to score 80 percent to pass.  Mr. Turley

9    scored 75 percent.  The academy now stated that it

10   considered 75 percent a failure," did I read that

11   correctly?

12        A.    Yes.

13        Q.    Were you told before or after you took the

14   exam that the passing score was a 75?

15        A.    I believe it was 80, was a passing score.

16        Q.    Sorry.  You are right.  My mistake.  Were

17   you told before or after the exam that the passing

18   score was 80?

19        A.    I believe it was as the test was given out.

20   So it would have been immediately prior.

21        Q.    So right before?

22        A.    That's my memory.

23        Q.    Do you know who set the passing score for

24   the SFST?

1      A.    The passing score?

2      Q.    Yes.

3      A.    It would either be the MPTC or the National

4  Highway Safety and -- I forget the letters.  It's an

5  acronym.

6      Q.    National Highway Safety Transportation

7  Administration, does that sound right?

8      A.    I would say yes.

9            MR. SINSHEIMER:  The question was do you

10  know.

11      A.    I don't know.

12            MR. SINSHEIMER:  I understand what you are

13  saying.

14      A.    It may be both agencies.  I don't know.

15            MR. SINSHEIMER:  I apologize on that one.

16            Listen carefully to the questions.  It's

17  getting late.

18      Q.    Let's turn back to Exhibit 24, please.  I

19  would like to turn to the last page of the exhibit,

20  Bates labeled COMMONWEALTH 708.

21      A.    (Examines document)

22      Q.    Are you there?

23            MR. SINSHEIMER:  Which one is this now?

24            MR. KOSTER:  Exhibit 24.

1      A.    Yes, I'm there.

2      Q.    Looking at the first paragraph, the last

3   words of the second line start with "This."  It

4   continues with "This training under the auspices and

5   direction," do you see that?

6      A.    Sorry, which paragraph?

7      Q.    The first paragraph, the end of the second

8   line.

9      A.    (Examines document)  Yes, I see it.

10     Q.    It says, "This training under the auspices

11  and direction of International Association of Chiefs

12  of Police and the National Highway Safety Traffic

13  Administration," and it goes on from there, do you

14  see that?

15     A.    Yes.

16     Q.    Do you see where it says, "This training

17  under the auspices and direction of the ACP and the

18  NHTSA"?

19     A.    I see that.

20     Q.    What does that mean to you?

21     A.    It means they formulated the curriculum for

22  it, those two agencies.

23     Q.    Does it suggest to you that these agencies

24  would have set the passing score for the SFST test?

1          MR. SINSHEIMER:  Objection.  You can

2   answer.

3      A.   It does not.

4      Q.   Does it state that the training is under

5   the auspices and direction of the MPTC?

6      A.   It does not state that.

7      Q.   Does it state it is under the direction of

8   the academy?

9      A.   It does not.

10     Q.   Let's turn to what will now be marked as

11  Exhibit 27.

12               (Document marked as Turley

13               Exhibit 27 for identification)

14     Q.   Exhibit 27 is Bates labeled COMMONWEALTH

15  1050 through 1055.  This is a portion of the SFST

16  guidebook that we just looked at in Exhibit 23.

17          I want to turn your attention to

18  Section 16, Written Examination and Program

19  Conclusion.  I want to turn your attention to the

20  page labeled COMMONWEALTH 1055, do you see that?

21     A.   (Examines document)  Yes.

22     Q.   Do you see the top box where it says, "Post

23  Test"; do you see that?

24     A.   I do.

1      Q.    You see it says, "Post Test, 'Closed Book,'
2   Passing score is 80%"?
3      A.    I do.
4      Q.    What did the instructors tell you the
5   passing score was, 80 percent?
6      A.    Yes.
7      Q.    So that score comes from the National
8   Highway Transportation Safety Administration
9   guidebook, doesn't it?
10         MR. SINSHEIMER:  Hold on.  I'm objecting to
11   the form of the question.  You can answer.
12      A.    I don't know where that score comes from.
13      Q.    These numbers are identical, aren't they?
14      A.    What numbers?
15      Q.    You just testified that the instructors
16   told you the passing score was 80 percent, correct?
17      A.    Yes.
18      Q.    And this National Highway Transportation
19   Safety Administration guidebook says that the
20   passing score is 80 percent?
21         MR. SINSHEIMER:  Objection to the form of
22   the question.
23      A.    I don't know what that agency has to do
24   with this test.

