# ATTACHMENT B

Volume II
Pages 2-10 to 2-171
Exhibits 28 to 38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
TIMOTHY TURLEY,                  :
          Plaintiff,             :
                                 :
     vs.                         :  C.A. No.
                                 :  1:14-cv-14755-
DANIEL ZIVKOVICH,                :  LTS
Individually and as Executive    :
Director of the MPTC; CURTIS     :
McKENZIE, Individually and as    :
Director of the WMRPA; ROBERT    :
POWERS; DELILAH YEE; SEAN        :
SHATTUCK; MUNICIPAL POLICE       :
TRAINING COMMISSION; and         :
WESTERN MASSACHUSETTS            :
REGIONAL POLICE ACADEMY,         :
          Defendants.            :
- - - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF TIMOTHY TURLEY, a
witness called on behalf of the Defendants Daniel
Zivkovich, Individually and as Executive Director of
the MPTC; Curtis McKenzie, Individually and as
Director of the WMRPA; Robert Powers; Delilah Yee;
Municipal Police Training Commission; and Western
Massachusetts Regional Police Academy, taken
pursuant to the Federal Rules of Civil Procedure,
before Alexander K. Loos, Registered Diplomate
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of the
Attorney General, One Ashburton Place, 18th Floor,
Boston, Massachusetts, on Monday, October 24, 2016,
commencing at 10:06 a.m.

PRESENT:

    Sinsheimer & Associates.
        (by Robert S. Sinsheimer, Esq.)
        E-mail: Rsinsheimer@sinsheimerlaw.com
        92 State Street
        9th Floor
        Boston, MA 02109
        617.722.9954
        for the Plaintiff.

    Office of the Attorney General.
        (By Andrew W. Koster, Assistant Attorney
        General; and Nicole Eldredge, Assistant
        Attorney General)
        E-mail: Andrew.Koster@state.ma.us
               Nicole.Eldredge@state.ma.us
        One Ashburton Place
        18th Floor
        Boston, MA 02108
        617.963.2246
        for the Defendants Daniel Zivkovich,
        Individually and as Executive Director of
        the MPTC; Curtis McKenzie, Individually and
        as the Director of the WMRPA; Robert
        Powers; Delilah Yee; Municipal Police
        Training Commission; and Western
        Massachusetts Regional Police Academy.

    Reardon, Joyce & Akerson, PC
        (by Andrew J. Gambaccini, Esq.)
        E-mail: agambaccini@rja-law.com
        4 Lancaster Terrace
        Worcester, Massachusetts 01609
        508.754.7285
        for the Defendant Sean Shattuck.

ALSO PRESENT: Ellen Duffy

* * * * *

1                    I N D E X

2

3   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

4   TIMOTHY TURLEY,
    Resumed

5
    BY MR. KOSTER         2-5

6
    BY MR. GAMBACCINI             2-95

7

8

9                    *  *  *  *

10                  E X H I B I T S

11  NO.                DESCRIPTION                      PAGE

12  28    Clinton Hospital Emergency                    2-18
          Department Record, dated 11/26/13,
13        for Timothy M. Turley

14  29    Statements from William Cavanaugh,            2-46
          Paul Burns and Kurt Wilkins
15
    30    Text messages between Mr. Turley and          2-46
16        Mr. Cavanaugh

17  31    Notes on Conversation with Mike               2-52
          Calcasola
18
    32    Text messages between Mr. Turley and          2-56
19        Mr. Burns

20  33    Municipal Police Training Committee,          2-82
          Monthly Meeting Minutes, Randolph,
21        December 18, 2013

22  34    Partial transcript of deposition of           2-92
          William Cavanaugh, September 27,
23        2016

24

1                  E X H I B I T S, Continued

2        NO.                    DESCRIPTION                    PAGE

3
         35      Plaintiff Timothy Turley's Responses    2-95
4                to Defendant Sean Shattuck's First
                 Set of Interrogatories
5
         36      Westlaw, Bergeron v. Cabral, 535        2-98
6                F.Supp.2d 204 (2008)

7        37      Agreement between the Suffolk County    2-103
                 Sheriff and the Jail Officers' and
8                Employees' Association of Suffolk
                 County, signed April 12, 2006, and
9                April 7, 2006

10       38      Municipal Police Training Committee     2-116
                 Policies and Procedures for Police
11               Academies and Reserve/Intermittent
                 Training Programs
12

13                          *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

1                    P R O C E E D I N G S

2                    TIMOTHY TURLEY, Resumed

3    a witness recalled for examination by counsel for

4    the Defendants Daniel Zivkovich, Individually and as

5    Executive Director of the MPTC; Curtis McKenzie,

6    Individually and as Director of the WMRPA; Robert

7    Powers; Delilah Yee; Municipal Police Training

8    Commission; and Western Massachusetts Regional

9    Police Academy, having been satisfactorily

10   identified by the production of his driver's license

11   and being first duly sworn by the Notary Public, was

12   examined and testified as follows:

13                    DIRECT EXAMINATION, Continued

14      BY MR. KOSTER:

15      Q.    Good morning, Mr. Turley.

16      A.    Good morning.

17            MR. KOSTER:  Can we do the usual

18   stipulations?

19            MR. SINSHEIMER:  Yeah.

20            MR. KOSTER:  Same stips --

21            MR. SINSHEIMER:  Same deposition.

22            MR. KOSTER:  -- as last time?

23            MR. SINSHEIMER:  Same deposition, just

24   continuing.

1      BY MR. KOSTER:

2      Q.    Mr. Turley, last time we were -- when we

3   stopped we were going over your letter to your

4   chief, which is Exhibit 26.

5      A.    Yes.

6      Q.    You have that in front of you.

7            And so we're just going to go finish going

8   over that letter, so if you could turn down to --

9            MR. SINSHEIMER:  Do you have copies for me?

10           MR. KOSTER:  I handed out copies last time.

11   I didn't make more copies.

12           MR. SINSHEIMER:  Oh, you're using this --

13           MR. KOSTER:  This was an exhibit that was

14   marked last time.

15           MR. SINSHEIMER:  That's okay.  I know what

16   it says.

17      BY MR. KOSTER:

18      Q.    We're at the second page, which is labeled

19   Commonwealth 611.  And going down to the paragraph

20   that starts with:

21             "I noticed an increase in Sergeant

22             Powers' loathing towards me."

23             Do you see that in the middle of the page?

24      A.    Yes.

1      A.    Yes.

2      Q.    Would you have written this letter if you

3  graduated from the academy?

4     *A.    Yes.

5            MR. SINSHEIMER:  Object to the form.

6            Fine.  Objected to the form.  You have an

7  answer.

8      Q.    I'm sorry.  I didn't catch your answer

9  because your lawyer spoke over you.

10     A.    I'm sorry?

11           MR. SINSHEIMER:  Repeat your answer.  I

12  just objected to the form.  I didn't say anything

13  else.

14           MR. KOSTER:  Did you catch his answer.

15           THE REPORTER:  Yes.  I'll read it.

16           *(Record read)

17  BY MR. KOSTER:

18     Q.    So why didn't you write it before you were

19  separated?

20     A.    Because I was concerned about retaliation

21  from the academy staff.

22     Q.    Did you include in your letter that you

23  really didn't fail firearms but that Shattuck

24  wrongfully failed you in retaliation for your

1   actions, or something to that effect?

2        A.    Where would that be?

3            MR. SINSHEIMER:   The question was did you

4   include it.

5        A.    Oh, that specific language?

6            No, I don't think so.

7        Q.    Or anything to that effect?

8        A.    I don't recall saying anything.

9        Q.    You can review it.

10       A.    Okay.

11            I don't think so, no.

12    *Q.    Why not?

13    *A.    I believed that would have been -- this

14   would have started an investigation and that would

15   have been revealed.

16    *Q.    Wasn't that relevant to the investigation?

17    *A.    Yes.   That would have been part.

18    *Q.    So why didn't you include it?

19            MR. SINSHEIMER:   No, you asked --

20   objection, the same reasons before.   You can't argue

21   with him.

22            MR. KOSTER:   Well, if he doesn't answer the

23   question --

24            MR. SINSHEIMER:   He did answer the

1    about the right to re-enroll in the academy?

