# EXHIBIT

# 7

9

1      Q.    Documents that you had produced in

2  connection with this litigation?

3      A.    Correct.

4      Q.    Did you speak to anybody outside the

5  presence of counsel to prepare for today?

6      A.    My wife.

7      Q.    Other than your wife?

8      A.    No.

9      Q.    Would you please state your address.

10      A.    12 Greaton Road, West Roxbury, Mass.

11      Q.    How long have you lived there?

12      A.    12 years roughly.

13      Q.    Who do you live with?

14      A.    My wife and three children.

15      Q.    What is your date of birth?

16      A.    11/16/67.

17      Q.    How old does that make you now, 49?

18      A.    I'm 48.  I'll be 49 soon.

19      Q.    You said you have three kids.  How old are

20  your kids?

21      A.    My kids are 11, 10 and 9.

22      Q.    Did you graduate from high school?

23      A.    Yes.

24      Q.    Which high school?

10

1    A.    Catholic Memorial High School.

2    Q.    Where is that located?

3    A.    West Roxbury.

4    Q.    What year?

5    A.    1986.

6    Q.    Did you attend college?

7    A.    Some college.

8    Q.    Which college?

9    A.    I went to Massasoit Community College

10   briefly, and technically I'm still enrolled at UMass

11   Amherst, their on-line university.

12   Q.    Did you attain any degree at Massasoit

13   College?

14   A.    No.

15   Q.    And where is that located?

16   A.    That is I believe in Canton.

17   Q.    Do you have any degrees beyond a high

18   school diploma?

19   A.    No.

20   Q.    Do you have any professional licensures?

21   A.    I have an academy -- it was the Criminal

22   Justice Training Council at the time for corrections

23   officers.  That would have been in 1990.

24   Q.    What does that entail?

11

1       A.    It's like a basic training academy for

2   corrections officers.

3       Q.    Did you attend any other technical training

4   schools?

5       A.    Over the course of my career, I went to

6   several trainings.  I believe I provided you my

7   records.

8       Q.    What I'm referring to is, did you attend

9   any educational training to be licensed in a trade?

10  For example, that would be like plumbing,

11  electricity, anything like that.

12      A.    No.

13      Q.    Did you ever serve in the military?

14      A.    No.

15      Q.    Do you have any other educational

16  background other than what we just discussed?

17      A.    No.

18      Q.    Where you are currently employed?

19      A.    Massachusetts General Hospital.

20      Q.    When did you start working at MGH?

21      A.    February 2015.

22      Q.    What is your position there?

23      A.    I'm a security officer.

24      Q.    What is your salary there?

17

1      A.    I'm not either.

2      Q.    Were you charged with verbally assaulting a

3   police officer?

4      A.    No.

5      Q.    Resisting arrest?

6      A.    No.

7      Q.    Do you recall enrolling as a cadet at the

8   Western Mass. Regional Police Academy?

9      A.    I do.

10     Q.    I'll refer to that institution as "the

11  academy."  Is that okay with you?

12     A.    Yes.

13     Q.    You'll understand that?

14     A.    Yes.

15     Q.    I'm also going to refer to the Municipal

16  Police Training Commission as "the MPTC," okay?

17     A.    Understood.

18     Q.    Am I correct you were a member of the 49th

19  Recruit Class?

20     A.    That's correct.

21     Q.    When did your training course begin?

22     A.    It would have been August 19, 2013.

23     Q.    What town is the academy located in?

24     A.    It's in the City of Springfield, I believe

18

1    within the city limits.

2        Q.    In connection with your involvement as a

3    cadet, were you sponsored by any police department?

4        A.    I was.

5        Q.    Which department?

6        A.    The Clinton Police Department.

7        Q.    Who is the chief there that sponsored you?

8        A.    His name is Mark Lavendure, I believe is

9    the name.

10       Q.    Levenger?

11       A.    Lavendure.  I could be saying it wrong.

12       Q.    Where were you living at the time you

13   started at the academy in August of 2013?

14       A.    I actually had a dual residency.  On the

15   weekends I would be at my current address at

16   12 Greaton Road, and I stayed at Church Street in

17   Clinton.  I forget the exact address.

18       Q.    Let's mark these, which are your responses

19   to the interrogatories that were served by the MPTC.

20   You will receive a copy by the reporter.

21                    (Document marked as Turley

22                     Exhibit 1 for identification)

23       Q.    I ask you to turn to No. 18.

24       A.    (Examines document)

24

1   to start on Paragraph 18.

2       A.   (Examines document)

3       Q.   Are you on Paragraph 18?  Do you see that?

4       A.   No. 18, yes.

5       Q.   So I'll ask you some questions.  It says,

6   "Mr. Turley and only Mr. Turley was ordered to

7   perform the degrading task of kneeling down and

8   placing socks on the bare feet of another student

9   officer.  This occurred in front of the entire class

10  in the presence of several MPTC staff instructors

11  under the supervision of Sgt. Powers," did I read

12  that correctly?

13      A.   Yes.

14      Q.   Who ordered you to put socks on the bare

15  feet of another cadet?

16      A.   I don't know.

17      Q.   Where did the order come from?

18      A.   It would have been one of the people under

19  Sergeant Powers' direction that day.  He was the

20  lead instructor.  He was responsible for all

21  instructors.

22      Q.   How did you receive this order?

23      A.   I was shouted at to get moving.  I had to

24  leave my position in the formation.  I had to go to

25

1   the other side of the formation in front of the

2   formation, so very close to Sergeant Powers.  I had

3   to -- then Officer Latino -- well, later identified

4   as Officer Latino.  I didn't know who he was at the

5   time.  I was ordered -- I believe he showed up with

6   black socks.  That was inappropriate for Day 1 at

7   the academy.  I was ordered to change his socks for

8   him.

