# EXHIBIT

# 8

35

```
 1        Q.    Who called you in?

 2        A.    I don't remember.

 3        Q.    And did you go to Director McKenzie's

 4   office?

 5        A.    Yes, I did.

 6        Q.    Who did you see when you got there?

 7        A.    Director McKenzie and another MPTC staff

 8   member that was assigned up there.

 9        Q.    Do you know who that was?

10        A.    I know he takes care of the veteran academy

11   issues, and he had some medical -- he taught us in

12   first responder class.  His name escapes me at this

13   time.

14        Q.    And what happened when you arrived into

15   Director McKenzie's office?

16        A.    I was given two action notices

17   simultaneously -- or an action notice and a

18   dismissal notice simultaneously.

19        Q.    Was there a conversation?

20        A.    There -- there was, yes.

21        Q.    Can you please describe that conversation.

22        A.    It would have been conversation between me

23   and Curt McKenzie about the dismissal.  I don't

24   believe the other staff member would have -- I don't
```

66

1      BY MR. KOSTER:

2      Q.   When was the last time you spoke with Kurt

3  Wilkins?

4      A.   I'm going to say it was last spring.

5      Q.   And I asked you this question in the

6  context of the text messages before, but did you

7  speak with him about the claims in your case here?

8      A.   I don't believe so.  No.

9      Q.   All right.  I want to turn back to

10 Exhibit 1, which is your response to the MPTC's

11 interrogatories.

12     A.   Yes.

13     Q.   And we'll turn to Page 9.  And we're

14 looking at -- on Page 9 is your response to

15 Interrogatory Number 12.

16          And do you see at the very top of the page,

17 the first language that is not in bold, it says:

18               "During my time at the M" -- "at the

19          WMRPA, I never personally reported the

20          discrimination against me.  To do so would

21          violate the chain of command."

22          Did I read that correctly?

23     A.   You did.

24     Q.   And do you stand by that statement?

**Timothy Turley, Volume II - October 24, 2016**

67

```
 1      A.   Well, I would include something else if I
 2   could edit it.
 3      Q.   And what would you include to edit it?
 4      A.   Reported the discrimination to an MPTC
 5   employee.
 6      Q.   So you would say, "I never personally
 7   reported the discrimination against me to an MPTC
 8   employee"?
 9      A.   Yeah.  That would have been more accurate.
10      Q.   Okay.  And how is this, as it is written in
11   your interrogatories -- which you signed -- how is
12   that inaccurate?
13      A.   It would have clarified it.
14      Q.   And so is this statement as written in your
15   interrogatories, is that inaccurate?
16      A.   Well, I reported it to squad leaders and
17   class leader.  They were aware of it.  They were not
18   MPTC employees, so I didn't directly report it to an
19   MPTC employee.  Because they were -- the chain of
20   command was squad leader, class leader.
21      Q.   So as for MP -- so was the letter to your
22   chief, which we had marked as Exhibit 26, was that
23   the first time that you reported any discrimination
24   or retaliation to MPTC employees?
```

68

1           MR. SINSHEIMER:  Object to the form of the

2   question.

3           You can answer.

4      A.   At that time I was separated from MPTC,

5   and -- no.  Actually, I went to report it the next

6   day.  The very next morning I went, and I was sent

7   away.  I was told they would not see me.  I had no

8   appeal rights.

9      Q.   And when you said you went, where did you

10  go?

11     A.   I went to headquarters in Randolph.

12     Q.   The MPTC headquarters?

13     A.   Yes.

14     Q.   This was the day after you were dismissed?

15     A.   Yes.

16     Q.   Did you report any of the allegations in

17  the federal complaint to anyone at MPTC before you

18  were dismissed?

19     A.   No.

20     Q.   Did you report any of the allegations in

21  the complaint to the chairperson of the MPTC before

22  you were dismissed?

