# EXHIBIT

# 23

```
 1        Q.    In what way?

 2        A.    Because it still has an impact on the

 3   agency.

 4        Q.    This letter does, Exhibit 51.

 5        A.    Yes.

 6        Q.    Why?

 7        A.    Because of the whole circumstances

 8   surrounding his departure and the impact on our

 9   agency.

10        Q.    You mean his sudden departure?

11              MR. KOSTER:  Objection.

12        Q.    Are there other cases or other areas where

13   an attempt to re-create documents have failed because

14   McKenzie destroyed documents?

15        A.    Not of which I'm aware.

16        Q.    But you do believe he destroyed documents?

17        A.    If I may.  Um, I don't believe he destroyed

18   documents, but they were deleted.

19        Q.    By whom?

20        A.    I'm assuming by him.

21        Q.    So is it your position that a technical

22   person has -- could recreate them if someone went into

23   the hard drive and did that?

24              MR. KOSTER:  Objection.
```

1          MR. SINSHEIMER:  Withdrawn in that form.

2     Q.    You're familiar conceptually with the

3  notion that there are persons skilled in IT who can

4  pull up deleted documents, right?

5     A.    Correct.

6     Q.    You're familiar with the notion that that's

7  a tool that law enforcement uses routinely as forensic

8  evidence of serious cases, right?

9     A.    Correct.

10     Q.    They'll go to someone's cell phone and pull

11  up photos that the person tried to delete, right?

12     A.    Right.

13     Q.    Very effective in narcotic prosecutions,

14  right?

15     A.    Correct.

16     Q.    It's also very effective in money

17  laundering cases where they'll go into someone's

18  house, take their computer and resurrect years and

19  years of forensic trails of data that the person

20  thought they deleted, right?

21     A.    Yes.

22     Q.    And you're familiar with that, right?

23     A.    Yes.

24     Q.    So has anyone tried to do that here?

1        A.    I don't know.

2        Q.    You just don't know one way or the other?

3        A.    Correct.

4        Q.    But you do believe based on all the

5   available evidence that McKenzie himself was the one

6   who purged the files?

7        A.    Yes.

8        Q.    What evidence do you have that causes that

9   belief?

10        A.    Because the files would have been behind

11   his password and log in.

12        Q.    So it's your understanding that he's the

13   only one that had access to the documents that had

14   been deleted?

15        A.    Yes.

16        Q.    And that each individual's documents are

17   password protected?

18        A.    No.

19        Q.    So, I mean, let's take a look at Exhibit --

20   let me show you Exhibit 53.  And just to save time in

21   light of stipulation that your counsel made in the

22   other deposition, I'm going to represent what I think

23   it is.  You're free to disagree.  But just -- it's got

24   government Bates stamps on the bottom, means it was

1   produced by the government?

2        A.    Okay.

3        Q.    It has Curtis McKenzie's name above the bar

4   at the top of the page which suggests that they came

5   off of his computer, okay?

6        A.    If there's a question that means -- it was

7   generated by him but not necessarily off of his

8   computer.

9        Q.    Correct.  It was generated by him.  And

10  it's from McKenzie to, this top page, Millis, okay?

11       A.    Okay.

12       Q.    And if I suggest to you that it's a set of

13  e-mails that we received from the Government emanating

14  from Curt McKenzie's computer that this office then

15  reassembled to put in chronological order starting

16  with Wednesday, February 16th and the last one is

17  January 14, 2014.  Do you see that?

18       A.    Yes, sir.

19       Q.    Now we also, just to make the record really

20  clear, we have a couple of other e-mails that are not

21  in Exhibit 53, apparently were hard copies from

22  someone else's file.  Someone kept a copy of

23  something, he put it out for McKenzie.  You follow me?

24       A.    Yes, sir.

1      Q.     These appear to be, in good faith, all that

2    we have from him, okay?

3      A.     Okay.

4      Q.     And you'll notice, your lawyer is not

5    objecting to these representations because he also

6    made some stipulations earlier, you understand that?

7      A.     Yes, sir.

8      Q.     Now we're missing, it appears, from every

9    e-mail that was generated from the period of December

10   -- July 25, 2013 to December 11, 2013.  And you can

11   see that if you go to this page right here, you see

12   there is a July 5th one?

13     A.     Yes, sir.

14     Q.     And the next one chronologically is in

15   December?

16     A.     Yes, sir.

17     Q.     And we know that McKenzie routinely sent

18   e-mails on an almost daily basis, okay, is that true,

19   to your knowledge?

20     A.     That would be typical of him.

21     Q.     And certainly on a weekly basis, right?

22     A.     Yes, sir.

23     Q.     And the period we're missing is roughly 25

24   to 30 weeks.  You can see that, right, July to

1    December?

2        A.    That is right.

3        Q.    So we're trying to find out where they are,

4    in plain and simple English.   Do you understand that?

