# EXHIBIT

# 25

1    in the first deposition that you used e-mails fairly

2    regularly during your tenure at the Academy.  Do you

3    recall that?

4        A.    Yes.

5        Q.    Now if you go to -- this is going to be

6    Exhibit 53.

7                    (Exhibit 53, remarked.)

8                    MR. SINSHEIMER:  There's only one

9    Exhibit 53 now and I completely obliterated the other

10   one.

11       Q.    Okay.  If you go down to Page 3317.

12       A.    (Turns.)

13       Q.    3137, and the date is December 11, 2013.

14                   MR. KOSTER:  Sorry.  What is it, 3137?

15                   MR. SINSHEIMER:  3137.  And it's only a

16   few pages from the end.  It's six pages from the end.

17   3137.

18       A.    3137?

19       Q.    3137, lower right.  And there's one

20   December 11, 2013, okay?

21       A.    Yes.

22       Q.    And if you go to the one just before that

23   which begins a few pages back, July 25, 2013.

24       A.    (Turns.)  Yes.

1       Q.    Now if I said to you that in this

2   collection of e-mails there is a wide gap.  In other

3   words, we have no other e-mails of yours between those

4   two dates, July 25th to December 11th, except a couple

5   of hard copies that might have shown up in someone

6   else's files, would you have any explanation for that?

7       A.    I don't.

8       Q.    You certainly sent many e-mails during that

9   period of time, correct?

10      A.    I would say yes.

11      Q.    Sure.  Lots of them, right?

12      A.    I'm sure that I sent e-mails during that

13  period.

14      Q.    On a daily basis, correct, sir?

15      A.    I don't know if it was daily.

16      Q.    On a routine basis?

17      A.    Yes.

18      Q.    In a manner consistent with how you had

19  operated in the past?

20      A.    Yes.

21      Q.    In a manner consistent with how you operate

22  today?

23      A.    I'm not sure what that means.

24      Q.    How many e-mails do you get a day?

1      A.    It depends on the day.

2      Q.    How many e-mails do you average a day over

3  a month-long period of time?

4      A.    I don't know.

5      Q.    Guess.

6              MR. SINSHEIMER:  We don't like guesses.

7      Q.    Give me your best estimate.  50?

8      A.    I don't know.  I don't know.

9      Q.    More than 10?

10     A.    I would say probably, yes.

11     Q.    On most days, you certainly get more than

12  10, right?

13     A.    On most days?

14     Q.    Yeah.

15     A.    I don't know how many I get a day.

16     Q.    That wasn't my question.  You said that.

17  I'm trying to get a range.  How about a range.  Can

18  you give me a range?  0 to --

19     A.    I don't know.

20     Q.    How many do you send a day?

21     A.    How many do I send each day?

22     Q.    Today?

23     A.    Today?

24     Q.    Roughly.

1      A.    Zero.

2      Q.    You don't send e-mails?

3      A.    I didn't send any today.

4      Q.    Fair enough, sir.  On an average day in an

5   average work week, roughly how many e-mails do you

6   send?

7      A.    I would say a few.

8      Q.    More than five?

9      A.    No.

10      Q.    About five?

11      A.    Some days are different than others.  Some

12   days I send 0, some days, many days go by where I

13   don't send any and then I may send a few.

14      Q.    And what you understood through that, I'm

15   looking for an average, a rough estimate of the

16   average number of e-mails you send per day.  Can you

17   help me out at all?

18            MR. KOSTER:  I think he's answered that

19   question a couple of times already.

20            MR. SINSHEIMER:  No, he hasn't.

21            MR. KOSTER:  Yes, he has.

22            MR. SINSHEIMER:  He keeps changing the

23   question.

24            MR. KOSTER:  Who?  You keep changing the

1  question?

2                MR. SINSHEIMER:  No, I don't.

3                MR. KOSTER:  What do you mean "he"?

4  You're the one asking the questions.

5                MR. SINSHEIMER:  He keeps avoiding the

6  term "average."

7     Q.    So what's the average?

8                MR. KOSTER:  He said he doesn't know the

9  average.  He said it was between, from 0 to --

10                MR. SINSHEIMER:  I'm not talking about

11  the mathematical mean, counselor.  I asked him -- read

12  back the question.

13                MR. KOSTER:  He's bound by the words

14  that you used, Rob.

15                MR. SINSHEIMER:  Read back the question

16  then -- if he doesn't want to give me a specific

17  answer, I want his best estimate.  I'll try it again

18  then save yourself the trouble.

19                THE COURT REPORTER:  Do you want the

20  question read back?

21                MR. SINSHEIMER:  No.

22     Q.    Give me your best estimate of the average

23  number of e-mails you send a day on a regular

24  professional day?