1      Q.    I didn't ask that.

2      A.    You asked if they were responsible for it.

3      Q.    No, I didn't.

4      A.    Please reask the question.

5      Q.    You just testified that the instructors

6  told you that the passing score was 80 percent; is

7  that correct?

8      A.    Yes, I did.

9      Q.    And now this exhibit here, Exhibit 27, is a

10  portion of the National highway Transportation

11  Safety --

12           MR. SINSHEIMER:  Hold on.

13      Q.    -- Administration guidebook.

14           MR. SINSHEIMER:  Objection.  I object to

15  that.  You want to authenticate the document?  You

16  may even get me to stipulate to the authentication,

17  but the witness can't authenticate it.  He can

18  certainly acknowledge that the numbers are the same.

19      A.    And the --

20           MR. SINSHEIMER:  No.  Hold on.  Hold on

21  here.

22           MR. KOSTER:  And that was the first

23  question I asked him.

24           MR. SINSHEIMER:  So he already answered

1    that.  You are browbeating him.  I know you are

2    doing it in a very polite and civil way, but you are

3    browbeating him.

4         MR. KOSTER:  He didn't answer it.  Then you

5    objected to form.

6         MR. SINSHEIMER:  He did answer it.  No, I

7    objected to you telling him -- to try to get him to

8    adopt the authentication of a document that he may

9    or may not have even seen.

10        Now, you produced it in discovery in good

11   faith.  If you tell me it's authentic, I will

12   probably stipulate, but to him it's hearsay.  Unless

13   you ask him has he ever seen it before, does he know

14   where it came from.

15        So you are trying to get two different

16   things in here.  You are certainly handling it

17   low-key and civilly and politely, but you can't ask

18   the same stuff over and over again, no matter how

19   many clever ways you put it.

20        He doesn't know what this is, to the best

21   of my knowledge.  Your saying so doesn't change that

22   at all.  That's my objection.

23        MR. KOSTER:  Duly noted.

24        MR. SINSHEIMER:  Thank you.

154

1        Q.    Looking back to Exhibit 27, we're still on

2    COMMONWEALTH Page 1055, the box that says, "Post

3    Test."   It says that a passing score is 80 percent.

4    Is that consistent with the score that the

5    instructors told you at the academy?

6        A.    That is.

7        Q.    Thank you.  Let's turn back to Exhibit 26,

8    your letter to your chief.  I want to go to the last

9    page of the letter you wrote.  I'm looking at the

10   second paragraph.

11       A.    On the last page?

12       Q.    Yes.  The second paragraph starts, "On

13   December 9th," do you see at that?

14       A.    Yes.

15       Q.    There you wrote, "On December 9th, an inch

16   thick study packet was provided to the students

17   after lunch - the subject matter was field sobriety

18   training.  We were tested on this material less than

19   24 hours after receipt.  Additionally, we were

20   required to write a report about three legal updates

21   on the evening of December 9th.  I scored a

22   75% on the field sobriety exam.  Normally this would

23   be passing, but we were informed just prior to the

24   test that passing was 80% for this particular test.

1    Knowledge of this may have impacted the class'

2    election to take the test so quickly after receiving

3    the materials," did I read that correctly?

4        A.   Yes.

5        Q.   You wrote that the class elected to take

6    the test.  Does that mean that the instructors gave

7    the class the option of taking the test the

8    following day?

9        A.   I don't remember that.

10       Q.   Do you recall whether the class took a vote

11   for when they would take the test?

12       A.   I don't.

13       Q.   Do you have any reason to believe that what

14   you wrote in this letter is inaccurate?

15       A.   No.

16       Q.   You wrote that "Knowledge of this may have

17   impacted the class' election to take the test so

18   quickly after receiving the materials."

19       A.   Yes.  I believe there was a group decision

20   made that had to do with one of the instructors had

21   a detail or something and had to leave.  I didn't

22   vote to take any test because we just received the

23   material.  I don't know how that went exactly.

24       Q.   Well, when you wrote that -- and I'm asking

1    to the best of your recollection because I know it's

2    been a while.  When you wrote that knowledge of this

3    may have impacted the class' election, why do you

4    think your classmates might have changed their

5    minds?

6        A.   Oh, on the changing score?

7        Q.   No, on the date on which the test would be

8    taken.