2              MR. SINSHEIMER:  Object to the form of the

3    question.

4              You can answer.

5        A.    I believe I would have -- I would have

6    discovered that when I went through all the

7    documents.

8        Q.    Well, I understand, I think -- now that I

9    think about it, I understand Mr. Sinsheimer's

10   objection.  Maybe I could go back.

11             Do you -- have you ever been told that you

12   had a right to re-enroll in the academy?

13       A.    Through -- no.  Through my own

14   interpretation of M --

15             MR. SINSHEIMER:  The question was have you

16   ever been told.

17             What's the answer?

18       A.    Told verbally, no, I don't believe so.

19             MR. SINSHEIMER:  Other than what may or may

20   not have been attorney/client privilege, which I

21   object to.

22       Q.    Do you know whether you had a right to

23   re-enroll in the academy?

24             MR. SINSHEIMER:  Object to the form of the

1   question because it calls for a legal conclusion.

2          But you can answer.

3       A.   Not a legal conclusion, but my own

4   conclusion through reading MPTC policies.

5       Q.   Is what?

6       A.   A performance failure, you can re-enroll.

7       Q.   Now, did you re-enroll at the academy?

8       A.   No.

9       Q.   Why not?

10      A.   It was not economically feasible.

11      Q.   Did anyone ever tell you that you could not

12  re-enroll in the academy?  Strike that.

13         Did anybody -- did anybody from the MPTC or

14  from the academy tell you that you could not

15  re-enroll in the academy?

16      A.   No.

17      Q.   Now, in this paragraph that we just read

18  together it mentioned language about an 80-mile

19  commute.

20         Do you see that?  Do you recall reading

21  that just a moment ago?

22      A.   Yes.

23      Q.   Did you say that, that you had an 80-mile

24  commute?

1      A.    Well, I would include something else if I
2  could edit it.
3      Q.    And what would you include to edit it?
4      A.    Reported the discrimination to an MPTC
5  employee.
6      Q.    So you would say, "I never personally
7  reported the discrimination against me to an MPTC
8  employee"?
9      A.    Yeah.  That would have been more accurate.
10     Q.    Okay.  And how is this, as it is written in
11 your interrogatories -- which you signed -- how is
12 that inaccurate?
13     A.    It would have clarified it.
14     Q.    And so is this statement as written in your
15 interrogatories, is that inaccurate?
16     A.    Well, I reported it to squad leaders and
17 class leader.  They were aware of it.  They were not
18 MPTC employees, so I didn't directly report it to an
19 MPTC employee.  Because they were -- the chain of
20 command was squad leader, class leader.
21     Q.    So as for MP -- so was the letter to your
22 chief, which we had marked as Exhibit 26, was that
23 the first time that you reported any discrimination
24 or retaliation to MPTC employees?

1          MR. SINSHEIMER:  Object to the form of the

2     question.

3          You can answer.

4     A.    At that time I was separated from MPTC,

5     and -- no.  Actually, I went to report it the next

6     day.  The very next morning I went, and I was sent

7     away.  I was told they would not see me.  I had no

8     appeal rights.

9     Q.    And when you said you went, where did you

10    go?

11    A.    I went to headquarters in Randolph.

12    Q.    The MPTC headquarters?

13    A.    Yes.

14    Q.    This was the day after you were dismissed?

15    A.    Yes.

16    Q.    Did you report any of the allegations in

17    the federal complaint to anyone at MPTC before you

18    were dismissed?

19    A.    No.

20    Q.    Did you report any of the allegations in

21    the complaint to the chairperson of the MPTC before

22    you were dismissed?

23    A.    One more time?

24    Q.    Did you report any of the allegations in

1        A.    Yes.

2        Q.    And you had testified last time at your

3   first session that you carpooled with other

4   students --

5        A.    Yes.

6        Q.    -- is that right?

7              Did you all pool your commuting expenses?

8        A.    Yeah.   Roughly it was $30 a week, I think,

9   $33 a week.   I worked it out with another student.

10  We commuted together.

11       Q.    Which other student?

12       A.    Paul Burns.

13       Q.    And $33 a week total?

14       A.    Yeah.   I believe that's what I paid Paul.

15  I'm -- just off the top of my head.   I know I have

16  it written down somewhere.

17       Q.    In other words, you each contributed $33 a

18  week?

19       A.    Yeah.   We averaged with gas and...

20       Q.    And then in the next interrogatory, Number

21  29 -- it's the last interrogatory -- you wrote that

22  you had job offers from Boston College police,

23  Boston University police and the Northeastern

24  University police.

1        A.    I was in talks with all three of those

2   agencies.

3        Q.    Do you have any documentation showing

4   offers from any of those agencies?

5        A.    I don't believe I do.

6        Q.    When you communicated with them, by which

7   method did you communicate with them?

8        A.    That would have been e-mail or

9   telephonically, or in-person several times with

10  Boston College.

11       Q.    Who did you e-mail with?

12       A.    I don't know if I e-mailed with them or

13  texted and called, but it would have been Captain

14  James Hussey at Boston College.

15            MR. KOSTER:  Just noted for the record I

16  would ask that you look --

17            MR. SINSHEIMER:  As you know, we noticed

18  Hussey's deposition.

19            MR. KOSTER:  No.

20            MR. SINSHEIMER:  Yeah, we did.

21            MR. KOSTER:  I don't think I saw that.

22            MR. SINSHEIMER:  I'm not -- well, I'll

23  double-check.  Maybe it didn't go out.

24            MR. KOSTER:  Yeah.

```
 1              MR. SINSHEIMER:  I think we did, though.  I
 2    think we noticed -- maybe --
 3              MR. KOSTER:  I --
 4              MR. SINSHEIMER:  -- I could be mistaken.
 5              MR. KOSTER:  That's okay.
 6              MR. SINSHEIMER:  I may be remembering what
 7    we talked about and didn't do.  So all right.
 8              THE WITNESS:  I believe --
 9              MR. SINSHEIMER:  Up.
10              THE WITNESS:  Sorry.
11              MR. SINSHEIMER:  Did he get a subpoena?
12    Did he tell you he did?
13              THE WITNESS:  No.
14              There was a lieutenant at Boston University
15    and a sergeant at Northeastern University.
16              MR. SINSHEIMER:  Were you just asking about
17    BC, or were you asking about the other two places?
18              MR. KOSTER:  All of them in general.
19              MR. SINSHEIMER:  Keep going.
20              THE WITNESS:  I was in communication with
21    all three different -- I'm not sure of which form,
22    but I was -- my most likely prospect was Boston
23    College.
24              MR. KOSTER:  33.
```

1      Q.    You were sponsored by the Clinton Police

2   Department, correct?

3      A.    Yes.

4      Q.    Why did you seek sponsorship -- strike

5   that.

6            Did you seek sponsorship from Clinton, or

7   did they approach you?

8            MR. SINSHEIMER:  Objection, asked and

9   answered last time.

10           But I'll let him answer.

11           Go ahead.

12     A.    I approached -- I had conversations with

13   the chief.  He agreed to sponsor me.

14     Q.    And so my question is -- it's building up

15   to it, Rob -- why Clinton?

16     A.    He was friends with my brother-in-law, and

17   I met him.  He liked me; thought I would be a good

18   candidate for the academy, and he agreed to sponsor

19   me.

20     Q.    When did you first meet him, this chief?

21     A.    I don't recall exactly.

22     Q.    Did your brother-in-law arrange that

23   meeting?

24     A.    I believe I arranged the meeting.  He might

1    have introduced me to him.  I needed a police chief

2    to attend academy.

3         Q.   Did you ever talk to -- to the Clinton

4    chief after your separation?

5         A.   Yes.

6         Q.   And did you speak to him about the

7    separation?

8         A.   I did.

9         Q.   Can you describe that conversation?

10        A.   I had several.

11             He was supportive.

12        Q.   What did he say?

13        A.   He told me to fight it.  He was upset at

14   what occurred out there, what I revealed to him

15   about the staff misconduct.  And he had a -- a

16   tough -- he wasn't -- he did -- he disliked Curt

17   McKenzie.  They had a rough exchange that he did not

18   think was appropriate.  He was just trying to have a

19   conversation, and he kind of gave me some of the

20   details of that.