9        Q.   But my question was, who gave you the order?

10       A.   I don't know.

11       Q.   How did you receive the order?

12       A.   It would have been one instructor -- two

13  instructors followed me over to Latino.  I don't

14  know what their names were.  I didn't know anybody's

15  name when I arrived out there.

16       Q.   Did you hear it verbally from an instructor?

17       A.   Shouted very loudly, yes.

18       Q.   An instructor shouted the order at you?

19       A.   Very loudly.

20       Q.   Was it a male or female?

21       A.   It was two male instructors.

22       Q.   You don't know who it was, though?

23       A.   I don't.

24       Q.   You testified you had to put socks on

26

1    Student Officer Latino?

2        A.    Nicholas Latino, yes.

3        Q.    Do you know the date on which this happened?

4        A.    That would have been August 19, 2013.

5        Q.    Who else was present when you were told to

6    put socks on Latino's feet?

7        A.    That would have been the entire 49th.  I

8    don't believe anyone had -- the entire class that

9    started that day.  I don't believe anyone had

10   dropped out by that point.

11       Q.    So all of your classmates would have heard

12   it as well?

13       A.    Yes.  It was frequently discussed after

14   that date.

15       Q.    You wrote that, "Mr. Turley and only

16   Mr. Turley was told to put socks on another cadet,"

17   correct?

18       A.    Yes.

19       Q.    Sorry?

20       A.    I said yes.

21       Q.    Is it your testimony you were the only

22   cadet in the whole 49th class that was told to put

23   socks on another cadet's feet?

24       A.    Yes.

1    Q.    During the entire academic year?

2    A.    Correct.

3    Q.    How do you know you were the only one over

4  the course of the entire academic year?

5    A.    It was a frequent topic of discussion

6  amongst myself and the other students.

7    Q.    How do you know it never happened again

8  outside of your presence?

9         MR. STOKER:  Objection.

10    A.    That's impossible to know.

11    Q.    So you recognize, then, that it might have

12  happened again and you were just not aware of it?

13         MR. STOKER:  Objection.   You can answer.

14    A.    It's impossible for me to know what

15  occurred outside of my presence.

16    Q.    Paragraph 19 says, if you will read along

17  with me, "On another occasion, Sgt. Powers ordered

18  Mr. Turley to write the entire 'Use of Force' model

19  on the white board every day for several weeks

20  during his lunch break.  This punishment was ordered

21  for misspelling the word 'volatile.'  Thus,

22  Mr. Turley was deprived of the right to eat his

23  lunch on several occasions during this physically

24  demanding training," did I read that correctly?

28

1      A.    Yes.

2      Q.    You wrote "every day for several weeks"

3   there, right?

4      A.    Yes.

5      Q.    How many weeks are we talking about?

6      A.    I'm guessing about four.

7      Q.    So you didn't have lunch once for four

8   weeks?

9      A.    That's not what I wrote.

10      Q.    You wrote "every day for several weeks,"

11   right?

12      A.    Yes.

13      Q.    Then you just said it lasted four weeks?

14      A.    Yes.

15      Q.    So that means every day for four weeks you

16   didn't have lunch.

17      A.    No.

18      Q.    So please correct me.  That's not a good

19   question.  Is this statement in the complaint

20   incorrect?

21      A.    This is correct.

22      Q.    So how many days were you deprived of lunch

23   over that four-week period?

24      A.    Several.

1     Q.   Were you instructed to memorize the use of

2  force module?

3     A.   I was.

4     Q.   Did any of your classmates fail to memorize

5  it to the best of your memory?

6     A.   Yes.

7     Q.   How many?

8     A.   Well, that is why it took so long.  The

9  entire class had to pass or everyone failed.  My

10  misspelling the word "volatile" resulted in the

11  entire class failing.  Every week we were tested on

12  it.  Different little errors would occur, and that's

13  why it took five weeks.  That was the one I was

14  responsible for.  That continued until the entire

15  class passed.

16     Q.   And your mistake was spelling the word

17  "volatile"?

18     A.   Correct.

19     Q.   Were your other classmates also required to

20  write the use of force module?

21     A.   No.

22     Q.   How were they required to remediate the

23  mistakes that they made?

24     A.   It was not anything I would have seen of,

33

1    like, writing things on the board.

2         Q.   So it could have been something different?

3         A.   I don't know.

4              MR. STOKER:  Objection.

5         Q.   Would you turn to Paragraph 20.  It says

6    that the academy "required Mr. Turley to endure

7    incessant jokes about his age.  Staff instructors

8    including Sergeant Robert Powers, Instructor Delilah

9    Yee and others repeatedly ridiculed Mr. Turley about

10   his use of Viagra, rotary phones, and numerous other

11   age-related topics," did I read that sentence

12   correctly?

13        A.   Yes.

14        Q.   You wrote that age jokes were made by

15   Sergeant Powers, Delilah Yee and others.  When you

16   say "and others," who are you talking about there?

17        A.   Different instructors that would come in.

18        Q.   Who?

19        A.   I don't remember all their names.

20        Q.   Do you remember any of their names?

21        A.   No.  It would happen during defensive

22   tactics.  Palmaram -- I forget his name.  It was his

23   thing.  That was interesting because he was

24   corrected for it.  Palmaram maybe -- I can't think

36

1    crime scene photos in one of the classes, and there

2    was a wheelchair.  Someone mentioned, "That's

3    Turley's chair."

4        Q.  A cadet or instructor?

5        A.  An instructor.  There was a toilet with --

6    like, I don't know what they call it -- the

7    handlebar things to assist an elderly person.  That

8    was supposedly my thrown.  It was jokes like that

9    all throughout the academy, all by instructors.

10       Q.  Any comments from cadets about

11   age-related topics?