23     A.   One more time?

24     Q.   Did you report any of the allegations in

**Timothy Turley, Volume II - October 24, 2016**

```
 1   the federal complaint to the MPTC chairperson before
 2   you were dismissed?
 3        A.   I'm not aware of anyone having that title.
 4        Q.   So you didn't report to anybody who has
 5   that title?
 6        A.   The chairperson would be who?
 7        Q.   Well, whoever was the chairperson at the
 8   time.
 9             Is it fair to say, though --
10        A.   I'm unaware that title exists.
11        Q.   Okay.  That's fine, then.
12             And did you report any of the allegations
13   in the federal complaint to any instructor,
14   administrator, or staff at the academy before you
15   were dismissed?
16        A.   Well, I guess you could say I had
17   interaction with Sean Shattuck that would indicate I
18   was not happy with his sense of humor.  Or what he
19   deemed funny, I did not.
20        Q.   Did you file a written report with Sean
21   Shattuck?
22        A.   No.
23        Q.   Did you report all of the contents in the
24   letter to your chief, Exhibit 28, to Sean Shattuck?
```

**Timothy Turley, Volume II - October 24, 2016**

```
 1        A.    I did not.

 2        Q.    What do you want from this case?

 3              MR. SINSHEIMER:  Hold.  Stop.

 4              Instruct him not to answer.

 5              MR. KOSTER:  On what grounds?

 6              MR. SINSHEIMER:  Intrudes on

 7    attorney/client privilege.

 8              MR. KOSTER:  Well, I don't know that it

 9    does.

10              MR. SINSHEIMER:  Well, I do.  So I'm

11    instructing him not to answer and taking my chances.

12              We all know every single -- no, it's not

13    even close.  If the other lawyers are letting you

14    get away with it, that's great.  From the minute a

15    client comes to me, the question of remedy becomes

16    part of my discussion with them.  By the time we get

17    here, it is several years later, intertwined, in my

18    professional judgment, with all of the thinking

19    about, quote, "the case," in which the question was

20    asked.

21              And as you know, Counselor, we have already

22    sent you, at your request, a written demand.  And I

23    will incorporate that into this objection and

24    answer.  In fact, I would even be willing to mark it
```

71

1    as the answer to the question, which I signed, and

2    which therefore I am instructing the witness not to

3    answer.

4           If you want to ask him -- no, I'm not going

5    to tell you what to say.  He's not answering any

6    question about what he wants.  It's coming through

7    me.  And you can ask it a -- you can ask different

8    questions different ways if you'd like, and we'll

9    object to them one at a time.

10          So that's my objection.  I'm instructing

11   him not to answer.

12          MR. KOSTER:  I'll just -- I respect your

13   objection.  I'll just note for the record, also,

14   that I think I disagree here.  I think this is a

15   unique situation where he was pro se for a period of

16   time.

17          MR. SINSHEIMER:  You didn't ask him that.

18   You asked him what he wants today, knowing that you

19   have a written demand that I signed in your hand.

20          MR. KOSTER:  So --

21          MR. SINSHEIMER:  Knowing, frankly, that

22   we've already discussed the possibility of a

23   mediation.  Normally I wouldn't point that out on

24   the record, but you're asking the client, you know,

**Timothy Turley, Volume II - October 24, 2016**

1   the night before the mediation, what does he want?

2   That's not how it works.  You go into separate

3   rooms, you have privileged communication.

4           MR. KOSTER:  Robert, I let you speak, and I

5   didn't interrupt you.

6           MR. SINSHEIMER:  All right.

7           MR. KOSTER:  You just made a couple of

8   misrepresentations on the record probably to try to

9   get me riled up here.

10          MR. SINSHEIMER:  No, no.

11          MR. KOSTER:  Because I know that's your

12  game.

13          But listen to me.  There is no mediation

14  tomorrow.

15          MR. SINSHEIMER:  I meant tomorrow --

16          MR. KOSTER:  You said the night before the

17  mediation.  We do not have a mediation on the

18  record.