5        A.    Yes, sir.

6        Q.    Do you have any idea where they are?

7        A.    No, sir.

8        Q.    Do you know who could find them for us?

9        A.    If the software used by the Commonwealth to

10   look for them did not discover them, then I really

11   don't know.

12       Q.    So you believe that the Commonwealth as an

13   institution, I don't care about the main person, the

14   Commonwealth, probably someone from Mr. Koster's

15   office or an IT person, did what they could to get the

16   documents, right?

17       A.    Yes, sir.

18       Q.    And this comes after you've already accused

19   this very same person of purging documents, right?

20       A.    (No answer.)

21       Q.    This information being presented to you?

22       A.    Oh.   Yes, sir.

23       Q.    So understanding professional caution,

24   understanding you don't want to accuse anybody of

```
 1   something you don't know, but the evidence in front of
 2   you, this is a civil case, suggests it's more likely
 3   than not that McKenzie destroyed these documents,
 4   right?
 5                MR. KOSTER:  Objection.
 6        Q.    More likely than not.  That's all I asked.
 7        A.    That would be speculation on my part.
 8        Q.    No, sir.  I'm asking you whether the
 9   totality of the circumstances, it's more than
10   speculation, it's likely, based on the combination of
11   the fact that he had a password, based on the
12   combination of the fact that we had other people's
13   e-mails, based on the fact that we have a whole bunch
14   of them that predated Mr. Turley's time, based on your
15   own accusation and everything else you know that it
16   appears likely he's the one that destroyed them, isn't
17   that true?
18                MR. KOSTER:  Objection.  I think it's
19   argumentative and --
20                MR. SINSHEIMER:  No, it's not.
21                MR. KOSTER:  -- and you're really
22   calling for a legal conclusion.
23                MR. SINSHEIMER:  I'm not calling for a
24   legal conclusion.  I'm calling for a factual
```

1  conclusion about the guy who is in charge of the

2  agency.

3              MR. KOSTER:  That's not a factual.

4              MR. SINSHEIMER:  It is too.

5              MR. KOSTER:  You're not calling for a

6  factual --

7              MR. SINSHEIMER:  I'll withdraw it in

8  that form.

9      Q.   Wouldn't you like to know who in your

10  agency destroyed documents?

11      A.   Yes.

12      Q.   Haven't you already suggested that McKenzie

13  purged documents?

14      A.   Yes.

15      Q.   Haven't you seen Exhibit 53 which suggests

16  strongly that there is a purged set of documents

17  during the very time that Mr. Turley was a student?

18              MR. KOSTER:  Objection.

19      A.   Based on what I've seen here, it looks like

20  there is a significant gap in documents.  Beyond that,

21  I wouldn't know what, for sure what the cause was.  I

22  mean, it would be speculation on my part why they

23  would not be here.  I can't discount the fact that for

24  whatever reason, there were no documents generated in

```
 1   that time frame.  I don't know.
 2        Q.    Well, you do know that McKenzie sent
 3   e-mails on a routine basis, right?
 4        A.    Yup.
 5              MR. KOSTER:  Objection.  Asked and
 6   answered.
 7              MR. SINSHEIMER:  Well, because he does
 8   know.  And he's just -- and.
 9              MR. KOSTER:  Just because he knows
10   doesn't mean you can ask the same question over and
11   over again.
12              Wes is nodding in agreement with me.
13              MR. SINSHEIMER:  That's why I paused.
14   But just because you call it a legal conclusion
15   doesn't mean it's not a fair inference.
16              MR. KOSTER:  No, this objection was
17   asked and answered.
18              MR. SINSHEIMER:  This last one was, but
19   the one I'm trying to get from the executive director
20   of the agency is the inference you have is that your
21   former employee destroyed these documents, isn't that
22   true, sir?
23        A.    I agree there is an inference.
24        Q.    All right.  Do you have any reason to
```

1    believe anybody else did it?

2        A.    No, sir.

3        Q.    You wouldn't put it past him since you've

4    already accused him of purging documents, right?

5        A.    (Pause.)  Could you rephrase the question?

6        Q.    It appears to be something he's willing to

7    do, right, purge documents?  Withdrawn in that form.

8        Your own belief as of June of 2015 is that

9    despite his fiduciary duties, McKenzie had it in him

10   to purge documents and did so, correct?

11       A.    Yes, sir.

12             MR. SINSHEIMER:  That covers that angle.

13   What's the next one?  I need a break.

14             MR. KOSTER:  You're telling me.

15       Q.    Anyone else other than Shattuck

16   disciplined?  We covered that, right?

17       A.    Yes, sir.

18       Q.    Did you ever discipline Delilah Yee for

19   anything?

20       A.    No, sir.

21       Q.    Do you know if she ever has been

22   disciplined for anything?

23       A.    I'm not aware of any discipline.

24       Q.    How are things going at the Academy today?