1      A.    Anywhere from 0 to 5.

2      Q.    Now you've already seen Exhibit 53.  And

3  that is a pretty thorough compilation of the e-mails

4  you sent in the late winter and spring of 2013, right?

5      A.    Yes.

6      Q.    If you want to take a minute and look,

7  that's fine.

8      A.    Well, I'm going to assume that these are

9  all sent from me.

10     Q.    Because it says "Curt McKenzie" at the top,

11  right?

12     A.    Well, I'm not assuming it because of that.

13  I'm assuming it because I would assume it's already

14  been put together.

15     Q.    I don't think you should make that

16  assumption because some may be to you.  I mean, we see

17  a string between you and Mellis.  We see lots of them

18  from you to Powers.  All I can tell you for sure is

19  they came from the Government and your lawyer

20  stipulated to that.  They seem to be your e-mails for

21  that stated period.

22     A.    Okay.

23     Q.    Fair enough?

24     A.    Yes.

1       Q.    And you have no explanation for why so many

2   are missing between July and December?

3       A.    I do not.

4       Q.    Now you do know, obviously that you were

5   accused in writing of purging, right?

6       A.    That's correct.

7       Q.    Do you know why Zivkovich believed that you

8   purged?

9       A.    I do not.

10      Q.    How about the possibility it's right in

11   front of you that they can't find the e-mail.  Did you

12   consider that?

13      A.    I personally --

14              MR. KOSTER:  The question was, "Did you

15   consider that?"

16      A.    Yes.

17      Q.    Okay.  And do you think someone else purged

18   your e-mails?

19      A.    I don't know.

20      Q.    How long have you been aware that there

21   were missing e-mails?

22      A.    Um, since last evening or yesterday

23   afternoon.

24      Q.    All right.  And just yes or no.  Was that

1  the result of a conference of privileged communication

2  with your attorney?

3      A.    Yes.

4      Q.    You don't recall me asking you at your

5  deposition over and over again why don't I have

6  e-mails for this, that and the other thing the first

7  time you were here?

8      A.    Not specifically, no.

9      Q.    Did you read your transcript last night?

10     A.    No, I did not.

11     Q.    When is the last time you read your

12  transcript?

13     A.    Probably maybe two to three weeks after the

14  last time I was here.

15     Q.    When it came in the routine course?

16     A.    Yes.

17     Q.    You have no doubt that they're gone as you

18  sit here today, correct?

19     A.    I don't know.

20     Q.    You were accused way back, almost two years

21  ago now, 2015, of purging them, right?

22     A.    I was accused?

23     Q.    Right.

24     A.    I wasn't accused of purging anything

1   specific.

2        Q.    Well, let's see.  I think you wrote to

3   Zivkovich, "You allege that I purged all files from my

4   computer in the agency share drive," right?

5        A.    That is correct.

6        Q.    He alleged that, right?

7        A.    Yes.

8        Q.    You understood what that means, right?

9        A.    I did not understand exactly what it meant,

10  no.

11       Q.    Well, you understood that you were accused

12  of doing something pretty bad that you were not

13  supposed to do, right?

14       A.    That's correct.

15       Q.    You know you're not supposed to purge

16  e-mails from your computer, right?

17       A.    That's correct.

18       Q.    You know that those are public records,

19  right?

20       A.    Yes.

21       Q.    And by that I mean under the definition of

22  the public records law, there is question about who

23  gets access and when, but you understand that you're

24  supposed to keep them?

1        A.    Yes.

2        Q.    And if you're being paid a paycheck by the

3    Commonwealth, you're supposed to preserve their

4    records, right?

5        A.    Yes.

6        Q.    And you understood that you don't own them,

7    they did, right?

8        A.    Yes.

9        Q.    And you understand that a relatively

10   high-placed executive person who had been your boss is

11   accusing you of perjury -- accusing you of purging

12   them, in other words, making them disappear somehow,

13   deleting them?

14       A.    I understand what you mean.

15       Q.    No, no.  I'm asking you about what happened

16   in -- you got an e-mail or you got a letter that

17   accused you of purging, right?

18       A.    Yes.

19       Q.    And you wrote back and said that was a lie,

20   right?

21       A.    Yes.

22       Q.    And you said that that was a lie that he

23   created to disparage your reputation, right?

24       A.    Yes.

1       Q.    What did you do to follow that up?

2             MR. KOSTER:   Objection.   Follow what up?

3       Q.    You can answer.

4       A.    I didn't do anything.

5       Q.    So let me see if I got this right.   We're

6   in June of 2015, right?

7       A.    Um-hum.

8       Q.    At that time you're a defendant in a

9   Federal lawsuit?

10      A.    Yes.

11      Q.    You know that the plaintiff is going to be

12  seeking documents from you, right?

13      A.    Yes.

14      Q.    You know that a high level executive in the

15  government has accused you of essentially destroying

16  documents that would be relevant, right?