9        A.   The class wasn't aware of a higher score.

10   We were just introduced to the material.  They were

11   not aware, and they would have probably not wanted

12   to be tested that quickly with a higher standard had

13   they known about it.

14       Q.   Did anyone tell you they felt this way?

15       A.   Yes.  We discussions about it afterwards.

16       Q.   Who?

17       A.   Adam Symanski, Curt Wilkins, Strazulli,

18   Nick Latino, Melissa Burns.  I don't know.  There

19   was a bunch of them.  We had spoken about it.

20       Q.   Putting aside the issue of whether the SFST

21   was a quiz or a test or what the passing score was,

22   do you dispute that you scored a 75 percent?

23       A.   75 percent?  I was dismissed shortly after

24   that.  I don't think I ever reviewed the test.  Yes,

1    I would dispute it.

2        Q.    What is the basis for that dispute?

3        A.    I just haven't reviewed it.  I would

4    dispute anything until I've reviewed it in its

5    entirety.

6            MR. SINSHEIMER:  I will need a short break

7    soon.  If now is good, that's fine.  If not...

8        Q.    Did you ever fall asleep during the SFST

9    course, Mr. Turley?

10       A.    Not that I recall, no.

11       Q.    You testified that you had a couple of late

12   nights and you were under pressure from time to

13   time.  Does that refresh your recollection at all as

14   to whether you ever dozed off during a course?

15       A.    No.  I don't recall.

16       Q.    Let's turn back to Exhibit 2, please.

17   That's McKenzie's memo.  I want to look at the last

18   page of the document.  Are you there?

19       A.    Yes, the last page of the document?

20       Q.    The end of the sixth line starts with the

21   words "The next day."  Tell me when you are there.

22   Do you see that?

23       A.    (Examines document)  No.

24            MR. SINSHEIMER:  What page are you on?

1          MR. KOSTER:  I'm sorry.  It's COMMONWEALTH

2    575, the last paragraph on that page.

3          A.   (Examines document)  Oh, okay.

4          Q.   The last paragraph on the page, the

5    sentence starts with "The next day."  It says, "The

6    next day SFST Instructor Rich MaClean informed me

7    that Turley had been falling asleep in class prior

8    to taking the exam."  Does that refresh your

9    recollection as to whether you fell asleep during

10   the course?

11         A.   No, that doesn't.  I would dispute that.  I

12   would probably receive an action notice for

13   sleeping.  It was not allowed.

14         MR. KOSTER:  We can take a quick break now.

15         (Recess at 2:34 p.m.)

16         (Robert Powers exits)

17   BY MR. KOSTER:  (2:50 p.m.)

18         Q.   Back on the record.  We already marked your

19   letter to your chief as Exhibit No. 26.  Can we turn

20   back to that one, please.  That's dated December 13,

21   2013, Bates labeled COMMONWEALTH 610 to 612.  I

22   would like to go through this letter a little bit.

23         You testified earlier that Chief Lavendure

24   is the chief of Clinton; is that correct?

1      Q.    Just colorful language that you used?

2      A.    Descriptive language.

3      Q.    The next paragraph starts with, "The

4 expected military type training I took in stride -

5 the Parris Island experience thinned the ranks of

6 the 49th recruit officer course," do you see that?

7      A.    Yes.

8      Q.    What do you mean by "Parris Island

9 experience"?

10     A.    The first day of instruction and the harsh

11 discipline environment, modified stress environment,

12 I expected that in the police academy, you know,

13 just through my experience, although I never served

14 in the military.  I know Parris Island is known as

15 the toughest boot camp.  I knew we would have former

16 military with that background teaching us and trying

17 to, you know, bring that harsh discipline,

18 especially to weed out a lot of students without the

19 mental commitment that the academy requires early

20 on.

21     Q.    You just said you don't have any military

22 experience?

23     A.    No.

24     Q.    So how do you know what Parris Island is

1   like?

2      A.   I researched what to expect in a police

3   academy.  It's paramilitary.  We are divided into

4   squads.  We have squad leaders.  It's very

5   militaristic, the structure and the discipline-rich

6   environment.

7      Q.   Was it your understanding that the Parris

8   Island experience was a negative experience?

9      A.   I don't believe I indicated that, no.  I

10   expected it.  I expected a tough discipline

11   environment.

12      Q.   You've been in all the depositions in the

13   case, right?

14      A.   Yes.

15      Q.   Do you recall Mr. Powers, who was here

16   earlier, was deposed a few months ago by your

17   lawyer?