21        Q.   Rough exchange concerning what?

22        A.   He asked Curt McKenzie about the dismissal,

23   and McKenzie started referring to CMRs and, "Do you

24   want me to violate them," and got real defensive.

1           MR. SINSHEIMER:  Thanks.  Your rights are

2   saved.  I instructed him not to answer.  That's a

3   risk.  I got it.

4           Next question.

5           MR. KOSTER:  So we're just -- just about

6   finished here.  I've got a few more questions, and

7   then we're going to move on.

8           MR. SINSHEIMER:  Meaning move on to

9   Mr. Gambaccini?

10          MR. KOSTER:  To Gambaccini.

11          And I'll note that I'm under seven and a

12  half hours, which I'm afforded under the rules.

13          MR. SINSHEIMER:  I know.  Each of my

14  depositions have probably been a quarter of that.

15          MR. KOSTER:  If we total them all up, what

16  would the total of them be?

17          MR. SINSHEIMER:  Roughly the same.

18          MR. KOSTER:  Probably not.

19      Q.   I just want to talk about Garrett Danna and

20  Sean Shattuck.

21          Did this alleged assault by Sean Shattuck

22  on Garrett Danna, did that happen on the same day as

23  the firearms qualification exam?

24      A.   That's not my memory.  It would have been

1    prior to that.

2         Q.    The assault -- the assault occurred prior

3    the exam?

4         A.    I believe it did.

5         Q.    And just moving quickly to a different

6    topic.

7               During -- during your last session we spoke

8    briefly about Sergeant Powers' instruction about

9    ethnically altered vehicles.

10              Do you recall that?

11        A.    I do.

12        Q.    And your testimony was -- I have a copy of

13   the transcript here if Mr. Sinsheimer disagrees with

14   me.

15              MR. SINSHEIMER:  Is this by way of

16   foundation?

17              MR. KOSTER:  Yes.

18              MR. SINSHEIMER:  Got it.

19        BY MR. KOSTER:

20        Q.    I think your testimony was that you

21   believed you made a verbal objection to that

22   statement, but you don't remember exactly what it

23   was that you said.

24              Is that right?

1    He's good at asking others.  You don't have to

2    worry.

3         Q.    Do you dispute that you filed a false

4    report?

5         A.    I have -- yes.  And I continue to.

6         Q.    Now, in 2010, you retired from the

7    Sheriff's Department; is that correct?

8         A.    Yes.

9         Q.    At that time you had about 21 years of

10   service?

11        A.    Correct.

12        Q.    And you were about 43 years old?

13        A.    I was.

14        Q.    Since that time, have you begun collecting

15   any pension?

16        A.    Yes.

17        Q.    When did you begin collecting a pension?

18        A.    Roughly 30 days after my retirement.

19        Q.    Do you know what your percentage was for

20   your pension when you began collecting?

21        A.    It was 50 percent.

22        Q.    Is that a superannuation retirement or a

23   disability retirement?

24        A.    Superannuation.

1      Q.     Based on age and years of service?

2      A.     Correct.

3      Q.     Have you been collecting that pension from

4  that period 30 days after you left the department to

5  the present?

6      A.     I have.

7      Q.     What is the annual amount of that pension?

8             MR. SINSHEIMER:  Well, no.  Go ahead.  You

9  can answer.

10     A.     Roughly -- I don't know exactly -- because

11  I know there is COLA increases -- roughly 36,000

12  annually.

13     Q.     What were the reasons that you decided to

14  leave the Sheriff's Department in 2010?

15     A.     It -- it made mathematical sense.  I

16  could -- I could go get employment and make half my

17  pay, at least, somewhere else.  That was my

18  objective.

19     Q.     You had no desire to stay with the

20  Sheriff's Department until you reached maximum

21  retirement, both in terms of age and years of

22  service?

23             MR. SINSHEIMER:  Object to the form.

24             You can answer.

1      A.    In that field people don't live long after

2    doing a full 32 or 33 years, going to the 80 percent

3    retirement.  So the first step-off point is 20/50,

4    20 years, 50 percent.

5      Q.    Were you under any investigation by the

6    department at the time you decided to retire?

7      A.    No.

8      Q.    Was it suggested by anybody associated with

9    the department to you that you retire?

10     A.    Not at all.

11     Q.    Now, from your retirement with the

12   Sheriff's Department in 2010, until you began the

13   academy that we've been discussing during your

14   deposition in August of 2013, did you work?

15     A.    Yes.

16     Q.    Where did you work?

17     A.    I had several jobs.

18           I'm sorry, the dates again?

19     Q.    From your retirement in 2010 --

20     A.    Yes.

21     Q.    -- you began collecting your pension?

22     A.    Yes.

23     Q.    You started the academy in August of 2013.

24           For that period of time, where did you

1    work?

2        A.    I would have worked for a private security

3    firm at the "Boston Globe," roughly a year and a

4    half, I believe.

5            Prior to that I had -- I was a student at

6    UMass working towards my criminal justice degree,

7    and I was primary caregiver to my three young

8    children.

9        Q.    Are there any jobs other than the "Boston

10   Globe" job that you mentioned?

11       A.    Prior to the academy?

12       Q.    Prior to the academy.

13       A.    Different jobs, just construction related.

14   I'm a pretty good tile setter, so I helped a few

15   people.

16       Q.    Was it for one company or more than one

17   company?

18       A.    It would have been myself.

19       Q.    Was your employment during that period full

20   time, or part time, or did it vary?

21       A.    It was full time at the "Globe."  And, you

22   know, on the side I would do some...

23       Q.    Do you remember what your salary was when

24   you worked for the "Globe"?

1          A.    No.  It wasn't much.

2                MR. SINSHEIMER:  Did you get that?

3                THE REPORTER:  "It wasn't much."

4          Q.    If you were to add your salary from the

5    "Globe" to the approximately 36,000 that you were

6    receiving from a pension at that time --

7          A.    Yes.

8          Q.    -- were you making more or less than you

9    were making when you worked full-time for the

10   Sheriff's Department?

11         A.    Probably less.

12         Q.    Now, earlier you provided some testimony

13   about your interactions with the Clinton chief about

14   him sponsoring you through that department to the

15   academy, correct?

16         A.    Yes.

17         Q.    Were there any conditions imposed upon you

18   by the chief or by the police department in terms of

19   employment after the academy, expectations while you

20   were with the academy, anything of that sort?

21         A.    Yes.

22         Q.    What were the conditions that were placed

23   upon you?

24         A.    Well, the -- there were uniform

1      A.    No, I did not.

2      Q.    When you retired from the Sheriff's

3  Department, did you thereafter maintain an active

4  LTC?

5      A.    No.

6      Q.    Okay.

7      A.    I actually -- I did not.  And I had to turn

8  in some stuff I had.  No, I did not.

9      Q.    At the time that you retired from the

10  Sheriff's Department you turned in your duty weapon?

11      A.    Yes.

12      Q.    After that period, did you have a personal

13  weapon?

14      A.    I did not.

15      Q.    Do you know when your LTC expired?

16      A.    No.  With the Sheriff's Department, you're

17  not issued an LTC.  You actually carry on your

18  badge.  Law enforcement officers can carry on their

19  credentials.

20      Q.    I'm aware.

21      A.    So that's what I would have carried under

22  for them.  I never sought prior to -- I never had a

23  reason.  I'm not a -- I didn't have an LTC from the

24  City of Boston.

1       Q.    Okay.  When did you first obtain an LTC?

2       A.    I'm -- I'm going to say 2012, roughly.

3       Q.    From the time period of obtaining that LTC

4   in 2012 until you began the academy in 2013, and

5   used a weapon from the Clinton Police Department,

6   did you have a personal weapon?

7       A.    No.

8             I'm sorry, Counsel, on that date, I have my

9   LTC on me.  I think the date of issue is on it.

10      Q.    If you want to take a look, that's fine

11  with me.

12      A.    Yeah.  I just -- just for accuracy.

13            11/27/2012.  And this would be my first

14  LTC.

15      Q.    Okay.  As you began attending the academy

16  in August of 2013, did you have any post-academy

17  employment secured?

18      A.    As -- I'm sorry.

19      Q.    As you began the academy in August of

20  2014 --

21      A.    I did not.

22      Q.    I understand from your earlier testimony

23  that you had been in discussion with some campus

24  police departments about working there after.