12       A.  Not that I can recall.

13       Q.  Would you turn to Paragraph 24.  It says,

14   "In a module of motor vehicle law, Instructor

15   Sgt. Powers clearly expressed his pleasure that

16   Turley's class was not 'ethnically diverse' because

17   the class was made up of apparently 'white'

18   recruits."  Now, what exactly did Powers say?

19            MR. STOKER:  Objection.

20       A.  He said, This is not an ethnically diverse

21   group, and he expressed his pleasure that it was not

22   ethnically diverse.

23       Q.  We will come back to that in a minute.  Is

24   that a direct quote from him or are you paraphrasing

1    that to the best of your ability?

2        A.    I'm paraphrasing.

3        Q.    Who witnessed this statement?

4        A.    That would be the entire 49th ROC.

5        Q.    When you wrote that the entire class was

6    made up of apparently white recruits, were every one

7    of your classmates white?

8        A.    I can't say for certain, apparently.

9        Q.    What do you mean "apparently"?

10       A.    Apparently they were all Caucasian.

11       Q.    Why do you say "apparently," though?

12       A.    Well, sometimes...

13       Q.    Is that your belief?

14       A.    That's my belief.  That's how it appeared

15   to me.

16       Q.    You just testified that Sergeant, now

17   Lieutenant, Powers clearly expressed his pleasure?

18       A.    Yes.

19       Q.    What do you mean by that?

20       A.    He either said -- he may have said it, but

21   he definitely expressed it, an exaggerated smile.

22   He may have said that he likes it like that, that's

23   it not ethnically diverse.  He expressed pleasure at

24   it.

38

1    Q.   He may have said that he likes it that it's

2 not ethnically diverse?

3    A.   Yes.   I don't remember an exact quote.   I

4 remember being mad about it.

5    Q.   Is it your testimony that he said he likes

6 it like that?

7    A.   No.   I can't say directly.

8    Q.   So that's not your testimony?

9    A.   He expressed pleasure.   I don't know

10 exactly how he expressed it.   I know he had an

11 exaggerated smile on his face.

12   Q.   What's an exaggerated smile?

13        MR. STOKER:   Objection.

14   A.   Smiling from ear to rear.

15   Q.   Ear to ear?

16   A.   Yes.

17   Q.   Was his mouth wide open?

18   A.   No.

19   Q.   Were his teeth showing?

20   A.   Yes.

21   Q.   Was his tongue hanging out?

22   A.   No.

23   Q.   Was he laughing?

24   A.   No.

39

1      Q.    But you would describe it as an exaggerated

2   smile?

3      A.    Yes.

4      Q.    Did he tell you that he -- strike that.

5      A.    Possibly.

6      Q.    Sorry?

7      A.    Nothing.  Continue.

8      Q.    Again, you put in your complaint the words

9   "white" and "ethnically diverse" in quotes.  Were

10  those your words or Sergeant Powers' words?

11     A.    "White" in this context would have been

12  mine.  "Ethnically diverse" was a direct quote of

13  his.

14     Q.    Would you turn to Paragraph 25.  This

15  reads, "When student officer Nick Latino described

16  his experience in this class of being pulled over

17  just outside of his own driveway for no apparent

18  reason, Sgt. Powers asked him, 'Is your vehicle

19  ethnically modified,' continuing, 'that could be the

20  reason for the stop.'  Sgt. Powers then went on to

21  advise the student officers that Massachusetts

22  police officers could issue citations to 'ethnically

23  altered vehicles all day long.'  Sgt. Powers later

24  admitted to this commentary and confirmed that he

40

1    refers to 'ethnically altered vehicles' as those

2    commonly driven by Hispanics.  Sgt. Powers regularly

3    used the term 'ethnics' interchangeably with

4    'Hispanics.'"

5         What is an ethnically modified vehicle?

6         A.    The exhaust on -- ethnics would be

7    interchangeable with Hispanics, as we were taught.

8    Certain model vehicles, a Toyota Corolla was one.

9    One of the smaller Honda models was one.  I forget

10   the exact -- the suspensions were lowered.  The

11   exhaust was louder.  Somehow modified.

12        Q.    Is it referring to --

13        A.    Tinted windows.  I'm sorry.

14        Q.    That's fine.

15        A.    There was a bunch of criteria for an

16   ethnically modified vehicle that he explained to the

17   class.  He said, you know, common to the Hispanic

18   car culture, I guess.

19        Q.    Is it referring to equipment modifications

20   to cars?

21        A.    Correct.

22        Q.    Like equipment violations?

23        A.    Yes, I guess.

24        Q.    Police officers can issue citations to

41

1    vehicles with equipment violations, correct?

2        A.    That's correct.

3        Q.    Turning to Paragraph 28, I want to look at

4    the third line from the bottom of the paragraph.

5    There are some derogatory terms here that I will

6    read from the complaint.  It says, "Firearms

7    instructors routinely referred to Student Officers

8    as:  faggots, homos and queers among other

9    derogatory terms in the presence of several MPTC

10   Staff Instructors."

11       A.    Yes.

12       Q.    Can you name the firearms instructors that

13   used those homophobic slurs?

14       A.    Primarily it was two.  It would have

15   been -- I believe the name was Bob Cady.  I forget

16   the jurisdiction he works for -- and Sean Shattuck.

17   He's a named defendant.

18       Q.    You said the comments were made in front of

19   several MPTC staff instructors.  Who were those

20   staff instructors?

21       A.    I believe Sergeant Williams was present on

22   the range.  I don't know who was in the classroom.

23   It would have been whatever sergeant was assigned to

24   it.  There was a staff instructor assigned to us

42

1    each day.  I don't know who exactly would have been

2    assigned to the classroom portion.

3        Q.    You are not sure who the other staff

4    instructors were?

5        A.    No, but they were usually present.  It was

6    so common.  They to be present.

7        Q.    You are not sure which ones they were,

8    though?