19          MR. SINSHEIMER:  We do not.

20          MR. KOSTER:  You're making me regret

21  negotiating with you in bad faith.  Of if you want

22  to back off on that --

23          MR. SINSHEIMER:  Not bad faith.  When

24  you --

73

```
 1              MR. KOSTER:  Excuse me.  Excuse me.
 2              MR. SINSHEIMER:  It's not bad faith.
 3              MR. KOSTER:  I did not interrupt you.  Let
 4    me speak.
 5              MR. SINSHEIMER:  You're raising your voice.
 6              MR. KOSTER:  Okay.
 7              MR. SINSHEIMER:  And I didn't.
 8              MR. KOSTER:  Let me finish what I have to
 9    say.
10              MR. SINSHEIMER:  Okay.
11              MR. KOSTER:  I said that I respect your
12    objection, although I disagree with it.  The reason
13    for -- for disagreeing with your objection is
14    because he has been pro se for a period of time, and
15    I think that asking him what -- what he wants out of
16    this lawsuit is reasonable.  I respect your
17    objection.
18              MR. SINSHEIMER:  It's more than an
19    objection.  Rarely do I instruct him not to answer.
20              MR. KOSTER:  I doubt that you respect my
21    position.  I'm going to move on, and I'm going to
22    take you up on your advice to ask a couple of
23    questions.
24              MR. SINSHEIMER:  I respect -- just to be
```

**Timothy Turley, Volume II - October 24, 2016**

74

1    clear --

2            MR. KOSTER:  I don't want to be clear.

3    Because every time you try to be clear, you say

4    something that one of us regrets.  So why don't we

5    move on.

6            MR. SINSHEIMER:  You have every right to

7    ask admissible questions, and you certainly have a

8    right to explore the damages in the case.

9            Next question.

10           MR. KOSTER:  This is one of your lines when

11   I say, "Thank you, Judge Sinsheimer."

12           Let the record show that he's laughing.

13           MR. SINSHEIMER:  I am laughing.  Imitation

14   is a form of flattery.  That's the oldest cliche in

15   the book.

16           And yes, it is a line that I have used in

17   these depositions.

18       BY MR. KOSTER:

19       Q.   Let me ask you this, Mr. Turley:

20            You understand that you're demanding money

21   in this case; is that right?

22           MR. SINSHEIMER:  Just "yes" or "no."

23       A.   Yes.

24       Q.   You understand that you sued five

75

```
 1    individuals?
 2         A.    Individuals, yes.
 3         Q.    And two state agencies?
 4         A.    Yes.
 5         Q.    You understand that that money could come
 6    from these individuals' personal savings?
 7              MR. SINSHEIMER:  Objection, instruct him
 8    not to answer.
 9         Q.    Are you comfortable with taking their life
10    savings away from them?
11              MR. SINSHEIMER:  Objection, instruct him
12    not to answer.
13         Q.    Are you comfortable taking the defendants'
14    retirement accounts away from them?
15              MR. SINSHEIMER:  Objection, instruct him
16    not to answer.
17         Q.    Are you comfortable taking away any money
18    that they might have saved for their kids to go to
19    college?
20              MR. SINSHEIMER:  Objection, instruct him
21    not to answer.
22         Q.    Are you comfortable taking their homes away
23    from them?
24              MR. SINSHEIMER:  Objection, instruct him
```

76

1   not to answer.

2       Q.   Let's turn back to Exhibit 1.  It's

3   response Number 27.

4            Are you there?

5            And the page numbers on here are a little

6   funny.  They're -- they all either say 1 or 2, but

7   we're looking at Number 27.

8            Did you -- did you find Number 27?

9       A.   I believe I did.

10      Q.   And so the question from the Commonwealth

11  was:

12            "Please state the value of the 'funds'

13            you were 'forced to remove' 'from

14            retirement' as alleged in your initial

15            disclosures."

16           And your response is on the next page, and

17  it says:

18            "I do not know the exact dollar amount

19            at this time."

20           Do you know -- and you signed these a few

21  months ago.

22           Do you know the exact dollar amount now?

23      A.   Not offhand.

24           MR. KOSTER:  All right.

77

 1              And I would just ask him to supplement his

 2    response to these interrogatories.