17      A.    Yes.

18      Q.    And you know if you've given it a moment's

19  thought, that that's going to put you in a very bad

20  light, correct?

21      A.    Potentially, yes.

22      Q.    Because someone is going to say you

23  destroyed these e-mails, right?

24      A.    (No answer.)

1        Q.     Somebody already had at that point in time,
2    right?
3        A.     I'm going to answer that no.
4        Q.     Because you don't think "purged" and
5    "destroyed" mean the same thing?
6        A.     No.
7        Q.     What do you mean?
8        A.     Mr. Zivkovich wrote "purged all files" from
9    my computer.
10        Q.     Well, that's worse than just e-mails.  So
11    he's accused you of destroying public records, right?
12        A.     Yes.
13        Q.     Which you knew could make you look very bad
14    in front of a jury, right?
15        A.     Yes.
16        Q.     What you told him to his face in writing --
17    what you told him directly in writing was a lie,
18    right?
19        A.     Yes.
20        Q.     And what did you do, if anything, to make
21    sure that you wouldn't be called a liar by your former
22    boss who is a very high level executive in the state?
23        A.     I authored and sent this e-mail to him.
24        Q.     So you told him he was lying?

1      A.    That's correct.

2      Q.    That's all there is to it as far as you're

3    concerned?

4      A.    That's correct.

5      Q.    Did you ever ask anybody to see whether an

6    IT professional could pull the documents?

7      A.    I did not.

8      Q.    Do you know what, if any, effort was made

9    by the Attorney General's office to utilize an IT

10   person to pull the documents?

11     A.    I don't.

12     Q.    Do you know whether Zivkovich himself

13   utilized the services of an IT person to pull the

14   documents?

15     A.    I don't.

16     Q.    You understand that these are documents

17   that the plaintiff alleges are very relevant to this

18   lawsuit, correct?

19     A.    Um no, I'm not.

20     Q.    Well, let's try it a different way.  You

21   understand that they overlap a period of time that

22   Mr. Turley was a student, right?

23     A.    Yes.

24     Q.    And that we have lots of documents from

1  before Turley was a student, right?  You have it right

2  in your hand involving Callasola.

3      A.    Okay.

4      Q.    Right?

5      A.    Yes.

6      Q.    And you understand that there have been

7  allegations made by Mr. Callasola -- Cappasola?

8      A.    Yes.

9      Q.    And you understand he's been deposed in

10  this case, right?

11      A.    No.

12      Q.    Oh, you didn't know that?

13      A.    No.

14      Q.    Okay.  Well, if I represented to you and

15  Mr. Koster acknowledges it, you have no reason to

16  doubt it, do you?

17      A.    No.

18      Q.    So we have documents concerning Cappasola,

19  right?

20      A.    Yes.

21      Q.    In your hand, Exhibit 52.

22      A.    53.

23      Q.    53.  And we're missing the exact same

24  period that Mr. Turley was a student, right?

1      A.     I don't know.

2      Q.     Well, I showed you the numbers.  We're

3   missing, at least in Exhibit -- let's look at it this

4   way.  Exhibit 53 does not include any e-mails you

5   authorized between July 23, 2013 and December 13,

6   2013.  And you can look at Page 3137 to confirm, which

7   is about six or so pages from the back.

8              MR. KOSTER:  And so this question is

9   based on the record that you put together here and now

10  marked as Exhibit 53, that's what this answer is going

11  to be based on?

12             MR. SINSHEIMER:  That's correct for me.

13     A.     (Looks.)

14             (Discussion off the record.)

15             MR. KOSTER:  What I had said and what I

16  wanted on the record is that Mr. McKenzie's response

17  to Rob's question is based on Exhibit 53, which was

18  compiled by Mr. Sinsheimer.

19     Q.     Well, let's make it even more clear record.

20     The clip around Exhibit 53 as it is marked is --

21  53, we can't testify.  So all 53 really is is a bunch

22  of documents that have Government Bates stamps at the

23  bottom.  And they were complied by the Government and

24  produced to us.  It may well be that they were

1    reordered by my office in order to make the dates at

2    the top chronological.  And so whatever that 53 is,

3    whether or not it's a complete set of anything, all

4    I'm saying -- and it may not be, I'll stipulate to

5    that.  I just want to know that that set of documents

6    is missing um, any e-mails from you between July 23rd

7    or so, let me get the exact date, July 25, 2013 to

8    December 19, 2013.  Do you understand the question?

9              THE WITNESS:  Yes.  I didn't know if he

10   was finished.

11        Q.    I am finished.

12        A.    Okay.  Yes.

13        Q.    So they're missing?

14        A.    Yes.

15        Q.    What, if anything, could you do right now

16   given your employment position and so forth, to help

17   us find them?