18      A.   Yes.

19      Q.   You'll recall that when Attorney Sinsheimer

20   asked Lieutenant Powers about the Parris Island

21   experience.  Lieutenant Powers smiled.  Attorney

22   Sinsheimer asked, "Why are you smiling?"  Lieutenant

23   Powers said something to the effect of, "I have fond

24   memories."  Is that consistent with your

1      A.    Of course.

2      Q.    Why did Shattuck say, "What is your fucking

3  problem?"

4      A.    Probably because I was not laughing.  Some

5  of the students had nervous laughter.  They didn't

6  know how to respond to Shattuck.

7      Q.    Was he talking to you when he said that?

8      A.    Yes, directly to me.

9      Q.    Did you tell him that you were offended by

10  the statement?

11      A.    I believe I did.

12      Q.    What did you say to him?

13      A.    I don't know, "It's not funny," something

14  along that line.

15      Q.    Why didn't you include that in this?

16      A.    I don't know the exact quote.

17      Q.    This is another example of a statement that

18  you made that you didn't include in the letter?

19      A.    Sorry?

20      Q.    This is another example of a statement that

21  you made that you didn't include in the letter?

22      A.    I didn't quote myself.

23      Q.    So that's the second time you didn't

24  include a statement you made in the letter?

1     A.    Yes.

2     Q.    In the next paragraph you describe an

3  incident where firearms Instructor Shattuck grabbed

4  a male cadet's buttocks and bumped into him from

5  behind.   You wrote, quote, "I started walking toward

6  them, as I could see the stress in Danna's face.   I

7  had the intention of physically stopping the assault

8  when Instructor Shattuck stopped on his own and

9  released Danna.   Shattuck shouted at me, 'Don't you

10 have a sense of humor, Turley?'"

11          You wrote that you had the intention of

12 physically stopping the assault.   What did you plan

13 to do?

14    A.    I would have physically separated them.

15    Q.    Why didn't you do that?

16    A.    He released Student Officer Danna before it

17 was necessary to be physically separated.

18    Q.    So he stopped before you could step in?

19    A.    As I approached.

20    Q.    Did you tell Shattuck that you were

21 offended by this conduct?

22    A.    He surmised it.

23    Q.    How do you know that?

24    A.    He asked me, "Don't you have a fucking

1      A.    Yes.

2      Q.    Did he ever file a complaint to your

3   knowledge?

4      A.    I believe he did.

5      Q.    He did?

6      A.    I believe he wrote a report.   That would

7   certainly constitute a complaint.

8      Q.    Who did he submit this report to?

9      A.    I believe to Curtis McKenzie.

10      Q.    Did he file a complaint at the MCAD?

11      A.    I have no idea.

12           MR. SINSHEIMER:   Counsel, would you mind if

13   we cleaned that up.   I think he's referring to the

14   report, the one and only report.

15      Q.    The question that I was getting at is

16   whether you knew if Garrett Danna ever filed a

17   complaint at the MCAD.   That was the question.

18      A.    No, I don't.

19      Q.    Let's go to the next paragraph.   It says,

20   "The age related comments continued non-stop.   As I

21   mentioned before, I can't really quantify them.   I

22   was the focus of humor about Viagra use, rotary

23   phones, record players and anything age related."

24   Who made these age-related statements to you?

1     A.     Various instructors.  Certainly Ms. Delilah

2  Yee on several occasions during PT instruction; as

3  discussed earlier, McKenzie, Sergeant Powers.

4     Q.     Anybody else?

5     A.     Like I said, there was Sue Figgy.  She had

6  a few jokes about my age.  There was another

7  instructor, an Asian police chief.  I forget the

8  name.  He was in as an instructor for a day or

9  something; some of the DT staff.

10    Q.     DP?

11    A.     DT, defensive tactics staff.

12    Q.     Who would that be?

13    A.     Palmaram, whatever the name is.

14    Q.     I think we talked about that already this

15  morning.

16    A.     We did.

17    Q.     Let's skip down to the paragraph starting

18  with "Upon returning to the Western Mass academy" in

19  the fourth paragraph here.  You wrote, "Upon

20  returning to the Western Mass academy Thanksgiving

21  week - the month of December was almost here.

22  Director McKenzie addressed the issue of misconduct

23  in the first range group."  Which staff misconduct

24  are you referring to here?