1      A.    Yes.

2      Q.    Had you completed an interview or

3   background process for any of those departments you

4   spoke with?

5      A.    I went, I believe, to two interviews with

6   Boston College, and I had several discussions -- I

7   actually entered the academy under the advice of

8   Captain Hussey at Boston College.  And I've had -- I

9   had a couple of discussions with him while I was in

10  the academy.

11     Q.    Did you have any understanding as you were

12  in the academy what was left in terms of your

13  application process with Boston College?

14     A.    No.  He -- Hussey said, "As soon as you get

15  that certificate, get down here, and," you know,

16  "we'll" -- "we'll get this through," you know.  So

17  it was -- it seemed contingent upon successful

18  completion of the academy.

19     Q.    Understanding that, do you have any

20  understanding as to whether you had to interview

21  with the chief, for example, once you graduated from

22  the academy?

23     A.    Yes.  I believe that was the final

24  interview.

1      Q.    Do you know if Boston College had already

2 conducted a background check on you?

3      A.    I do not know.

4      Q.    Did you know Sean Shattuck prior to

5 beginning the academy in August of 2013?

6      A.    I did not.

7      Q.    Understanding that the academy began in

8 August of 2013, do you recall when it was that you

9 first had any kind of interaction with Sean

10 Shattuck?

11     A.    I -- sometime during academy.  I believe he

12 was present for maybe a defensive tactics class.

13 I'm not -- I'm not completely sure.  I know he was

14 around the academy.  I just don't know what date.

15     Q.    You have some form of memory of observing

16 him prior to the firearms period --

17     A.    Yes.

18     Q.    -- in October?

19     A.    Yes.  At some point he was there.  I just

20 don't know exactly when.

21     Q.    During those interactions prior to the

22 firearms training component of the academy, did Sean

23 Shattuck do or say anything that you found

24 objectionable?

1      A.    I would -- nothing remarkable stands out.

2    I don't -- I don't remember anything prior to his --

3    the classroom portion of the firearms would be the

4    first.

5      Q.    Did you receive any written or verbal

6    instruction in connection with your academy

7    attendance that if you observed wrongdoing by

8    anyone, you were obliged to report it?

9      A.    Possibly.

10                  (Document marked as Turley

11                  Exhibit 38 for identification)

12            MR. GAMBACCINI:  Mark that as the next

13    exhibit.

14      Q.    I would ask you just to take a look at that

15    document.

16            And particularly, I'll direct you to the

17    bottom of Page 4, Section 3, "Recruit Training

18    Environment."

19            You can take as much time as you need to

20    with this.  My question is simply going to be if

21    you've seen this document before.

22      A.    I believe I have.

23      Q.    On Page 5, there is a Subsection 2,

24    "Responsibilities of All Student Officers."

```
 1    correct?
 2         A.   I -- I know there is an executive director.
 3    I know there is a lot of director titles.  I
 4    never -- I don't know of anyone who holds the title
 5    chairperson.  I don't know who that would be affixed
 6    to.  It may be parallel.  I don't know.
 7         Q.   Do you know with Jim Hicks is?
 8         A.   No.
 9         Q.   If you go back to your interrogatory
10    responses, Exhibit 35 --
11         A.   This one?
12         Q.   -- Pages 14 and 15, and it's Interrogatory
13    Number 17 and your response.
14              If you could review your response that
15    begins on Page 15 after the bolded portion.
16              (Mr. Koster exits)
17         A.   Yes.
18         Q.   Having reviewed that response, is it fair
19    for me to understand that the actions that you
20    allege as part of your complaint against Sean
21    Shattuck all took place within the firearms training
22    period of late October to mid November 2013?
23         A.   In regards to Sean Shattuck, yes.
24         Q.   How long was the firearms training period?
```

1      A.    For me, it would have been -- I don't know

2   if it was two days in the classroom and -- two days

3   in the classroom and then it would have been five

4   days at the range.

5      Q.    And that is on a Monday through Friday

6   schedule?

7      A.    The range -- I'm sorry.  It would be

8   four days, one evening at the range.

9            Yes, Monday through Friday.

10      Q.    So it would have lasted a full week and

11   then bled into a second week?

12      A.    No.  It would have -- it would have been

13   two days in one week.  We were in a classroom

14   portion -- the whole class was together.  And then

15   we were split into two firearm groups.

16            So half the class would be at the range for

17   the Monday through Friday portion.

18      Q.    But the entire firearms training period

19   would have been just shy of two weeks, including the

20   classroom component?

21      A.    Yes.

22      Q.    Now, you just referenced that the class was

23   split.

24      A.    Yes.

1     Q.     For the classroom component, the two days

2   that you described, the class was together as a

3   unit?

4     A.     I'm not completely -- it may have been one

5   day.  It may have been two days.  My memory -- I

6   know there was a classroom component.

7             (Mr. Koster enters)

8     Q.     However long the classroom component was,

9   the class was together as a single unit?

10    A.     Yes.

11    Q.     How many students were in the class at that

12  time?

13    A.     I'm going to say at least 25.  I know we

14  lost a couple of students to the state police

15  academy right around that time frame.

16    Q.     Did the classroom component of the firearms

17  training precede the range component?

18    A.     Yes.

19    Q.     Was Sean Shattuck involved in the classroom

20  component?

21    A.     He was.

22    Q.     Is there anything that he said or did

23  during the classroom component of the firearms

24  training period that you found objectionable?

1    A.    Yes.

2    Q.    What was that?

3    A.    He instructed us to stand in a position

4  like we were getting "fucked in the ass" to use his

5  words.

6    Q.    How many instructors were associated with

7  the classroom component?

8    A.    I don't remember exactly.

9    Q.    Was it more than Shattuck?

10    A.    Yes.   Definitely.

11    Q.    Did anyone else use that same phraseology

12  during the classroom component?

13    A.    Yes.

14    Q.    At any time when those statements were made

15  by Shattuck or anyone else, did you object?

16    A.    Directly to -- amongst ourselves or to the

17  class leaders, yes.

18    Q.    Did you say anything to Shattuck or any of

19  the other instructors that used that language that

20  you found it offensive?

21    A.    On that particular comment?

22    Q.    Correct.

23    A.    No.

24    Q.    Did any members of the class laugh when

1  that was said?

2     A.    Possibly.

3     Q.    Now, pulling word choice out of it, you

4  were trained at that point in time for a couple of

5  decades with a weapon, correct?

6     A.    Yes.

7     Q.    Did that stance fairly describe a proper

8  position --

9        MR. SINSHEIMER:  No.

10    Q.    -- for firing a weapon?

11       MR. SINSHEIMER:  I'm going to object to the

12  form of the question.

13       Hold on a second.

14       I'm going to object to the form of the

15  question, and all kidding aside -- because this is

16  going to sound period, but it's not.  I'm going to

17  tell you why.  Because the question assumes that he

18  knows what it means to be, quote, f'd up the.

19       So I'm objecting.  I think it's a

20  meaningless question.

21       That having been said, I'm not going to

22  instruct.  You want to describe the stance might be

23  a better way to put it.

24    Q.    Let me put it this way:

1          MR. SINSHEIMER:  Thank you.

2      Q.   Could you describe in your own words what

3  is an appropriate stance to fire a weapon?

4          MR. SINSHEIMER:  In appropriate words?

5      Q.   In whatever way you want to characterize

6  it.

7      A.   I certainly wouldn't ever use those terms,

8  but you need a balanced stance, your feet roughly

9  shoulder width apart.  You bend slightly forward.

10  You have your hands together, the weapon directly in

11  front of you.

12      Q.   During that classroom component of the

13  firearms training period, did you have any

14  interactions with Sean Shattuck that you thought

15  were pleasant?

16      A.   No.

17      Q.   Did you have any interaction with any of

18  the other instructors -- again during the classroom

19  component of the firearms training period -- that

20  you thought were pleasant?

21      A.   I did.

22      Q.   Who was the instructor?

23      A.   That would be Sergeant Mark Baron.

24      Q.   Yes, from South Hadley?

1    A.    Oh, yes.

2    Q.    Now, by the time that you began the

3  firearms training period, you already had failed one

4  examination, correct?