9        A.    With the exception of Sergeant Williams,

10   I'm not.  Maybe Sergeant Baran was at the range as

11   well.

12       Q.    To the best of your knowledge, which cadets

13   witnessed this conduct?

14       A.    In the classroom portion at the academy,

15   that would have been the entire class present at the

16   time.  I know there were a few dropouts by the time

17   we came to firearms training.  At the range the

18   class was split in two groups.  It would be the

19   group I was assigned to.

20       Q.    If you look at Paragraph 29, it reads, "By

21   way of example only, during the initial classroom

22   portion of the firearms class training, Instructor

23   Shattuck repeatedly told the class to 'stand like

24   you are getting fucked in the ass, you should be

43

1   used to it,'" did I read that correctly?

2       A.   You did.

3       Q.   Who did he say that to?

4       A.   The entire class.

5       Q.   The entire 49th class?

6       A.   Yes.  That should have included Bob Cady as

7   well.  Because that was done in the classroom.

8       Q.   Who was the comment directed towards?

9       A.   It was directed towards the entire class.

10      Q.   How many times was this comment made, to

11  the best of your knowledge.

12      A.   That was one they used quite a bit.  They

13  seemed to like that one.  They thought it was

14  instructive in how to hold a firearm in front of

15  you.  This was like their mantra for how to properly

16  hold a firearm, what your body stance should be.

17  This is what they instructed us.

18      Q.   Paragraph 30 says, "At another point

19  Instructor Shattuck placed two fingers under the

20  nose of a student officer and asked, 'Does this

21  smell like your wife?'  When Shattuck noticed that

22  Turley was watching, he turned and asked, 'What is

23  your of fucking problem,'" did I read that

24  correctly?

44

1    A.    Yes.

2    Q.    Who witnessed this incident?

3    A.    That would have been Nick Latino.  He was a

4  classmate in close proximity.  I believe William

5  Cavanaugh.  There would have been several others

6  that were in close proximity when that occurred.

7    Q.    So to the best of your knowledge, it would

8  have been yourself, Cavanaugh, Nick Latino, and was

9  there somebody else?

10    A.    Maybe Curt Wilkins, possibly Paul Burns.  I

11  know that they were all present in the class.  It

12  would have been the entire class present.  He was a

13  loud guy.  I'm pretty sure he was well heard.

14    Q.    When Shattuck asked, "What is your fucking

15  problem," who was that question directed towards?

16    A.    My issue with this is in this instance when

17  that occurred, I was drilling -- we were doing a

18  firearms retention --

19    Q.    Well, my question was not open-ended.

20    A.    I'm sorry.

21    Q.    I'll ask it again.  When he asked, "What is

22  your fucking problem," who was that directed towards?

23    A.    Me.

24    Q.    Anybody else?

45

1      A.   No.  It was directly towards me.

2      Q.   You testified that Cavanaugh and Latino

3  were both present with you as well?

4      A.   Yes.

5      Q.   The statement or the question was not

6  directed towards either of them?

7      A.   No.  It was directed towards me.

8      Q.   How do you know that?

9      A.   The comment stands like -- the vulgarity,

10  anyway, it triggered a nervous laughter from some of

11  the classmates.  It didn't trigger it from me.

12          I was with Latino.  I was in close

13  proximity to him.  He was either in restraints at

14  the time wearing my handcuffs or I had just released

15  him from my cuffs when that occurred.  I was right

16  with Latino.  I didn't think it was funny.

17          The others in class, they didn't now how --

18  I don't know why, but it triggered nervous laughter.

19  We discussed it afterwards, especially with Latino.

20      Q.   My question is how do you know it was

21  directed towards you and not --

22      A.   He was very close to me, Shattuck.  He was

23  facing me when he said, "What's your fucking

24  problem?"

46

1     Q.   So the other people were laughing, and you

2  were the only one who was not laughing?

3     A.   I can't speak for everyone.  I know there

4  was nervous laughter triggered, and he was close and

5  facing me.

6     Q.   Was he looking directly at you?

7     A.   Yes.  We had eye contact.

8     Q.   Did he say your name?

9     A.   No.  At least I don't remember it.  He may

10  have.

11     Q.   Did you say anything to him in response?

12     A.   I don't recall.  I may have.

13     Q.   Paragraph 31 says, "Shattuck's abuse

14  culminated at the academy shooting range in West

15  Springfield.  When a student officer stood in front

16  of one of the firing tables, Instructor Shattuck

17  grabbed his buttocks behind the genitals at the

18  anus, forced his finger into the victim's anus (over

19  the clothing) and proceeded to rub his own genitals

20  against the victim simulating sexual intercourse,"

21  did I read that correctly?

22     A.   Yes.

23     Q.   Did you observe this entire incident as

24  described in Paragraph 31?

47

1      A.    Yes.

2      Q.    Who else was present for this?

3      A.    That would have been my firearms group.  I

4  can't speak to what everybody saw.  It would have

5  been half the class of the 49th.

6      Q.    Half the 49th class was in firearms with

7  you?

8      A.    Yes.

9      Q.    And that half was present, but you were not

10  sure who saw what?

11      A.    Yes.

12      Q.    But you witnessed the entire incident?

13      A.    I did.

14      Q.    Paragraph 32, "Mr. Turley noticed the

15  student officer was clearly distressed by his sexual

16  assault and walked towards the table to stop it.

17  Again, Mr. Turley acted to interrupt or otherwise

18  interfere with the academy faculty's harassment and

19  discriminatory remarks directed at student

20  officers," did I read that correctly?

21      A.    You read it correctly.

22      Q.    How did you notice that the student officer

23  was clearly distressed?

24      A.    He had the look of terror on his face.  He

48

1   was a young officer.  He looked clearly distressed

2   to me.

3       Q.    How did you act to interrupt or otherwise

4   interfere with the conduct?