 3              MR. SINSHEIMER:  I don't know that under

 4    26(e) if he has to.  We did include a number in the

 5    demand, as you know.  I think 26(e) says -- I can

 6    verify the demand.  I can get it to be his testimony

 7    or something like that.  We'll work that through.

 8              MR. KOSTER:  That was my concern.  You're

 9    right that you did include in it the demand, but I'm

10    not sure --

11              MR. SINSHEIMER:  Didn't come from him under

12    oath.  I get that.  That part I can work with you

13    on.

14       BY MR. KOSTER:

15       Q.   We'll stay on the same page.  Now we're

16    looking at Interrogatory Number 28.  And you wrote

17    that -- at the bottom of this page, you wrote that

18    your out-of-pocket expenses were roughly $12,600 for

19    equipment, plus tuition and commuting expenses.

20              Do you know what you paid for tuition?

21       A.   I believe it was $3,000.

22       Q.   Total?

23       A.   I believe that's what it was.

24       Q.   And --

**Timothy Turley, Volume II - October 24, 2016**

1    He's good at asking others.  You don't have to
 2    worry.
 3        Q.   Do you dispute that you filed a false
 4    report?
 5        A.   I have -- yes.  And I continue to.
 6        Q.   Now, in 2010, you retired from the
 7    Sheriff's Department; is that correct?
 8        A.   Yes.
 9        Q.   At that time you had about 21 years of
10    service?
11        A.   Correct.
12        Q.   And you were about 43 years old?
13        A.   I was.
14        Q.   Since that time, have you begun collecting
15    any pension?
16        A.   Yes.
17        Q.   When did you begin collecting a pension?
18        A.   Roughly 30 days after my retirement.
19        Q.   Do you know what your percentage was for
20    your pension when you began collecting?
21        A.   It was 50 percent.
22        Q.   Is that a superannuation retirement or a
23    disability retirement?
24        A.   Superannuation.

121

1      Q.   For the classroom component, the two days

2    that you described, the class was together as a

3    unit?

4      A.   I'm not completely -- it may have been one

5    day.  It may have been two days.  My memory -- I

6    know there was a classroom component.

7           (Mr. Koster enters)

8      Q.   However long the classroom component was,

9    the class was together as a single unit?

10     A.   Yes.

11     Q.   How many students were in the class at that

12   time?

13     A.   I'm going to say at least 25.  I know we

14   lost a couple of students to the state police

15   academy right around that time frame.

16     Q.   Did the classroom component of the firearms

17   training precede the range component?

18     A.   Yes.

19     Q.   Was Sean Shattuck involved in the classroom

20   component?

21     A.   He was.

22     Q.   Is there anything that he said or did

23   during the classroom component of the firearms

24   training period that you found objectionable?

122

1      A.    Yes.

2      Q.    What was that?

3      A.    He instructed us to stand in a position

4   like we were getting "fucked in the ass" to use his

5   words.

6      Q.    How many instructors were associated with

7   the classroom component?

8      A.    I don't remember exactly.

9      Q.    Was it more than Shattuck?

10     A.    Yes.  Definitely.

11     Q.    Did anyone else use that same phraseology

12   during the classroom component?

13     A.    Yes.

14     Q.    At any time when those statements were made

15   by Shattuck or anyone else, did you object?

16     A.    Directly to -- amongst ourselves or to the

17   class leaders, yes.

18     Q.    Did you say anything to Shattuck or any of

19   the other instructors that used that language that

20   you found it offensive?

21     A.    On that particular comment?

22     Q.    Correct.

23     A.    No.

24     Q.    Did any members of the class laugh when

125

1      A.   Oh, yes.

2      Q.   Now, by the time that you began the

3  firearms training period, you already had failed one

4  examination, correct?

5           MR. SINSHEIMER:   Object to the form of the

6  question.

7           You can answer.

8           MR. GAMBACCINI:   Let me fix it.

9           MR. SINSHEIMER:   That's fine.

10  BY MR. GAMBACCINI:

11     Q.   By the time that you began the firearms

12  training period, you understood that the academy

13  indicated that you already had failed one

14  examination?