18        A.    I can't think of anything.

19        Q.    One thing you could do, I suggest

20   respectfully, is to ask your attorney in a privileged

21   communication, "Can you get them through the

22   Government for the adversary?"  Right?

23        A.    I suppose I could, yes.

24        Q.    And what if Mr. Koster and the people at

1    his office have told me one way or another that apart

2    from a few other e-mails that may have popped up in

3    other people's files, this is all they can find,

4    what's your reaction to that?

5                    (Pause.)

6        A.    I don't know that I have one.

7        Q.    Well, would you agree with me if you didn't

8    do it, someone must be lying about you?

9        A.    No.

10       Q.    Well, that's what you said to Zivkovich

11   almost a year ago.  You said, "This is a complete

12   lie," right?

13       A.    Yes.

14       Q.    Are you calling Zivkovich a liar?

15       A.    I'm saying the fact that there's an

16   allegation that I purged all files from my computer is

17   a complete lie.

18       Q.    Well, did you purge some files?

19       A.    No.

20       Q.    Did you purge any files?

21       A.    No.

22       Q.    It's your testimony under oath that when

23   you left, they were exactly as they had been all that

24   time?

1    understood?

2        A.    Yes.

3        Q.    Stick in your craw for a bit while you're

4    driving back?

5        A.    No.

6        Q.    Now in this e-mail during that same

7    conversation, we're talking about the February

8    conversation with Zivkovich?

9        A.    Yes.

10       Q.    You mentioned actual violations of law by a

11   staff instructor?

12       A.    Yes.

13       Q.    Is that the same John Doe, Mr. Doe?

14       A.    No.

15       Q.    Who is what?

16             MR. SINSHEIMER:  Give your lawyer a

17   chance.

18       A.    Robert Powers.

19       Q.    Okay.  And um, what laws did Mr. Powers

20   violate that you were concerned about?

21       A.    Public records loss.

22       Q.    In what way did he do that?

23       A.    It came to my attention that um, Mr. Powers

24   had instructed recruit classes at the end of the, each

1   recruit officer class to author an anonymous report, I

2   later found out that that report was addressed to me

3   as the Academy Director.  This was done without um, my

4   knowledge.  And at one point when I learned of these,

5   I asked Mr. Powers for those documents.

6        And -- well, first of all, I asked him, he told

7   me that he had, in fact, done that.  I asked for the

8   documents and he said that he didn't have them.  And

9   um, I searched the Academy, the building of the

10  Academy, and was unable to locate those files.

11       Q.    All right.  And this is something that you

12  told Zivkovich in February of 2013?

13       A.    That's correct.

14       Q.    Is that the first time you told him?

15       A.    That's the first time I told him, yes.

16       Q.    All right.  I found your answer very

17  confusing so it's going to take me a minute to boil it

18  down.

19       A.    Okay.

20       Q.    Powers had said what to the classes about

21  authoring some documents?

22       A.    I don't know exactly what he said.  I

23  wasn't present.

24       Q.    Of course not.  What is your understanding

1   of what had been said?

2       A.    My understanding is that the recruits were

3   to author an anonymous report on what they liked, what

4   they didn't like, that sort of thing, to be addressed

5   to me as the Academy Director during the last few days

6   of the class.

7       Q.    And how long had you been Academy Director

8   at that time?

9       A.    I was hired in September of 2012.  I'm not

10  sure on the timeline.

11          MR. KOSTER:  I don't want you to think

12  out loud.  I want you to answer the question to the

13  best of your knowledge.

14          THE WITNESS:  Okay.

15      Q.    So the 48th and 49th class.

16      A.    (No answer.)

17      Q.    Were you there for the 48th and 49th?

18      A.    Yes.

19      Q.    Were you there for the 50th?

20      A.    Yes.

21      Q.    The 51st?

22      A.    Part of the 51st, I think.

23      Q.    Did you ever see the report that Mr. Powers

24  had allegedly commissioned, for lack of a better word,

```
 1   for the 48th class?
 2        A.    No.
 3        Q.    Did you ever see such a report for the 49th
 4   class?
 5        A.    No.
 6        Q.    Did you ever see such a report for the 50th
 7   class?
 8        A.    Yes.
 9        Q.    How did you see it?
10        A.    I was contacted by Marylou Powers a few
11   days after the graduation of that class and she said
12   that she wanted to talk to me about the evaluations.
13   That's the term that she used.
14        Q.    She called them evaluations?
15        A.    That's correct.
16        Q.    And she had them in her hand?
17        A.    She had -- that was my understanding, yes.
18        Q.    And um, did you speak with her about them?
19        A.    I did.
20        Q.    Where?
21        A.    On the telephone.  And she had come out to
22   the Academy a couple days after that.
23        Q.    And did she give you a copy?
24        A.    She did.
```