5         MR. SINSHEIMER:  Object to the form of the

6  question.

7         You can answer.

8         MR. GAMBACCINI:  Let me fix it.

9         MR. SINSHEIMER:  That's fine.

10  BY MR. GAMBACCINI:

11    Q.    By the time that you began the firearms

12  training period, you understood that the academy

13  indicated that you already had failed one

14  examination?

15    A.    Yes.

16    Q.    Do you allege that Sean Shattuck was

17  involved in any way with that alleged failure?

18    A.    I do not.

19    Q.    Now, when the classroom component was over,

20  the class broke up into two groups?

21         MR. SINSHEIMER:  You mean of the firearm?

22    Q.    The firearm training period.

23    A.    The classroom, yes, after the classroom

24  portion.

1      Q.    Were the groups called anything?  1 and 2?

2  A and B?

3      A.    They may have been.  I think it was week

4  one and week two.

5      Q.    And as to your group, I'm gathering, if

6  there were about 25 students in the class, your

7  group had about 12 or 13 persons; is that fair?

8      A.    Roughly, yes.

9      Q.    Were you in the group that went immediately

10  to the range?  Or did you do something else after

11  the classroom component of the firearms training

12  period was over?

13      A.    Yes.  The groups were split.  So yes, I was

14  in the first firearms group.  So class -- the

15  classroom portion ended on Friday; the range portion

16  began on Monday.

17      Q.    Do you know what the other group was doing

18  while you were assigned to the range?

19      A.    Yes.

20      Q.    What were they doing?

21      A.    They were to report to Fort Devens for

22  EVOC, emergency vehicle operation course.

23      Q.    So as to your group, you basically carried

24  over with the instructors immediately into the range

1    period after the classroom component was over?

2        A.    That's correct.

3        Q.    During this period of the classroom

4    component and then the range component, was this an

5    all-day endeavor for your group?  Or were you still

6    doing things like physical training or having other

7    classes on other topics?

8        A.    There was a city park in West

9    Springfield -- I'm sorry.  It may have been the town

10   of Westfield, or West Springfield, but there was a

11   municipal park, and we reported there for physical

12   training.

13       Q.    How long did the physical training aspect

14   of the day last?

15       A.    It was -- it was usually an hour.

16       Q.    And was the rest of the day devoted to

17   firearms, either in classroom or on the range?

18       A.    It was entirely range at that point.

19       Q.    How many days were you present at the

20   range?

21       A.    At the range in West Springfield, it would

22   have been there five days.  I'm sorry, four days,

23   one evening.

24       Q.    Was Sean Shattuck there for each of those

1    otherwise the sequence of the range component, first

2    day, second day -- do you recall when the Latino

3    incident took place?

4        A.    The Latino incident occurred prior to the

5    range.  It was in the classroom portion of it.  So

6    that would have been either Thursday or Friday.

7        Q.    So that was when the group was together as

8    a single whole?

9        A.    In the academy building, yes.

10        Q.    Understanding it was in the building, was

11    it in the classroom?

12        A.    Yes.

13        Q.    Was it during an instructional period or

14    during a break?

15        A.    It was during an instructional period.

16        Q.    Was Sean Shattuck the only individual

17    instructing at that time?

18        A.    No.

19        Q.    Who was the other instructor?

20        A.    It would have been Nicole Gaynor, Bob Cady.

21    I believe Mark Baron was there.  I could be wrong.

22    He might not have been the sergeant when that

23    incident occurred.

24        Q.    How long did the encounter between Latino

1   and Shattuck last?

2       A.    The encounter?

3       Q.    By encounter --

4       A.    The described incident?

5       Q.    -- you've alleged that Sean Shattuck placed

6   a couple of fingers underneath Latino's nose and

7   said words to the effect of, "Does it smell like

8   your wife?"

9       A.    Yes.

10      Q.    How long did that interaction take place --

11  last for, rather?

12      A.    Probably as long as you just described it.

13      Q.    A few seconds?

14      A.    Yeah.  Probably a minute or less.

15      Q.    Did Latino respond?

16      A.    Verbally?

17      Q.    Verbally or physically.

18      A.    Yeah.  He seemed pretty upset.

19      Q.    You say he seemed upset.

20            What gave you --

21      A.    He expressed he was upset after the

22  incident.

23      Q.    That moment in time, Shattuck does what he

24  does and says what he says --

1       A.      Yes.

2       Q.      -- did Latino, to your mind, verbalize or

3   otherwise present with any degree of upset?

4       A.      Yes.   He had a look of astonishment and

5   rage on his face, I guess.   A lot of people did.

6       Q.      You believe that he was enraged?

7       A.      I do.

8       Q.      Did you start to approach him in order to

9   prevent him from physically attacking Shattuck?

10          MR. SINSHEIMER:   Object to the form of the

11  question.

12          Hold on.   Hold on.

13          You can answer.

14      A.      Did I what?

15      Q.      Did you begin to move towards Latino to

16  stop him from any physical attack that might be

17  imminent?

18          MR. SINSHEIMER:   Object to the form of the

19  question.

20          You can answer.

21      A.      No.   It's my memory I was with Latino.   We

22  were -- we were working as a trio with one

23  instructor, being Shattuck.   I had either just had

24  handcuffs on Latino, or he was still in handcuffs

```
1        A.    No.

2        Q.    After Shattuck made the comment to Latino,

3   was there any other verbal exchange between Sean

4   Shattuck and anyone else?

5        A.    I don't -- I don't recall.

6        Q.    Did you say anything?

7        A.    To Latino?  Yes.

8        Q.    Or to Shattuck?

9        A.    Not directly to Shattuck.

10       Q.    What did you say to Latino at that time?

11       A.    It would have been after.  We discussed it.

12   You know, he was -- was furious about it.

13       Q.    Keeping us confined to that moment in time,

14   my question is, after you saw what you saw and heard

15   what you heard, did you say anything?

16       A.    No.

17       Q.    Did you do anything?

18       A.    Like I said, I continued to remove the

19   restraints from Latino.  It was part of the drill we

20   were doing.

21       Q.    Did Shattuck say anything to you?

22       A.    Yeah.  Something.  I wasn't laughing, you

23   know, so I -- I must have -- I must have carried a

24   look of agitation, or aggravation, disdain.  I don't
```

1    know.  He said something about a lack of a sense of

2    humor, or he made a comment.

3        Q.   Do you remember responding to that comment,

4    whatever it was?  In any way, verbally or with a

5    look of disgust?

6        A.   More than likely.  I don't know.  I don't

7    recall.

8        Q.   Do you recall -- now we're moving to the

9    range period and the incident with Danna.

10            Do you recall on what day the Danna event

11   occurred?

12       A.   I'm going to say it was Wednesday.  I

13   believe it was Wednesday.  I'm guessing.  I know it

14   was a daytime period.  I know it wasn't the night

15   shoot, and I'm almost positive it wasn't during exam

16   day.  So that would place it around Wednesday or

17   Tuesday.

18       Q.   Am I correct that the examination day was

19   Friday?

20       A.   Yes.

21       Q.   And your memory is then that it took place

22   a couple of days in advance of the examination?

23       A.   That's my memory.

24       Q.   Can you describe for me the layout of the

1    range area?

2        A.    The range area is an open wooded -- it's an

3    opening surrounded by woods.  There is a quarry

4    nearby.  There is tables.  There is lanes, shooting

5    lanes.  Targets are hung -- it's just a crude wood

6    structure they're hung from, and there is a berm

7    behind the range to contain rounds.  There is an

8    abandoned building that is riddled with bullet

9    holes, so I'm assuming it's used for exercises, and

10   there is a shack, like an instructor's shack,

11   immediately next to the range.

12       Q.    During the range component, did instructors

13   wear microphones?

14       A.    Some did.

15       Q.    What were the acoustics like in that area

16   when people were not wearing microphones?

17       A.    It was -- it was an open area.  It's about

18   the size of -- I don't know, roughly a -- I would

19   say a quarter acre.  The acoustics are good.  We're

20   all -- you can be heard.

21       Q.    The interaction that saw between Danna and

22   Shattuck, where were they when it took place?

23       A.    They were on the firing range.

24       Q.    Where were you?

1      A.    I was to the -- if you're looking down

2    range, I would have been to the left of the firing

3    range.