5       A.    I was heading over quickly to stop it.

6       Q.    Did you say anything?

7       A.    I don't recall.

8       Q.    Did you physically remove Shattuck from the

9   cadet?

10      A.    No.  He released him as I approached.

11      Q.    He released him before you could get to

12  him?

13      A.    Yes.

14      Q.    What did you do to interfere, then?

15      A.    I don't know if my presence or my approach

16  is the reason why he released him.  I have no way of

17  knowing.  I believe it might have been a factor.  I

18  don't know.

19      Q.    Paragraph 33 reads, "Seeing Mr. Turley's

20  approach, Shattuck released the victim from but" --

21  there's a typo there -- "then shouted, 'Don't you

22  have a fucking sense of humor Turley?'  Shattuck

23  expressed his intention to retaliate against

24  Mr. Turley when he threatened, 'If you ever

54

1    Q.    But you don't know if anybody else was

2    involved?

3    A.    There were several staff members.

4    Q.    Who?

5    A.    I believe Gaynor would have been in charge.

6    She was the lead.  I believe the title is

7    supervising instructor.

8    Q.    Anybody else?

9          (Robert S. Sinsheimer, Esq., enters)

10   A.    Present that day would have been Bob Cady.

11   I don't know which sergeants from the MPTC would

12   have been assigned to us that day.  It could have

13   been Mark Baran.  I'm not sure.

14   Q.    Could you turn to Paragraph 40, please.

15   Here you wrote, "On November 26th, Sergeant Powers

16   singled out Mr. Turley and ordered him to get a

17   'doctor's note' for a minor back strain and forbid

18   Mr. Turley from attending further police training

19   courses until he did so," do you see that?

20   A.    Yes.

21   Q.    Why is this a problem?

22         MR. KOSTER:  Let the record show that

23   Attorney Sinsheimer just joined us.

24         MR. SINSHEIMER:  Can we take a short recess

55

1  when you get a moment?

2         MR. KOSTER:  Maybe if I could ask just two

3  or three more questions.

4         MR. SINSHEIMER:  Sure.

5     Q.   Why was that a problem that Lieutenant

6  Powers told you to get a doctor's note?

7     A.   It was unique to me.

8     Q.   What do you mean by that?

9     A.   We had class EMTs and a paramedic.  I was

10 never examined by them.  It was unique for a staff

11 instructor.

12        It was explained to us earlier that the

13 paramedic in our class, who was a fellow student,

14 was the higher medical authority in the class.  On

15 medical issues, he or the EMTs were consulted on

16 everything.  I was never seen or told to see an EMT

17 or a paramedic.

18    Q.   Did you report your back injury to

19 Lieutenant Powers?

20    A.   No.

21    Q.   You didn't report it to him?

22    A.   No, I did not.  I actually -- no, I did

23 not.

24    Q.   We will come back to that.

56

1          MR. KOSTER:  We can pause here if you would

2     to take a break.

3          MR. SINSHEIMER:  Thank you.

4          (Recess at 11:30 a.m.)

5          (Wesley Stoker, Esq., exits)

6          MR. KOSTER:  (11:37 a.m.)  So the record is

7     clear, 30 days to read and sign.  We will reserve

8     all objections, except as to form.  We can waive the

9     notary.

10          We were just going through the Plaintiff's

11     complaint, which was marked as Exhibit No. 3.  We

12     will continue to walk through that.  We have just a

13     handful of paragraphs to get through before we

14     finish up with that.

15     BY MR. KOSTER:

16     Q.   The next paragraph, Mr. Turley, is

17     Paragraph 46 of the complaint.  I'll read that to

18     you.  You can read along with me.  It says,

19     "The immediate pretext for Mr. Turley's expulsion

20     from the program was a third 'action notice' issued

21     to Mr. Turley on a quiz testing officers' knowledge

22     of the Standard Field Sobriety Test ('SFST')," did I

23     read that correctly?

24     A.   You did.

57

1    Q.   We will back to that one.  Other than

2    everything that we just discussed -- well, you know

3    what?  Let's do it this way.  I want to just exhaust

4    this.  Take a look at Paragraph 48.

5    A.   (Examines document)  Yes.

6    Q.   Here you are referring to -- and you can

7    read along with me -- the SFST test, and you wrote,

8    "This twenty-question quiz was administered on the

9    morning of Day 2 of a 3-day course, and prior to the

10   classroom presentation of a majority of the

11   material, although MPTC policy states that 'the

12   passing score on all tests shall be 70 percent,'

13   just prior to Mr. Turley's test, the academy

14   instructors told him that he was required to score

15   80 percent to pass.  Mr. Turley scored 75 percent.

16   The academy now stated that it considered 75 percent

17   a failure; an arbitrary and capricious testing

18   practice," did I read that correctly?

19   A.   Yes.

20   Q.   Is there anything else you want to add to

21   the answer?

22        MR. SINSHEIMER:  Objection to form.  You

23   can answer.

24   A.   Yes.  I believe it was a four-day class,

61

1              (Document marked as Turley

2              Exhibit 4 for identification)

3      Q.   What is an action notice?

4      A.   It's a form of progressive discipline I

5  guess.  It's the training academy's progressive

6  discipline I guess.

7      Q.   Did you receive more than one of these

8  while you were at the academy?

9      A.   Well, they are categorized.  I believe this

10  is the only action notice for disciplinary.  I

11  believe I received one.

12      Q.   Is it your testimony that there are

13  different kinds of action notices to the best of

14  your recollection?

15      A.   Yes.

16      Q.   And this is the only disciplinary action

17  notice that you received?

18      A.   Yes, to my memory.

19      Q.   And we're talking about Exhibit 4.  Just

20  for the record, this is Bates labeled COMMONWEALTH

21  518.  Do you recognize this document?