15     A.   Yes.

16     Q.   Do you allege that Sean Shattuck was

17  involved in any way with that alleged failure?

18     A.   I do not.

19     Q.   Now, when the classroom component was over,

20  the class broke up into two groups?

21           MR. SINSHEIMER:   You mean of the firearm?

22     Q.   The firearm training period.

23     A.   The classroom, yes, after the classroom

24  portion.

130

1    and Shattuck last?

2         A.    The encounter?

3         Q.    By encounter --

4         A.    The described incident?

5         Q.    -- you've alleged that Sean Shattuck placed

6    a couple of fingers underneath Latino's nose and

7    said words to the effect of, "Does it smell like

8    your wife?"

9         A.    Yes.

10        Q.    How long did that interaction take place --

11   last for, rather?

12        A.    Probably as long as you just described it.

13        Q.    A few seconds?

14        A.    Yeah.  Probably a minute or less.

15        Q.    Did Latino respond?

16        A.    Verbally?

17        Q.    Verbally or physically.

18        A.    Yeah.  He seemed pretty upset.

19        Q.    You say he seemed upset.

20              What gave you --

21        A.    He expressed he was upset after the

22   incident.

23        Q.    That moment in time, Shattuck does what he

24   does and says what he says --

131

1      A.    Yes.

2      Q.    -- did Latino, to your mind, verbalize or

3  otherwise present with any degree of upset?

4      A.    Yes.  He had a look of astonishment and

5  rage on his face, I guess.  A lot of people did.

6      Q.    You believe that he was enraged?

7      A.    I do.

8      Q.    Did you start to approach him in order to

9  prevent him from physically attacking Shattuck?

10          MR. SINSHEIMER:  Object to the form of the

11  question.

12          Hold on.  Hold on.

13          You can answer.

14      A.    Did I what?

15      Q.    Did you begin to move towards Latino to

16  stop him from any physical attack that might be

17  imminent?

18          MR. SINSHEIMER:  Object to the form of the

19  question.

20          You can answer.

21      A.    No.  It's my memory I was with Latino.  We

22  were -- we were working as a trio with one

23  instructor, being Shattuck.  I had either just had

24  handcuffs on Latino, or he was still in handcuffs

138

```
 1   weapon was downstream -- downrange.
 2       Q.   Okay.
 3       A.   I don't know -- I don't know if it was -- I
 4   don't know the condition of the firearm, if it
 5   was -- if it was charged, if it had a live round in
 6   it.
 7       Q.   He was pointing his weapon?
 8       A.   He was pointing his weapon towards the
 9   target.
10       Q.   Do you know if it was loaded at that time?
11       A.   I have no way of knowing.
12       Q.   Now, you indicated you were about 15 yards
13   away?
14       A.   Yes.
15       Q.   And how soon after you observed the
16   physical contact begin was it you began moving
17   towards them?
18       A.   I probably took two seconds to process,
19   like, "What the hell is this?"  And then I headed
20   towards them to stop it.
21       Q.   And understanding that you've testified
22   that the physical contact lasted for a matter of a
23   few seconds, how much ground did you traverse before
24   Shattuck released Danna?
```

140

1        At what point does Shattuck first turn in

2   your direction?

3        A.   He released Danna.  He was looking at me as

4   I approached, and then he released and directed

5   towards me, "Don't you have a fucking sense of

6   humor, Turley?"  I think I replied, "That's not

7   funny.  It's not funny," and something to that

8   effect.

9        Q.   Do you know Shattuck saw you before he

10  released Danna?

11       A.   I believe he did.

12       Q.   So Shattuck then said to you, "Don't you

13  have a sense of humor?"

14       A.   Yes.

15       Q.   You said, "That's not funny"?

16       A.   Yes.

17       Q.   Did Shattuck say anything at that point?

18       A.   Yeah.  He made a comment about if I ever

19  graduate, then I can tell him to go fuck himself.