4      Q.    How far away were you when you observed the

5    physical contact between the two?

6      A.    When it initially started?  About 15 yards.

7      Q.    You were about 15 yards away.

8            Were Shattuck and Danna facing the same

9    direction?

10     A.    Danna would have been facing the targets,

11   and Shattuck would have been behind him.

12     Q.    And oriented to that, were you behind the

13   two?  To the left of them?  To the right of them?

14     A.    To the left.

15     Q.    So would their left, the back of their left

16   shoulders be what was visible to you first and

17   foremost?

18     A.    I was coming from the left side, so yeah.

19   So I would see their left shoulders.

20     Q.    They were not facing you directly, neither

21   one of them?

22     A.    At some point Shattuck was facing me.

23     Q.    Okay.

24     A.    He saw me approach.  Danna was focused and,

1    you know, he was -- he was going through what he was

2    going through, and...

3        Q.    And I'm just talking about at the inception

4    of the contact that you saw.

5              They were facing in a different direction?

6        A.    Yeah.   They were facing the targets.

7        Q.    Okay.   How long did the physical contact

8    last between Shattuck and Danna?

9        A.    A couple of seconds.

10       Q.    Did Danna say anything that you could hear?

11       A.    I just saw the look on his face.  I didn't

12   hear any -- I don't recall anything verbally.

13       Q.    Did you hear Shattuck say anything?  Again,

14   at that time that the physical contact is taking

15   place.

16       A.    I don't recall exactly what Shattuck said

17   to Danna.  I don't recall.

18       Q.    Do you know if there was anything said?

19       A.    I'm assuming there was during the -- during

20   the instruction.  But during the assault, I don't --

21   I don't recall anything being said.

22       Q.    At that time was Danna actually discharging

23   his weapon?

24       A.    No.  But his weapon was -- I remember his

1    weapon was downstream -- downrange.

2        Q.    Okay.

3        A.    I don't know -- I don't know if it was -- I

4    don't know the condition of the firearm, if it

5    was -- if it was charged, if it had a live round in

6    it.

7        Q.    He was pointing his weapon?

8        A.    He was pointing his weapon towards the

9    target.

10        Q.    Do you know if it was loaded at that time?

11        A.    I have no way of knowing.

12        Q.    Now, you indicated you were about 15 yards

13    away?

14        A.    Yes.

15        Q.    And how soon after you observed the

16    physical contact begin was it you began moving

17    towards them?

18        A.    I probably took two seconds to process,

19    like, "What the hell is this?"  And then I headed

20    towards them to stop it.

21        Q.    And understanding that you've testified

22    that the physical contact lasted for a matter of a

23    few seconds, how much ground did you traverse before

24    Shattuck released Danna?

1    A.    I was probably within five yards of him.

2    Q.    So you had moved about ten yards?

3    A.    Yes.

4    Q.    Did you say anything as you were closing

5    that distance?

6    A.    I -- I had an exchange with Shattuck.

7    Q.    That was --

8    A.    Oh, when I was closing the distance?  No.

9    No.  I was still kind of, "What the hell is this?"

10   Like trying to process what the hell he was doing.

11   Q.    Did you observe anyone else closing

12   distance to the two as you were?

13   A.    I don't -- I don't know.  I was -- I don't

14   remember anyone else closing distance.

15   Q.    And you've also testified that Shattuck

16   broke off his contact with Danna before you arrived

17   there?

18   A.    Before I physically intervened, yes.

19   Q.    At what -- you described Shattuck engaging

20   with you?

21   A.    Yes.

22   Q.    Walk me through their positioning.

23         You see the contact.  They're looking away

24   from you.  You begin to walk towards them.

1          At what point does Shattuck first turn in

2    your direction?

3        A.   He released Danna.  He was looking at me as

4    I approached, and then he released and directed

5    towards me, "Don't you have a fucking sense of

6    humor, Turley?"  I think I replied, "That's not

7    funny.  It's not funny," and something to that

8    effect.

9        Q.   Do you know Shattuck saw you before he

10   released Danna?

11       A.   I believe he did.

12       Q.   So Shattuck then said to you, "Don't you

13   have a sense of humor?"

14       A.   Yes.

15       Q.   You said, "That's not funny"?

16       A.   Yes.

17       Q.   Did Shattuck say anything at that point?

18       A.   Yeah.  He made a comment about if I ever

19   graduate, then I can tell him to go fuck himself.

20       Q.   Did you view that comment as a threat?

21       A.   I did.

22       Q.   How did you respond to that threat?

23       A.   I believe I said, "I'll keep that in mind,

24   sir."  I know it was difficult -- it's not like

1  took place?

2      A.    Afterwards, Danna was quite upset.  He

3  talked to me about, you know, if -- if I was a

4  homosexual I could be a millionaire for this shit

5  going on.  And I talked to him about, you know, "No

6  one gets to treat you that way."  You know, "If you

7  want to file a complaint, I'll go with you."  You

8  know, "I'll support you.  We'll file a complaint

9  together."

10         And during this engagement, I observed the

11  student officers, some of their laughter was

12  nervous.  We had discussed it prior with the

13  classroom thing with Danna -- I mean with Latino.

14  Their response is nervous laughter.  They didn't

15  know what to do.  The instructors were trying to be

16  amusing, and they -- it's almost like a -- we

17  discussed it.  It was almost like a programmed

18  response.

19         I was fed up with the laughter at this

20  point, because his behavior had escalated to a point

21  where I wasn't going to accept the students laughing

22  even out of nervousness.  So I spoke to them about

23  it.  I didn't want them laughing at it anymore.  I

24  believed it might be encouraging more of their

1   behavior.  It's not appropriate.  Stuff like that.

2          I admonished them.  I was kind of loud when

3   I spoke to the class during a break at the range,

4   and a student -- Student Officer Cunningham alerted

5   me to the fact that the instructors were listening

6   to you.  "They can hear everything you're saying."

7   So he was worried about me getting disciplined for

8   being insubordinate.

9      Q.    You had described that event during the

10  first day of your deposition.

11          That happened, that conversation amongst

12  the student officers, the same day as the Danna

13  incident?

14     A.    Yes.

15     Q.    So that would have been on Wednesday,

16  thereabouts?

17     A.    Roughly, yes.

18     Q.    Now, you've consistently described the

19  laughter that you heard from student officers as

20  "nervous laughter."

21     A.    Yes.

22     Q.    Did -- from your mind, did anyone just

23  simply laugh at the event?

24     A.    No.  We -- like I said, we had discussed

1    it.  I'm trying to think.  Merrigan was one of them.

2    That might have been in the classroom thing.

3    They're like, "We don't know what to do.  It's so

4    F'd up."  Like it really put the students in an

5    awkward situation.  It was a tough environment for

6    them to -- because you can't express yourself as you

7    normally would because of the discipline rich

8    environment.

9         Q.    How long --

10        A.    And they didn't know how to respond.  They

11   wanted to please the instructor or somehow satisfy

12   the instructor.

13        Q.    How long did this talk that you gave to

14   other student officers last?

15        A.    It was -- it was quick.  Just, you know,

16   "knock it off."

17        Q.    Less than a minute?

18        A.    Yeah.  There was a couple of students that

19   kind of laughed at every little joke, and I'm, like,

20   "Knock it off, guys."  I think I -- I -- I think I

21   used -- I believe I said, "I'm sick of the whole

22   chuckle bucket routine, guys.  Don't laugh," you

23   know.

24             And I mentioned statistically we more than

1    likely have a homosexual member in our class.  I

2    said, you know, think about that when you're

3    laughing at this stuff.

4        Q.    So in terms of the time line, was this

5    speech more than a minute or less than a minute?

6        A.    Probably 25 to 30 seconds.

7        Q.    And at the time this conversation was

8    taking place, you were grouped among the other

9    student officers?

10       A.    Yes.

11       Q.    How far away were the instructors?

12       A.    They would have been in or around the shed

13   that would be to the left of the fire line, if

14   you're looking downrange.  And we would have been

15   just left of the shed, in an open area.

16       Q.    In terms of distance, how far away were

17   they?