22      A.   Yes.

23      Q.   What is it?

24      A.   It is an action notice from Sergeant Mark

102

1     Q.   How many attempts did it take for you to -- 

2 how many tries did -- how many attempts did you

3 undertake in the firearms exam?  Sorry.

4     A.   I don't remember.

5     Q.   It's your testimony that you looked at your

6 target?

7     A.   I looked at my target every time.

8     Q.   And all of your rounds were accounted for?

9     A.   I didn't have the opportunity to count my

10 rounds.

11     Q.   So how do you know they were all accounted

12 for?

13     A.   I know based on my prior experience.

14     Q.   What do you mean?

15     A.   I fired the same weapon for 20 years.  We

16 may have had a different weapon when I first

17 started.  I never had a problem with firearms

18 qualification before or since, though.

19     Q.   So it's your testimony that because you

20 never had a problem in the past, you didn't have a

21 problem here?

22        MR. SINSHEIMER:  No.  He said, "before or

23 since."

24     A.   That's correct.

103

1    Q.    What score would you have gotten if you

2  hadn't not been allegedly wrongfully failed?

3    A.    I was not in a position to score the

4  target.  I don't know.  I've always scored very

5  high.

6    Q.    So you would have scored very high?

7    A.    I believe, yes.

8    Q.    And what is that based on?

9    A.    We received the same -- it's a 50-round

10  course with the Suffolk County Sheriff's Department.

11  I trained with that exact same weapon for many

12  years.

13    Q.    Is it possible you just didn't perform well

14  enough to pass?

15    A.    Unlikely.

16    Q.    It's unlikely?

17    A.    (Witness nods)

18    Q.    Would you say it's impossible that you

19  didn't perform well enough to pass?

20       MR. SINSHEIMER:  Objection to form.  You

21  can answer.

22    A.    Nothing is impossible.

23    Q.    So are you at all to blame for your failure

24  to pass the firearms test?

1     A.    I would say that's correct.

2     Q.    Do you see there's a lead instructor name

3  in the top right corner?

4     A.    Yes.

5     Q.    Whose name do you see?

6     A.    Nicole Gaynor.

7     Q.    Did she score your exam?

8     A.    No.

9     Q.    Who did?

10    A.    I remember Sean Shattuck scoring my exam.

11    Q.    Nicole Gaynor didn't contribute to the

12  scoring at all?

13    A.    She was present.  My memory of the scoring,

14  the instructors, you know, the firearms -- it's

15  aligned in rows, you know.  The instructors scored

16  it.  Then she walked by and recorded what they wrote

17  on the target of what the scores were.  She recorded

18  it probably for this document.

19    Q.    So the instructors wrote the score on the

20  targets, and then she would come through and look at

21  what was written on the target?

22    A.    And record it.

23    Q.    She was also looking at the target?

24    A.    She would have to obtain the information to

118

1    remember looking at either one of them.

2        Q.   Do you dispute that you shot an unaccounted

3    for round at 15 yards on your first attempt in your

4    second qualification?

5        A.   I would dispute anything the firearms staff

6    recorded on my behalf.

7        Q.   It looks like you had a perfect score on

8    your second attempt, right?

9        A.   (Witness nods)

10       Q.   Do you dispute that too?

11       A.   I would consider that entire staff

12   unreliable.

13       Q.   That's not what I asked you.

14       A.   Yes.  I would dispute all of it.

15       Q.   So you dispute that you got a perfect store

16   on the second attempt?

17       A.   (No response)

18       Q.   It's a yes or no question.

19       A.   Yes.  I consider this all unreliable.

20       Q.   So you think you scored less than perfect?

21            MR. SINSHEIMER:  It's a trick question.

22   You can answer the question any way you want.

23       A.   I believe I'm a good shot.  That's probably

24   the most closely aligned with the truth that they

123

1    target because you have 20 years of experience?

2         A.   Oh, no, that's not my expectation.

3         Q.   Do you recognize that you could miss your

4    shots from time to time?

5         A.   That's possible.

6         Q.   Do you consider yourself an expert

7    marksman?

8         A.   I do not.

9         Q.   Staying in Paragraph 34 of your complaint,

10   the last two sentences read, "Additionally,

11   Mr. Turley qualified in firearms certification on

12   March 8, 2014 by MPTC Instructor Fred Leland," do

13   you see that?

14        A.   Yes.

15        Q.   "This certification utilized the same

16   weapon and standards as the WMRPA, and Mr. Turley

17   qualified in his first attempt with a perfect

18   score," do you see that?

19        A.   Yes.

20        Q.   Why were you tested in firearms on March 8,

21   2014?

22        A.   Fred Leland is a Walpole Police lieutenant.

23   He was hired by Lockheed Martin to train us in

24   firearms.   I believe their insurance carrier

124

1    requires the same exam that Fred administers for the

2    MPTC.  We had to qualify for the same 50-rounds

3    standard.

4         Q.    So you carried a weapon in connection with

5    your Lockheed Martin security job?

6         A.    Correct.

7         Q.    And this certification is in connection

8    with that job at Lockheed Martin?

9         A.    Yes.  It's, more specifically, the exact

10   same weapon.  It's the same model weapon, a

11   Glock Model 22.

12        Q.    Does everyone use that Glock Model 22?

13             MR. SINSHEIMER:  Everyone where?

14        Q.    Every one that takes the exam, anyone.

15        A.    No.  Different agencies have different

16   firearms.

17        Q.    But you always used the Glock; is that what

18   you mean?  Is that what you mean when you said the

19   same weapon?