20       Q.   Did you view that comment as a threat?

21       A.   I did.

22       Q.   How did you respond to that threat?

23       A.   I believe I said, "I'll keep that in mind,

24  sir."  I know it was difficult -- it's not like

141

```
 1   normal communication between people.  It's the
 2   discipline rich environment, I believe -- I
 3   maintained discipline, and I think -- I'm pretty
 4   sure that was my response.
 5       Q.   What did you intend to be conveyed by your
 6   response?
 7       A.   Just my objection to his felonious acts.
 8       Q.   As that verbal exchange between you and
 9   Shattuck was taking place, did either of the two of
10   you move closer to each other?
11       A.   No.  He started pacing and walking around.
12   No.  Once he released Danna, I was -- I was trying
13   not to get kicked out of the academy for a
14   discipline infraction at that point.
15       Q.   Did Shattuck write you up for
16   insubordination for your response that you would
17   keep it in mind?
18       A.   No.  I believe my response was within the
19   boundaries of respectful communication.
20       Q.   Have you described for us everything that
21   you can recall taking place during this interaction
22   with Danna and Shattuck on that day?
23       A.   No.
24       Q.   What have you not described for us that
```

**Timothy Turley, Volume II - October 24, 2016**

1    took place?

2        A.    Afterwards, Danna was quite upset.  He

3    talked to me about, you know, if -- if I was a

4    homosexual I could be a millionaire for this shit

5    going on.  And I talked to him about, you know, "No

6    one gets to treat you that way."  You know, "If you

7    want to file a complaint, I'll go with you."  You

8    know, "I'll support you.  We'll file a complaint

9    together."

10            And during this engagement, I observed the

11   student officers, some of their laughter was

12   nervous.  We had discussed it prior with the

13   classroom thing with Danna -- I mean with Latino.

14   Their response is nervous laughter.  They didn't

15   know what to do.  The instructors were trying to be

16   amusing, and they -- it's almost like a -- we

17   discussed it.  It was almost like a programmed

18   response.

19            I was fed up with the laughter at this

20   point, because his behavior had escalated to a point

21   where I wasn't going to accept the students laughing

22   even out of nervousness.  So I spoke to them about

23   it.  I didn't want them laughing at it anymore.  I

24   believed it might be encouraging more of their

143

1    behavior.  It's not appropriate.  Stuff like that.

2            I admonished them.  I was kind of loud when

3    I spoke to the class during a break at the range,

4    and a student -- Student Officer Cunningham alerted

5    me to the fact that the instructors were listening

6    to you.  "They can hear everything you're saying."

7    So he was worried about me getting disciplined for

8    being insubordinate.

9        Q.   You had described that event during the

10   first day of your deposition.

11           That happened, that conversation amongst

12   the student officers, the same day as the Danna

13   incident?

14       A.   Yes.

15       Q.   So that would have been on Wednesday,

16   thereabouts?

17       A.   Roughly, yes.

18       Q.   Now, you've consistently described the

19   laughter that you heard from student officers as

20   "nervous laughter."

21       A.   Yes.

22       Q.   Did -- from your mind, did anyone just

23   simply laugh at the event?

24       A.   No.  We -- like I said, we had discussed

155

1  been looking downrange, waiting for our scores as

2  they scored the targets.

3      Q.   Do you recall how many instructors were

4  associated with grading the targets the first time

5  you went through the process that day?

6      A.   At least three.

7      Q.   Now, I think earlier you indicated that at

8  some point you saw Sean Shattuck grading your

9  target, correct?

10     A.   Several times he was grading my target.

11     Q.   Meaning as you went through the process

12 three times that day, you saw him grading your

13 target?

14     A.   Yes.

15     Q.   Did you see anyone else grading your

16 target?

17     A.   No.

18     Q.   How did you know it was your target among

19 others, presumably, that Shattuck was grading?

20     A.   I know what lane I was in.  Every student

21 was looking down their lane to see if they passed.

22 Because you could see the writing, the Sharpie

23 writing.  But you couldn't physically see

24 necessarily all of your rounds.

**Timothy Turley, Volume II - October 24, 2016**

156

1      Q.   Do you know if Officer Gaynor first graded

2   your target that day?