18       A.    20 yards.

19       Q.    And is it fair -- was there any portion of

20   your talk that went on after Cunningham made his

21   comment that instructors were listening?

22       A.    Maybe for a couple of seconds.  I wrapped

23   it up.

24       Q.    At that point in time or earlier, did you

1  try to keep your voice down so that only the people

2  you were trying to communicate with could hear you?

3      A.   No.

4      Q.   Was it your intention to speak loudly

5  enough that the instructors who were a number of

6  yards away could hear you?

7      A.   At that point I -- I was pretty mad at the

8  group.  We -- we were allowed to speak freely during

9  our -- once we were on a break, so we can speak

10  amongst ourselves freely.  The discipline goes away.

11  It's only in the presence of staff instructors were

12  we required to maintain.

13      Q.   You described what you observed between

14  Shattuck and Danna as a "felonious assault,"

15  correct?

16      A.   Yes.

17      Q.   And you were talking about that assault

18  with the other officers?

19      A.   Yes.

20      Q.   Did you want to do so in a tone of voice

21  that Shattuck could hear you talking about what he

22  had done with the other student officers?

23      A.   That Shattuck could hear me?

24      Q.   Yes.

1      A.    I was directing my remarks to the students.

2   I may have been loud.

3      Q.    Did you want Shattuck or the other

4   instructors to hear what you were saying?

5      A.    At that point there was no mutual respect

6   between me and Shattuck, or pretty much anyone at

7   that firearms group.  I didn't care if they heard

8   me.

9      Q.    Okay.  Did Cunningham tell you who the

10  instructor was that he thought was listening?

11     A.    He did not.  He said "instructors," plural.

12     Q.    Do you know where Sean Shattuck was at that

13  point?

14     A.    I don't know his exact location.

15     Q.    Could you see him from where you were

16  situated?

17     A.    Not -- I don't recall seeing him.

18     Q.    You don't have any personal information

19  that any of the instructors, to include Shattuck,

20  heard what you were saying that day, correct?

21     A.    Just what I heard from Cunningham.

22     Q.    Did Sean Shattuck ever make any comments

23  about your age?

24     A.    Possibly.

1      Q.    Can you recall any as you sit here today?

2      A.    Not specifically.

3      Q.    Now, you quote -- you attempted to qualify

4    with a firearm at the end of the range component,

5    correct?  The end of the range training period was

6    the firearms qualification exam?

7      A.    Yes.

8      Q.    At that point in time you had not qualified

9    with a weapon since you retired from the Sheriff's

10   Department more than three years prior, correct?

11     A.    That's correct.

12           MR. SINSHEIMER:  May I ask for -- I don't

13   want to interrupt.  I just got what appears to be an

14   emergency from my office.  If you're in the middle

15   of a line --

16           MR. GAMBACCINI:  Go ahead.

17           (Recess taken)

18   BY MR. GAMBACCINI:

19     Q.    Sir, earlier you were describing the

20   incident that you observed between Shattuck and

21   Danna.

22     A.    Yes.

23     Q.    Was Danna -- I think you had answered this

24   before that Danna was not discharging his weapon at

1     A.    Ear protection were required, yes.

2     Q.    Do you know if any student officers were

3  wearing earplugs at the time of the interaction

4  between Danna and Shattuck?

5     A.    Possibly.

6     Q.    Were you?

7     A.    I don't remember.

8     Q.    At the point in time that you had this

9  group conversation with the other student officers,

10 was there anyone that was firing at the range?

11    A.    No.

12    Q.    Was that also a break period?

13    A.    The period with my memory is the period

14 when the assault on Danna occurred.  That would have

15 not been a break.  That would have been in between

16 exercises.  You know, we have to reload.  We would

17 return to the tables, weapons are holstered safely,

18 and magazines are reloaded.  And sometimes we carry

19 loose rounds, depending on the exercise, in our

20 pockets, but we were -- they would have been setting

21 up for the next exercise.

22    Q.    Now, you had earlier, just before we broke,

23 indicated that at the time you were qualifying in

24 2013, you had not qualified with a weapon for more

1  than three years, since you had retired from the

2  Sheriff's Department, correct?

3      A.    That would have been correct.

4      Q.    Had you shot a weapon at all after your

5  retirement from the Sheriff's Department until you

6  began the live fire exercises associated with the

7  academy in October and November of 2013?

8      A.    I don't recall.  I don't believe I did.

9      Q.    Now, during the first day of your

10  deposition, you were asked some questions about

11  something you had noted at the time of the firearms

12  training period which was an injury to your right

13  elbow.

14          Do you recall that?

15      A.    I do.

16      Q.    How were you injured?

17      A.    During a -- an exercise at the academy.

18      Q.    Was this during the firearms piece or was

19  it prior to the firearms piece?

20      A.    No.   That would have been during defensive

21  tactics training.

22      Q.    As of the time of your qualification with

23  firearms that Friday, when you were tested, how long

24  had you had the right elbow injury for?

1     A.    It would have been -- defensive tactics is

2  on Friday.  So it would have been through the

3  weekend.  I probably reported the injury when it

4  occurred, and then if it was still aggravating,

5  we're required to report them again at PT

6  instruction.  And I believe the range required us to

7  report any injuries.

8     Q.    So at that point in time you had had the

9  injury for about a week?

10    A.    No.  Oh, yeah.  Almost -- yeah, exactly a

11  week.

12    Q.    Did you seek any treatment for your injury

13  to your elbow?

14    A.    No.

15    Q.    In terms of the examination process itself

16  on that Friday, do officers shoot one at a time?  Or

17  do multiple officers shoot at the same time?

18    A.    Multiple officers shoot at the same time.

19    Q.    How many officers would shoot at one time?

20    A.    I'm going to guess six.  Six or seven, I

21  believe.  We were cut in half, if memory serves.

22    Q.    And what are the instructors doing as the

23  live firing is happening?

24    A.    They would monitor the students as they

1  been looking downrange, waiting for our scores as

2  they scored the targets.

3      Q.   Do you recall how many instructors were

4  associated with grading the targets the first time

5  you went through the process that day?

6      A.   At least three.

7      Q.   Now, I think earlier you indicated that at

8  some point you saw Sean Shattuck grading your

9  target, correct?

10     A.   Several times he was grading my target.

11     Q.   Meaning as you went through the process

12 three times that day, you saw him grading your

13 target?

14     A.   Yes.

15     Q.   Did you see anyone else grading your

16 target?

17     A.   No.

18     Q.   How did you know it was your target among

19 others, presumably, that Shattuck was grading?

20     A.   I know what lane I was in.  Every student

21 was looking down their lane to see if they passed.

22 Because you could see the writing, the Sharpie

23 writing.  But you couldn't physically see

24 necessarily all of your rounds.

1    Q.   Do you know if Officer Gaynor first graded

2 your target that day?

3    A.   No.  My recollection of the scoring process

4 is I remember Shattuck scoring my target and then

5 Gaynor would progress down the line.  Different

6 instructors scored different targets.  It may be --

7 and Gaynor would go down and record what they wrote

8 as -- or on a clipboard.

9         She had a clipboard.  She would look at the

10 scores and progress to the next targets.

11    Q.   Did you ever see Gaynor scoring targets

12 that day?

13    A.   I don't recall her ever scoring targets.

14    Q.   Now, at some point, presumably, you were

15 told that the instructors did not believe that you

16 had qualified on the first attempt, correct?

17    A.   Yes.

18    Q.   Was there any discussion that you had with

19 the instructors at that point in time?

20    A.   No.  Possibly.  I wanted to know what I did

21 wrong so if I -- I assumed it was correct at that

22 point.  Since, I -- I don't have that faith.

23    Q.   Do you recall who it was?

24         MR. SINSHEIMER:  Did you get that last

1    comment?

2         THE REPORTER:  "Since, I don't have that

3    faith."

4         Q.    Do you recall who it was who you were

5    interacting with about your score?

6         A.    It may have been Gaynor.

7         Q.    You recall her being the one that told you

8    she believed you didn't pass?

9         A.    Gaynor -- I know my grouping was to the

10   left, and I think she gave me some -- it's called

11   sight picture.  She told me I could -- something

12   about the sight picture on the weapon, something.  I

13   don't know.  I know my grouping was just off center

14   to the left of the target, and I -- I've always shot

15   that way.  I don't know why.  It's just a -- I've

16   always grouped left.  I don't know why.