20        A.    It's coincidental.  The Glock was the

21   issued firearm for the Sheriff's Department.  Also,

22   it was the weapon for the Clinton Police.  It's also

23   the weapon -- it's a common firearm, but it's not

24   the only one.  It's also the weapon for Lockheed

132

1                  (Document marked as Turley

2                  Exhibit 18 for identification)

3      Q.    These are the CMRs, 550, Section 3.00, that

4  you received and reviewed and acknowledged in

5  Exhibits 16 and 17.  I would like to turn to Page 7,

6  Bates labeled COMMONWEALTH 119.  If you look at the

7  top of the page, do you see Section 3.09, Recruit

8  Training - Performance?

9      A.    (Examines document)

10     Q.    Are you there?

11     A.    Yes.

12     Q.    Do you see Subsection 4 below it, Dismissal

13 for Performance Reasons?

14     A.    Yes.

15     Q.    That section reads, "Dismissal for

16 Performance Reasons:  Any student officer who fails

17 to attain a passing score on a retest, or any three

18 tests, or who otherwise fails to successfully

19 complete performance requirements prescribed by the

20 Committee shall be dismissed for nondisciplinary

21 reasons," did I read that correctly?

22     A.    You did.

23     Q.    Now, is this consistent with your

24 understanding of how a cadet could fail out of the

133

1    academy?

2        A.    It is not.

3        Q.    How is your understanding different from

4    this provision here?

5        A.    If you look at Performance Requirements.

6    Section 1, the same page, those categories were

7    broken down, academic being written exams on subject

8    matter taught in the class.  Skills would be, like,

9    handcuffing, firearms.  Health and wellness is your

10   fitness level, ability to keep up with the group in

11   a run or perform exercises as directed by the PT

12   staff.  Those were three separate categories.  You

13   had to fail -- this is how it was explained by

14   Director McKenzie early in the academy.  Performance

15   reasons would be divided into those three

16   categories.  You would have to fail three academic

17   exams, which he explained were the four

18   comprehensive exams.  You could not fail three of

19   them or any one twice.  Skills would be any three

20   skills you failed.  Health and wellness would be you

21   would fall back in a run or you missed more than

22   20 percent of the physical training.  Maybe it was

23   30 percent.  You had to complete 70 percent of the

24   health and wellness.  You could not have days absent

134

1    for sick.  There was a limit on what you could miss

2    at the academy.

3           The interpretation of this is clearly

4    different than what was explained to the students,

5    even to the format of their own action notices.

6    They divided the categories up consistent with the

7    way it was explained to me.

8       Q.   Do you see any of that in Section 4?

9       A.   Section 4?

10      Q.   Subsection 4.

11           MR. SINSHEIMER:  And that was asked and

12   answered, sir.

13      A.   Well, how it's interpreted --

14           MR. SINSHEIMER:  Hold on.  You just asked

15   the same question again.

16           MR. KOSTER:  It was a different question.

17           MR. SINSHEIMER:  No.  You asked if it was

18   consistent.  Then he told you why it wasn't.  Then

19   you asked him again if it was consistent.

20           MR. KOSTER:  No, I didn't.

21           MR. SINSHEIMER.  You did.  That's okay,

22   though.

23      A.   The interpretation of this policy was

24   explained by Director McKenzie.  That's what I just

166

1          Q.    That was appropriate?

2          A.    Yes.

3          Q.    What about when you failed to write your

4    name on your dictionary?

5          A.    I think that was instruction.

6          Q.    And when you forgot to write your name on

7    your law book?

8          A.    Again, my name was on it.  Part of it is

9    you follow orders:  Your name is on it, but it's

10   wrong now.  It should have been here, not there.

11   Everybody is wrong on Day 1.  Everyone wrote

12   To/Froms on various equipment deficiencies.  I don't

13   think mine were unique.

14         Q.    The next paragraph, "In motor vehicles law

15   class, our instructor announced to the class You are

16   not an 'ethnically diverse' class.  He then smiled

17   in an exaggerated manner, expressing pleasure at the

18   fact we were all Caucasians," do you see that?

19         A.    Yes.

20         Q.    I know we touched on some of this before,

21   but not all of it.  You wrote that he expressed

22   pleasure at the fact you were all Caucasian.  Did he

23   actually say that he was happy you were all

24   Caucasian?

167

1      A.    Yes.

2      Q.    He actually said that?

3      A.    Well, not those exact words.  I can't quote

4  him exactly.  I know he was happy we were not

5  ethnically diverse.

6      Q.    The question is, did he say that he was

7  happy that you were all Caucasian, or something to

8  that effect?

9      A.    Yes, something to that effect.

10     Q.    Why didn't you write that here?

11     A.    I couldn't think of the exact quote.

12     Q.    You didn't think it was important to

13  include something --

14     A.    Well, he expressed it, and I did include

15  that.

16     Q.    So that to you means he made a statement

17  saying that he was happy that everyone in the class

18  was Caucasian?

19     A.    Yes.  He made it known.

20     Q.    Through a statement that he made?

21     A.    I believe, yes.

22     Q.    You believe?

23     A.    That's my memory.

24     Q.    Your memory is that he made a statement?

168

1          A.    Expressing pleasure that we were not

2     ethnically diverse.

3          Q.    But you can't remember what the statement

4     was?

5          A.    Not exactly.

6          Q.    And you didn't include it in this letter?

7          A.    He expressed pleasure at the fact we were

8     all Caucasian, yes.

9          Q.    The next sentence says, "The class was

10    later advised that they could cite 'ethnically

11    altered vehicles all day long.'"  Again, is this a

12    direct quote or a paraphrase?

13         A.    Direct quote.  That was said more than

14    once.

15         Q.    Who made that statement?

16         A.    Sergeant Powers.

17         Q.    What was the context in which he made that

18    statement?

19         A.    Good policing, good motor vehicle stops,

20    "You can make those all day long."  He was

21    encouraging stopping those vehicle all day long.

22         Q.    You say, "good vehicles, good vehicle

23    stops."  What do you mean?