3      A.   No.   My recollection of the scoring process

4   is I remember Shattuck scoring my target and then

5   Gaynor would progress down the line.   Different

6   instructors scored different targets.   It may be --

7   and Gaynor would go down and record what they wrote

8   as -- or on a clipboard.

9           She had a clipboard.   She would look at the

10   scores and progress to the next targets.

11      Q.   Did you ever see Gaynor scoring targets

12   that day?

13      A.   I don't recall her ever scoring targets.

14      Q.   Now, at some point, presumably, you were

15   told that the instructors did not believe that you

16   had qualified on the first attempt, correct?

17      A.   Yes.

18      Q.   Was there any discussion that you had with

19   the instructors at that point in time?

20      A.   No.   Possibly.   I wanted to know what I did

21   wrong so if I -- I assumed it was correct at that

22   point.   Since, I -- I don't have that faith.

23      Q.   Do you recall who it was?

24           MR. SINSHEIMER:   Did you get that last

**Timothy Turley, Volume II - October 24, 2016**

157

```
1    comment?

2            THE REPORTER:  "Since, I don't have that

3    faith."

4        Q.   Do you recall who it was who you were

5    interacting with about your score?

6        A.   It may have been Gaynor.

7        Q.   You recall her being the one that told you

8    she believed you didn't pass?

9        A.   Gaynor -- I know my grouping was to the

10   left, and I think she gave me some -- it's called

11   sight picture.  She told me I could -- something

12   about the sight picture on the weapon, something.  I

13   don't know.  I know my grouping was just off center

14   to the left of the target, and I -- I've always shot

15   that way.  I don't know why.  It's just a -- I've

16   always grouped left.  I don't know why.

17       Q.   But you recall the interaction about your

18   score that first time being with Gaynor?

19       A.   Yeah.  I thought maybe I drew a round off

20   the target.  Usually my group is tight, and they

21   were.  All the group was tight.  I thought maybe,

22   "What's going on?  How do I make an adjustment?"  If

23   she had any tips, I think.

24       Q.   Did you interact with anyone else about
```

**Timothy Turley, Volume II - October 24, 2016**

158

1   your score on your first attempt?

2       A.   I did.  I remember talking to Sergeant

3   Baron about a similar thing, positioning, finger on

4   the trigger, if somehow I'm moving the weapon as it

5   discharges.  There was some talk about that with

6   Sergeant Baron.

7       Q.   At that point that day did you present the

8   argument that your shots might have been double

9   shots?

10      A.   Yes.  There was talk about -- it's called a

11  keyhole, where basically a round -- if you have a

12  tight group, you may not be able to count 50 rounds,

13  but you may have keyhole, a shot which is

14  basically -- sometimes there is a slight -- it

15  almost makes the round hole look slightly oval, and

16  that would be an indicator of a keyhole shot, like

17  two bullets pass through the same hole.  Like that

18  was the terminology used.

19           Yeah, there was a conversation at the

20  range.

21      Q.   Do you know if any of the instructors

22  checked to see whether a keyhole had occurred?

23      A.   I don't.  I don't believe there was time.

24  They honestly -- once they were recorded, the

159

1    targets came down and they went into a barrel fire

2    that we had at the range once they were recorded on

3    the clipboard.

4        Q.   So you never had an opportunity to look at

5    your paper target yourself to see if you could

6    account for --

7        A.   No.

8        Q.   -- whether keyhole or otherwise, 50 --

9    50 shots at that target?

10       A.   Correct.  There was no such appeal.

11       Q.   And was that the same process after your

12   second and third attempts that day?

13       A.   Correct.

14       Q.   Do you recall interacting with Officer

15   Gaynor after the second and third attempts that day

16   about your score?

17       A.   I don't.

18       Q.   Do you recall if you interacted with any

19   instructor after your second and third attempts that

20   day?