17        Q.    But you recall the interaction about your

18   score that first time being with Gaynor?

19        A.    Yeah.  I thought maybe I drew a round off

20   the target.  Usually my group is tight, and they

21   were.  All the group was tight.  I thought maybe,

22   "What's going on?  How do I make an adjustment?"  If

23   she had any tips, I think.

24        Q.    Did you interact with anyone else about

1    your score on your first attempt?

2         A.    I did.  I remember talking to Sergeant

3    Baron about a similar thing, positioning, finger on

4    the trigger, if somehow I'm moving the weapon as it

5    discharges.  There was some talk about that with

6    Sergeant Baron.

7         Q.    At that point that day did you present the

8    argument that your shots might have been double

9    shots?

10        A.    Yes.  There was talk about -- it's called a

11   keyhole, where basically a round -- if you have a

12   tight group, you may not be able to count 50 rounds,

13   but you may have keyhole, a shot which is

14   basically -- sometimes there is a slight -- it

15   almost makes the round hole look slightly oval, and

16   that would be an indicator of a keyhole shot, like

17   two bullets pass through the same hole.  Like that

18   was the terminology used.

19             Yeah, there was a conversation at the

20   range.

21        Q.    Do you know if any of the instructors

22   checked to see whether a keyhole had occurred?

23        A.    I don't.  I don't believe there was time.

24   They honestly -- once they were recorded, the

1    targets came down and they went into a barrel fire

2    that we had at the range once they were recorded on

3    the clipboard.

4        Q.    So you never had an opportunity to look at

5    your paper target yourself to see if you could

6    account for --

7        A.    No.

8        Q.    -- whether keyhole or otherwise, 50 --

9    50 shots at that target?

10       A.    Correct.  There was no such appeal.

11       Q.    And was that the same process after your

12   second and third attempts that day?

13       A.    Correct.

14       Q.    Do you recall interacting with Officer

15   Gaynor after the second and third attempts that day

16   about your score?

17       A.    I don't.

18       Q.    Do you recall if you interacted with any

19   instructor after your second and third attempts that

20   day?

21       A.    No.  I -- I interacted with -- we had -- I

22   interacted with one student.  He was actually

23   remarkable.  I've never seen anyone shoot this good

24   in my entire time with the Sheriff's Department or

1   anywhere.  It was Adam Symanski.  He was amazingly

2   accurate with his firearm.  His grouping was

3   extremely tight.  And I consulted him on it, and he

4   gave me some tips.  But...

5       Q.   How old was Student Officer Symanski?

6       A.   I think he's 30, or at the time 30.  I'm

7   not sure.

8       Q.   So he didn't have, from your estimation,

9   the type of experience that you had with a weapon?

10      A.   No.  I believe he was raised in the

11  country.  I believe he had a tremendous amount of

12  experience.  I think he's a sportsman, fires all the

13  time with a great deal of experience.

14      Q.   And so as I understand it, then, you were

15  looking for tips from Gaynor and from Symanski about

16  what to do to shoot more proficiently that day?

17      A.   I was.  And then, you know -- and then I --

18  as it progressed, I lost faith, I think, in the

19  staff scoring the target.  I believe it was --

20      Q.   At what?

21      A.   I think the fix was in, so...

22      Q.   At what point in the sequence did you come

23  to that opinion that the fix was in?

24      A.   Probably after the second time I was told I

1    did not qualify.

2         Q.    And why did you believe the fix was in at

3    that point?

4         A.    Because I was -- I was -- I was very

5    deliberate with every round I put downrange.  I saw

6    the grouping.  I think I was informed I had missed

7    one on paper, and I'm -- I was pretty discouraged.

8    I'm, like, they're not --

9         Q.    Were you trying harder the second time than

10   you were the first?

11        A.    Yeah.  I was -- I was pretty focused.

12        Q.    Why did you believe you were being targeted

13   in that way?

14        A.    I believe it was my interaction with Sean

15   Shattuck and possibly my instruction to the students

16   to not laugh at Shattuck and Cady's outrageous

17   behavior.

18        Q.    Officer Gaynor was the lead firearms

19   instructor for that component?

20        A.    She was.

21        Q.    Did you ask her to have Sean Shattuck

22   refrain from scoring your targeted second or third

23   times?

24        A.    I -- again, my faith in the firearms

1        Q.    Do you allege that anything untoward

2    happened in the grading of the first attempt to

3    qualify on that remediation day?

4        A.    I -- like -- I don't -- I don't trust

5    anything that firearms crew did, or McKenzie.   I

6    don't -- I don't believe they acted appropriately at

7    all when it came to me or the instruction at that

8    academy, so I guess I would call into question

9    anything they did.

10       Q.    Now, you knew when you went to attempt to

11   qualify in the remediation day that if you did not

12   remediate successfully, that you would be dismissed

13   from the academy?

14       A.    That's correct.

15       Q.    Were you nervous as you shot that day?

16       A.    For a couple of reasons, but yes.

17       Q.    What were the other reasons other than fear

18   of failure?

19       A.    Well, the hostile environment the staff

20   created.   They were actually blasting in the quarry.

21   We had to interrupt between the first qualify

22   occasion and the second.   So, like, a horn went off;

23   we have to leave the quarry; we have to leave the

24   area and then come back in, like, 20 minutes.   So

1    that -- that added a factor.  But mostly the staff,

2    I had no faith in them, or McKenzie at that point.

3        Q.    At some point, either during the initial

4    qualification day or this remediation day, were you

5    ever given an opportunity to shoot at different

6    pieces of paper, different targets?

7        A.    I'm sorry.  Run that by --

8        Q.    Either on the first day that you attempted

9    to qualify, that Friday --

10       A.    Yes.

11       Q.    -- or on your remediation day, were you

12   ever given an opportunity to shoot at different

13   targets from different distances in order to make

14   the counting of the targets on the target easier?

15       A.    I did not shoot in between -- no.  I did

16   not shoot in between those days.

17       Q.    Not in between days.  I'm talking about

18   either on that first day that you attempted to

19   qualify, or on your remediation day, at some point

20   were you given an opportunity to shoot at, say, five

21   separate targets rather than one target?

22       A.    I don't remember.

23            Oh, I'm sorry.  I -- I just got the

24   question.

1      Q.    To use some terminology, were you given an

2   opportunity to shoot at different distances with a

3   clean target?

4      A.    I'm sorry.  Yes.  If that's what you meant,

5   yes, I did.  Sorry.  I got ensnared here with the

6   wiring.

7            MR. KOSTER:  Sorry about that.

8      Q.    Yes.

9      A.    So at each range -- I mean, at each

10  distance of the firearms exam there was a clean

11  target, so it was easier to count rounds.

12           Do you know what I'm saying?

13     Q.    I do.

14     A.    As I advanced, I would switch to a

15  different target and engage a different target,

16  because I was the only shooter at the range.

17     Q.    So that was on the remediation day?

18     A.    On the remediation day, yes.

19     Q.    Okay.  And do you know whose idea it was to

20  give you clean targets to shoot at on the

21  remediation day?

22     A.    I don't.  I know Nicole Gaynor told me to

23  hang five targets.  I didn't understand the purpose

24  of that at the time, but then once I started the

1    course, I did.

2         Q.    Now, after the firearms training period was

3    over, there was another examination that the academy

4    alleges you failed:  Field sobriety testing,

5    correct?

6              MR. SINSHEIMER:  Object to the form.

7         A.    Yes.

8              MR. SINSHEIMER:  Object to the form, word

9    "examination."  Everything else is fine.

10        Q.    The inquiry into your knowledge as to field

11   sobriety testing, there was an alleged failure after

12   that event, correct?

13        A.    That was alleged, yes.

14        Q.    Do you allege that Sean Shattuck had

15   anything to do with that inquiry into your knowledge

16   of field sobriety testing?

17        A.    To my knowledge, Sean Shattuck did not have

18   anything to do with it.

19        Q.    Is there anything else that you allege Sean

20   Shattuck said or did that you find objectionable

21   that we haven't talked about today?

22             MR. SINSHEIMER:  Object to the form.

23             You can answer.

24        A.    Today or --