24         A.    Police officers can make mistakes in stops.

169

1   He was encouraging that as a proper course of action

2   for a patrol officer.

3       Q.   Who was present for this statement other

4   than yourself?

5       A.   The entire class, unless someone was absent.

6       Q.   Meaning the whole 49th ROC?

7       A.   Yes.

8       Q.   The next paragraph says, "I was not pleased

9   at all by this instruction.  I'm the parent of a

10  Guatemalan child.  I was particularly offended and

11  stunned that these young student officers were

12  receiving this guidance in 2013.  My displeasure was

13  expressed on my face as I thought of my daughter's

14  future, and the fact that we would have to exclude

15  Western Massachusetts as an option for higher

16  education."  How old is your daughter?

17      A.   My daughter is ten years old.

18      Q.   Is she adopted?

19      A.   Yes.

20      Q.   You wrote that you were offended and

21  stunned.  Did you tell Mr. Powers that you felt this

22  way?

23      A.   I objected to the instruction.

24      Q.   How so?

1     A.    Through facial expressions.  I know

2 something was said.  I just don't know what exactly.

3 It was tough because my normal communication style

4 was somewhat stymied by the discipline environment.

5 I was not able to be as expressive as I otherwise

6 would have been.

7     Q.    Did you or did you not say anything

8 verbally to object to that statement?

9     A.    I did say things to my classmates, fellow

10 classmates.  We discussed it many times.

11     Q.    Did you say anything to Lieutenant Powers

12 to object to that statement?

13        MR. SINSHEIMER:  Sergeant Powers or

14 Lieutenant Powers?  Let's be clear about who is who

15 here.

16        MR. KOSTER:  Let the record show that

17 Sergeant Powers was since promoted to Lieutenant.

18        MR. SINSHEIMER:  But there's another Powers

19 in the case, though.  Otherwise, I wouldn't have

20 said anything.

21        MR. KOSTER:  You are referring to Marylou

22 Powers.

23        MR. SINSHEIMER:  Yes.

24        MR. KOSTER:  So let the record show that

1   each other at all of them.  They rolled their eyes

2   at each other.  They passed notes.  They whispered

3   to each other.  I never said anything about it.

4          MR. SINSHEIMER:  No problem with passing

5   notes, and there's no problem with speaking.

6          MR. KOSTER:  I think you are out of line

7   for calling out my witness on the record like that.

8   I wish you had not done that.  If you like -- and so

9   we can get everyone out of here -- I want to

10  continue with the examination.

11         MR. SINSHEIMER:  I will accept the

12  admonition actually and apologize to the individual

13  if he had no bad intent.  He certainly sat there

14  quietly enough.  Beyond that, I stand by what I

15  said.  Go ahead.

16     Q.   I think I asked you could you describe what

17  a look of displeasure looks like before your lawyer

18  told me to ask my own client what a look of

19  displeasure looks like.  I will ask the question

20  again.  When you wrote that the displeasure was

21  expressed on your face -- strike that.  My question

22  is did you tell -- sorry.  Do you know if Lieutenant

23  Powers/Sergeant Powers saw the look of displeasure

24  on your face?

174

1    A.    Yes.

2    Q.    How do you know that?

3    A.    It registered.  I just know.  It was an

4    unspoken communication.

5    Q.    It registered with you?

6    A.    With him.

7    Q.    Did he tell you that it registered with him?

8    A.    No.

9    Q.    So it was an unspoken communication, and

10   that's how you know?

11   A.    For the most part.  I know I said something

12   about the instruction.  I just don't know what I

13   said exactly.

14   Q.    You were sitting in a classroom among your

15   peers, right?

16   A.    Yes.

17   Q.    How many people was that approximately?

18   A.    The date would have been sometime in

19   September.  I'm going to say -- I don't know.  We

20   lost students along the way.  Some went to different

21   academies.

22   Q.    That's not what I asked.

23   A.    I don't know the exact number.

24   Q.    I asked, approximately how many people are

1      A.     Various instructors.  Certainly Ms. Delilah

2  Yee on several occasions during PT instruction; as

3  discussed earlier, McKenzie, Sergeant Powers.

4      Q.     Anybody else?

5      A.     Like I said, there was Sue Figgy.  She had

6  a few jokes about my age.  There was another

7  instructor, an Asian police chief.  I forget the

8  name.  He was in as an instructor for a day or

9  something; some of the DT staff.

10     Q.     DP?

11     A.     DT, defensive tactics staff.

12     Q.     Who would that be?

13     A.     Palmaram, whatever the name is.

14     Q.     I think we talked about that already this

15  morning.

16     A.     We did.

17     Q.     Let's skip down to the paragraph starting

18  with "Upon returning to the Western Mass academy" in

19  the fourth paragraph here.  You wrote, "Upon

20  returning to the Western Mass academy Thanksgiving

21  week - the month of December was almost here.

22  Director McKenzie addressed the issue of misconduct

23  in the first range group."  Which staff misconduct

24  are you referring to here?

188

1      A.    I'm not referring to -- it would have been

2   Shattuck's actions.  We all assumed it was

3   Shattuck's actions.  Everybody was talking about it.

4   Some of the students were racking up how many

5   felonies Shattuck committed based on their recent

6   training.  I'm assuming it would have been

7   Shattuck's behavior.

8      Q.    You're assuming?

9      A.    Well, he said he was investigating it.  We

10  just...

11     Q.    Which conduct of Shattuck specifically are

12  you referring to?

13     A.    I would say the assault on Student Officer

14  Danna.

15     Q.    You were still at the academy at this

16  point, correct?

17     A.    Yes.

18     Q.    You were still a cadet?

19     A.    Yes.

20     Q.    You testified earlier the first time you

21  reported Shattuck's conduct to anybody was in your

22  letter to your chief dated December 13, 2013; is

23  that right?

24     A.    In writing, yes.