21       A.   No.  I -- I interacted with -- we had -- I

22   interacted with one student.  He was actually

23   remarkable.  I've never seen anyone shoot this good

24   in my entire time with the Sheriff's Department or

**Timothy Turley, Volume II - October 24, 2016**

160

1    anywhere.  It was Adam Symanski.  He was amazingly

2    accurate with his firearm.  His grouping was

3    extremely tight.  And I consulted him on it, and he

4    gave me some tips.  But...

5        Q.    How old was Student Officer Symanski?

6        A.    I think he's 30, or at the time 30.  I'm

7    not sure.

8        Q.    So he didn't have, from your estimation,

9    the type of experience that you had with a weapon?

10        A.    No.  I believe he was raised in the

11   country.  I believe he had a tremendous amount of

12   experience.  I think he's a sportsman, fires all the

13   time with a great deal of experience.

14        Q.    And so as I understand it, then, you were

15   looking for tips from Gaynor and from Symanski about

16   what to do to shoot more proficiently that day?

17        A.    I was.  And then, you know -- and then I --

18   as it progressed, I lost faith, I think, in the

19   staff scoring the target.  I believe it was --

20        Q.    At what?

21        A.    I think the fix was in, so...

22        Q.    At what point in the sequence did you come

23   to that opinion that the fix was in?

24        A.    Probably after the second time I was told I

161

```
 1    did not qualify.
 2        Q.    And why did you believe the fix was in at
 3    that point?
 4        A.    Because I was -- I was -- I was very
 5    deliberate with every round I put downrange.  I saw
 6    the grouping.  I think I was informed I had missed
 7    one on paper, and I'm -- I was pretty discouraged.
 8    I'm, like, they're not --
 9        Q.    Were you trying harder the second time than
10    you were the first?
11        A.    Yeah.  I was -- I was pretty focused.
12        Q.    Why did you believe you were being targeted
13    in that way?
14        A.    I believe it was my interaction with Sean
15    Shattuck and possibly my instruction to the students
16    to not laugh at Shattuck and Cady's outrageous
17    behavior.
18        Q.    Officer Gaynor was the lead firearms
19    instructor for that component?
20        A.    She was.
21        Q.    Did you ask her to have Sean Shattuck
22    refrain from scoring your targeted second or third
23    times?
24        A.    I -- again, my faith in the firearms
```

162

```
1    crew -- she did nothing to correct Sean Shattuck's
2    behavior.  I did not believe she was approachable
3    for that subject.
4        Q.   You thought she was complicit?
5        A.   I did.
6        Q.   Did you make that known that you wanted to
7    have the academy director present on scene, for
8    example, for the scoring of your target?
9        A.   No.  No, I did not.
10       Q.   Is it fair for me to say that the first
11   time you alleged that your firearms, alleged
12   failures were retaliatory was after your separation
13   from the academy?
14       A.   Formally, yes.  In writing, anyway.
15       Q.   Now, you mentioned earlier a remediation
16   day.  That was a separate day that you went back to
17   attempt to qualify again?
18       A.   Yes.
19       Q.   How many times did it take you to qualify
20   on that remediation day?
21       A.   I believe twice.
22       Q.   And the academy director was present at
23   that time?
24       A.   He was.
```

165

1     Q.   To use some terminology, were you given an

2   opportunity to shoot at different distances with a

3   clean target?

4     A.   I'm sorry.  Yes.  If that's what you meant,

5   yes, I did.  Sorry.  I got ensnared here with the

6   wiring.

7          MR. KOSTER:  Sorry about that.

8     Q.   Yes.

9     A.   So at each range -- I mean, at each

10  distance of the firearms exam there was a clean

11  target, so it was easier to count rounds.

12         Do you know what I'm saying?

13    Q.   I do.

14    A.   As I advanced, I would switch to a

15  different target and engage a different target,

16  because I was the only shooter at the range.

17    Q.   So that was on the remediation day?

18    A.   On the remediation day, yes.

19    Q.   Okay.  And do you know whose idea it was to

20  give you clean targets to shoot at on the

21  remediation day?

22    A.   I don't.  I know Nicole Gaynor told me to

23  hang five targets.  I didn't understand the purpose

24  of that at the time, but then once I started the