UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY TURLEY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 14-14755-LTS |
| | ) |
| | ) |
| CURTIS MCKENZIE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

January 5, 2018

SOROKIN, J.

On December 31, 2014, plaintiff Timothy Turley filed a complaint in this Court against

the Municipal Police Training Commission ("the Commission"), the Western Massachusetts

Regional Police Academy ("the Academy"), Curtis McKenzie, Robert Powers, and Delilah Yee

(collectively, "the Commonwealth defendants"), and Sean Shattuck. The complaint alleged,

among other claims, sexual harassment, gender discrimination, age discrimination, breach of

contract, and retaliation, all arising from Turley's tenure at and dismissal from the Academy.

After the Court's ruling on the Commonwealth defendants' motion to dismiss and

defendant Shattuck's motion for partial judgment on the pleadings, six claims remain before this

Court. Doc. No. 29. Count I asserts a First Amendment retaliation claim under 42 U.S.C. § 1983

against McKenzie, Powers, Shattuck, and Yee in their individual capacities.[1] Doc. No. 1. Count II asserts a claim for non-monetary[2] relief under 20 U.S.C. § 1681 ("Title IX") against the Academy and the Commission. Id. Count III asserts a claim for equitable relief under Mass. Gen. Laws chapter 214, § 1C ("Chapter 214 sexual harassment") against the Academy. Count IV asserts a claim for equitable relief under Mass. Gen. Laws chapter 151B ("Chapter 151B") against the Commission, and against McKenzie in his official capacity, as well as a claim for monetary damages against, McKenzie, Powers, and Yee in their individual capacities. Id. Count VI asserts a claim for specific performance for breach of contract against the Commission. Id. Finally, Count VII asserts a claim for tortious interference with contract, for monetary damages, against McKenzie, Powers, Shattuck, and Yee in their individual capacities. Id.

Before the Court are the defendants' motions for summary judgment. The Commonwealth defendants move for summary judgment on all claims pending against them. Doc. No. 118. Separately, Shattuck moves for summary judgment on all claims pending against him. Doc. No. 120. Turley filed a combined omnibus opposition to the defendants' motions in which he addressed only the First Amendment claim (Count I), the Title IX claim (Count II), and the Chapter 214 sexual harassment claim (Count III).[3] Doc. Nos. 129; 134. Accordingly, the Court ALLOWS the defendants' motions for summary judgment as to Counts IV, VI, and VII (a)

---

[1] Originally, Plaintiff also asserted claims against Daniel Zivkovich, however, Plaintiff voluntarily dismissed these claims conceding that he had no reasonable likelihood of ever obtaining admissible evidence to support claims against Zivkovich. Doc. No. 54.

[2] All claims for monetary damages against the Academy and the Commission were dismissed. Doc. No. 29 at 2.

[3] Turley does assert, in two conclusory sentences that all his other state law claims survive defendants' motions. Doc. No. 129 at 25-26. This cursory argument is insufficient to prevent a waiver. See, e.g., United States v. Encarnacion-Ruiz, 787 F.3d 581, 586 (1st Cir. 2015) ("We have repeatedly stated that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument." (citations omitted)); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.").

as unopposed and (b) due to Turley's failure to prosecute these claims at this stage of the litigation. That leaves for resolution the motions for summary judgment on the First Amendment retaliation claim against, in their individual capacities, McKenzie, Powers, Shattuck, and Yee (Count I), the Title IX claim for non-monetary relief against the Academy and the Commission (Count II), and the Chapter 214 sexual harassment claim against the Academy (Count III).[4]

I.   BACKGROUND

The facts, based upon the undisputed facts before the Court, Plaintiffs' factual submissions even where disputed and those facts established by drawing all reasonable inferences in Turley's favor, are set forth below.[5]

Turley worked for twenty years at the Suffolk County Sheriff's Department. Doc. No. 136 at ¶ 2. He retired from the Sheriff's Department in 2010 at the age of forty-three. Id. at ¶ 3. In 2013, Turley decided to advance his career by training as a certified police officer. Doc. No. 1 at ¶ 12. To further this goal, Turley enrolled in a 20-week police officer training course at the Academy, which began in August of 2013.[6] Doc. No. 136 at ¶ 198.

**A.  Alleged Hazing at the Academy**

Turley avers that on his first day at the Academy he was forced "to place socks on [the] bare feet [of another cadet] in front of the entire [class]." Doc. No. 136 at ¶ 148. He was later required to write the Academy's use of force model on the board "every day during his lunch break." Id. at ¶ 151. Turley was teased by staff instructors Powers and Yee who often made jokes

---

[4] The Plaintiff's post-hearing motion to supplement the record (Doc. No. 142) is DENIED. The parties had a full and fair opportunity to submit their evidence. To allow the motion would further delay this matter as it would require permitting the defendants to respond. Moreover, the facts are not material to the Court's disposition of the pending motions.

[5] Defendants dispute many of the facts described in the text.

[6] In Massachusetts, a person who wishes to become a police officer must first complete a course of study at a police academy. Mass. Gen. Laws ch. 41, § 96B. The Massachusetts police academies, including the Academy, are overseen by the Commission. Doc. No. 136 at ¶ 2.

suggesting that Turley suffered from "erectile dysfunction" and "needed Viagra." Id. at ¶¶ 157, 162-63.

Turley was not the only cadet who was the object of the staffs' ridicule and jokes. Doc. No. 1 at ¶ 22. Cadets at the Academy are hazed to "toughen them up," Id. at ¶ 22, but much of the hazing is "racist, sexist, and homophobic." Doc. 136 at ¶ 146. For instance, one cadet was called "a walking heart attack" and "fucking retarded," he was instructed to stop "sticking [his] ass out" because he was "not at [his] boyfriend's house," and was "ordered . . . to exchange shoelaces with a female cadet whose laces were pink." Id. at ¶¶ 78, 80, 84-85. A cadet was asked "Does your wife read the news paper [sic] while you fuck her?" Id. at ¶ 100. Another cadet was instructed to bring Vaseline to class. Id. at ¶ 107. One teacher instructed the class to stop "ethnically altered vehicles." Id. at 124.

The hazing escalated during the cadets' firearms training. Shattuck, one of the firearms instructors, routinely "scream[ed] and [swore] at [student officers] in order to teach them to use their weapons while also feeling stress." Doc. 138 at ¶ 8. "Throughout the firearms course, Shattuck would refer to the cadets as 'ladies,' 'bitches,' 'faggots,' 'fags,' and 'retards'" Doc. 138 at ¶ 141. On one occasion, Shattuck handcuffed a cadet (not Turley), while Shattuck "took his fingers and placed them under [the cadet's] nose, asking [the cadet] if they [Shattuck's fingers] smelled like the cadet's wife." Doc. 136 at ¶ 99. The hazing "culminated" when "Shattuck grabbed [a cadet's (but not Turley's)] buttocks behind the genitals at the anus, forced his finger into the victim's anus . . . and proceeded to rub his genital against the victim, simulating sexual intercourse." Doc. 1 at 30; Doc. No. 136 at ¶ 110. After these incidents, Shattuck told the cadets "what happens on the range, stays on the range" and "you guys can all . . . bitch and moan about how we have talked to you and treated you, but we already have our badges." Doc. 136 at ¶ 115.

**B. Turley's Objections and Shattuck's "threat"**

Turley did not formally report the instructors' conduct during his tenure at the Academy. Doc. No. 136 at ¶ 36. Turley says, as a general matter, that he objected to Shattuck's behavior on the firing range by making facial expressions and through his body language. Doc. No. 138 at ¶ 217. Except as described later in this paragraph he does not give further details about when he made these expressions, who was present when he made these expressions, or the particular context in which he made them. Turley describes two specific instances by which he says he voiced his objections. First, when Shattuck asked a cadet if "his fingers smelled like [the cadet's] wife," Turley made an upset face. Id. at ¶ 219. Shattuck noticed Turley's displeasure and asked Turley "What's your fucking problem?" Id. Second, when Shattuck grabbed a cadet and "simulated intercourse," Turley approached to stop Shattuck. Id. at ¶¶ 220-22. Shattuck released the cadet and asked Turley, "Don't you have a sense of humor?" Id. at ¶ 223. Turley responded "That's not funny." Id. These incidents happened in Shattuck's classroom, and on the firing range, respectively. Id. at ¶¶ 38, 45, 47-52. Turley does not identify the other staff, if any, present during either incident.

In addition to these instances, Turley says he also "admonished other cadets for nervously laughing at Shattuck's inappropriate behavior." Id. at ¶ 227. A cadet told him "to keep it down because the staff was listening." Id. at ¶ 227. Turley does not describe where this occurred, or which instructors, if any, were listening. Id. at ¶ 227.

Shattuck later told Turley that if Turley ever graduated, then Turley could "tell [Shattuck] to go fuck himself." Id. at ¶ 223. Turley understood Shattuck's statement as a threat. Doc. No. 136 at ¶ 181.

### C. Shattuck's Alleged Retaliation

On the final day of weapons training at the firing range, cadets take a firearms qualification test, during which they fire their weapons at paper targets**.** Doc. No. 138 at ¶ 58. Instructors then score the cadets' tests by reviewing the cadets' targets. Id. at ¶ 60. A cadet is allowed three attempts to pass. Id. at ¶ 64.

Turley received a failing score on each of his three attempts to qualify on the firearms test. Doc No. 138 at ¶ 199. Turley saw Shattuck score his targets.[7] Doc. No. 138 at ¶ 244. He did not see any other instructors look at his target but admits that another instructor may have also looked at his targets. Doc. Nos. 138 at ¶ 82; 122, Attachment A at 53.

Turley, who has twenty years' experience qualifying on firearms tests, believes that he shot well enough to pass. Doc. No. 134 at 9; Doc. No. 136 at ¶ 205. Doc. No. 138 at ¶ 199. He contends that he actually did pass but that Shattuck "maliciously fail[ed] him." Doc. No. 138 at ¶ 250.

Turley subsequently passed a remedial firearms test, and then passed the same test again after he was separated from the Academy. Doc. No. 138 at ¶ 253-54.

### D. McKenzie's Knowledge

McKenzie, the director of the Academy, was frequently on the firing range during the hazing. Doc. 136 at ¶¶ 35, 192.

---

[7] Shattuck disputes that he was the "primary scorer" of Turley's target. Doc. No. 138 at ¶¶ 58-97. He says that another instructor, Gaynor, was the "primary scorer" and that Shattuck only reviewed Turley's targets to confirm that Turley had failed. Id. at ¶ 82-87. Gaynor does not recall scoring Turley's target or if she even "ever had Mr. Turley's target in [her] hands" but acknowledges that she, Shattuck, and another instructor, Cady, scored targets that day. Doc. Nos. 138 at ¶ 82; Doc. No. 122, Attachment Q at 6-9.

On one occasion, during a firearms training session, an instructor, Cady, told Shattuck that he "would ejaculate in [Shattuck's] mouth." Id. at ¶ 38. The instructors were standing near a live microphone, so the comment was broadcast throughout the firing range. Id.

McKenzie was apprised of the incident ("the hot microphone incident") in November of 2013, and initiated an investigation at the end of that month. Id. at ¶¶ 39-40. As part of the investigation, McKenzie addressed the cadets, explained that he was investigating, and asked if "they had any questions." Id. at ¶¶ 40-41. "[N]one responded." Id. at ¶ 41. McKenzie then interviewed the instructors and spoke with Cady about the incident. Id. at ¶¶ 42-47. Over the course of the interviews, one instructor told McKenzie that he had heard Shattuck make sexually aggressive comments to a cadet. Id. at ¶ 45.

McKenzie says that, on December 2, 2013, he and Powers arranged a meeting with Shattuck and Cady to discuss the hot microphone incident and the allegations of sexually aggressive comments. Id. at ¶ 48. The meeting was held on December 17, 2013, which McKenzie asserts was the earliest date at which the parties were available to meet. Id. at ¶ 49. December 17, 2013 is also the day that McKenzie received a post-dismissal complaint letter from Turley. Id. at ¶¶ 48-49. Turley argues that the meeting was not pre-arranged but was instead held to "manage the crisis created" by his letter. Id. at ¶ 49. He offers no evidence supporting this argument.

### E. Turley's Dismissal

McKenzie dismissed Turley from the Academy on December 10 of 2013, citing Municipal Police Training Committee regulation 550 CMR 3.09(4) as the reason for the dismissal. Doc. No. 136 at ¶ 17. The Municipal Police Training Committee regulations govern police training programs in Massachusetts, including cadet dismissal. Doc. Nos. 136 at ¶¶ 5, 23.

Regulation 550 CMR 3.09(4) ("the three strikes rule"), requires that a cadet be dismissed if he fails "any three tests." Doc. No. 136 at ¶ 6. When a cadet fails a test, the cadet receives an "action notice." Doc. 136 at ¶ 215. Per the three strikes rule, a cadet will be dismissed from the Academy upon his third action notice.

Turley received failing scores on three examinations during his tenure at the Academy: the firearms test, <u>supra</u> 5-6, a comprehensive exam, and the Standardized Field Sobriety Test, ("SFST"), Doc. Nos. 138 at ¶ 104; 136 at ¶¶ 18-19, 226-31.

### F. McKenzie's Alleged Retaliation

Although the three strikes rule requires that "any student officer who fails . . . *any three tests* . . . be dismissed for non-disciplinary reasons," Police Training Regulations, 550 CMR 3.09(4) (emphasis added), McKenzie instructed the cadets that only comprehensive exams would count towards the "three strike rule." Doc. No. 136 at ¶ 219. He described the comprehensive exams as four tests "which the students would be given advance notice and ample time to prepare for." <u>Id.</u> at ¶¶ 216-17. After the first comprehensive exam, McKenzie told the class that it "would be impossible to fail out of the academy for academic reasons if they passed a second comprehensive exam on their first attempt." <u>Id.</u> at ¶ 222.

The SFST is not a comprehensive exam. <u>Id.</u> at ¶ 217-220. The test covers only one subject and the material is taught over the course of only three days. <u>Id.</u> at ¶ 265. Turley failed the SFST. <u>Id.</u> 231. McKenzie treated Turley's failure of the SFST as his third and final failure under the three strikes rule. <u>Id.</u> at 232. Turley argues that this treatment was "retaliatory." <u>Id.</u> at ¶ 196.

### G. Turley's Post-Dismissal Letter

After his dismissal, Turley submitted a letter alleging that he experienced inappropriate hazing at the Academy and that his dismissal was retaliatory. Doc. No. 136 at ¶ 26-28.

The same day that McKenzie received Turley's letter, he met with Shattuck, Cady, and Powers purportedly to discuss his investigation of the hot microphone incident and the allegations that arose during the subsequent investigation.[8] Id. at ¶¶ 48-49. Following the meeting, McKenzie collected reports from thirteen cadets and ultimately fired Shattuck and Cady. Id. at ¶¶ 55-56. McKenzie then referred Shattuck's behavior to the District Attorney for potential criminal charges. Id. at ¶ 58.

## II. THE LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted).

Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

---

[8] Turley contends that the meeting was actually set-up in response to his letter. Doc. No. 136 at ¶ 49.

party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).

III. FIRST AMENDMENT RETALIATION CLAIM

"[T]he First Amendment prohibits government officials from subjecting an individual to

retaliatory actions . . . for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006). "To

prevail on a retaliation claim under § 1983 a plaintiff must show: (1) that his conduct was

constitutionally protected, and (2) that this conduct was a substantial factor or a motivating factor

for the defendant's retaliatory decision." Rosaura Bldg. Corp. v. Municipality of Mayaguez, 778

F.3d 55, 66 (1st Cir. 2015).

Turley argues, without opposition for purposes of summary judgment, that he engaged in

protected activity when he spoke out against the hazing culture at the Academy. Doc. Nos. 1 at 1;

134 at 5. He further argues that he was retaliated against because of his First Amendment activity

when he was: (1) given failing scores on three consecutive firearms tests, (2) given an "action

notice" for failing the Standard Field Sobriety Test ("SFST"), and (3) dismissed from the

Academy for violating the three strikes rule.[9] Doc. Nos. 1 at ¶¶ 43-50; 134 at 8; 129 at 8.

---

[9] Turley alleges that during his tenure at the Academy he voiced his dissatisfaction with the
hazing culture verbally and through facial expressions. Doc. Nos. 1 at 1, ¶ 68; 129 at 5-6. He
further alleges that Shattuck and other instructors made comments to him that could be
characterized as harassment. He does not argue that this alleged conduct was itself retaliation.
Doc. Nos. 1 at ¶¶ 66-70; 129 at 8. See Welch v. Ciampa, 542 F.3d 927, 937 (1st Cir. 2008)

a. Yee and Powers

Powers was a staff instructor, and Yee was a physical training instructor at the Academy during Turley's tenure there. Doc. No. 136 at ¶¶ 11, 13. Turley concedes that Powers and Yee were "not involved in scoring . . . the firearms exam." Doc. No. 136 at ¶ 61. He also concedes that neither Powers nor Yee were aware of Turley's complaints that the exam was scored incorrectly until after Turley's separation. Doc. No. 136 at ¶ 35. He concedes that Powers and Yee "were not involved in scoring . . . the SFST exam." Id. Finally, Turley concedes that Powers and Yee "were not consulted about [Turley's] dismissal and did not know that the plaintiff would be dismissed until after his separation." Doc. No. 136 at ¶ 25. As a result of these concessions, there is no evidence that Powers or Yee committed or participated directly in any of the three alleged retaliatory acts.

Nonetheless, Turley does not concede that summary judgment is warranted. He argues that Yee and Powers are liable for First Amendment retaliation because they acted in concert with the other defendants to retaliate against Turley. Turley's conspiracy argument fails because Turley failed (1) to plead a conspiracy action; and (2) to submit sufficient facts to support an inference that the defendants acted in concert.

Turley's complaint omits any allegations of joint action, concerted action, conspiracy or a claim under section 1985(3). See doc. No. 1 at ¶¶ 66-70 (listing allegations pertinent to Count I); see generally Doc. No. 1. Nor has Turley amended his complaint or sought leave to do so.

More than two years after filing the initial complaint, and well after the November 1, 2015 deadline for amending the pleadings without good cause, Doc. No. 31 at 1, Turley filed a

_____

(stating "[a]ctions of informal harassment, as opposed to formal employment actions ... can be the basis for first amendment claims," when "the motive [of the retaliatory harassment] was political discrimination.")

document entitled "Notice of Alternate Theories of Pleading" ("Notice") in which the plaintiff first mentioned his intent to pursue conspiracy liability with respect to his § 1983 claim. Doc. No. 107 at 1. The notice is neither an amended complaint nor a motion to amend. It neither alleges any facts nor advances any basis for amending the complaint. Id. Now, in the opposition to the defendants' motions for Summary Judgment, plaintiff advances such a conspiracy theory of liability. Doc. No. 129 at 17-19. This he cannot do. Rule 8 exists to "give defendant[s] fair notice of what the plaintiff's claim is and the grounds upon which it rests." Soni v. Boston Med. Ctr. Corp., 683 F. Supp. 2d 74, 91 (D. Mass. 2009) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)). Plaintiff failed to give defendants "fair notice" of his conspiracy claim, and the Court will not reopen discovery at this late date. See Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008) (affirming district court's denial of request to reopen discovery filed five weeks after opponent's motion for summary judgment).

Turley's conspiracy theory also fails for another independent reason: he has put forth insufficient facts to support an inference of conspiracy. To succeed on a claim for conspiracy under Section 1983, a plaintiff must prove (1) a conspiratorial agreement and (2) an abridgment of a federally secured right. Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). A conspiratorial agreement consists of "an agreement between two or more state actors." Williams v. City of Boston, 771 F. Supp. 2d 190, 204 (D. Mass. 2011). While it is "not necessary to show an express agreement to prove a conspiracy," Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988), "allegations of a conspiracy under Section 1983 must . . . be supported by material facts, not merely conclusory statements." Id. (quoting Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir.1980)). To survive summary judgment, the plaintiff must present "evidence, either direct or

circumstantial, of an agreement among defendants . . . to inflict harm upon the plaintiffs." <u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 178 (1st Cir. 2008).

Turley concedes that he has "no direct proof of an agreement" among the defendants to retaliate against Turley. Doc. No. 134 at 17. In support of his conspiracy claim, Turley advances the following facts:

1. There was a "culture of hazing" at the Academy. Doc. No. 136 at ¶ 69.

2. "McKenzie, Powers, Yee, and Shattuck contributed to the culture of hazing at various levels." <u>Id.</u> at ¶ 74.

3. Turley expressed his disapproval of the hazing. <u>Id.</u> 136 at ¶¶ 128, 175, 177, 179, 185-86.

4. McKenzie issued Turley an action notice after his failure of the SFST exam and then dismissed Turley from the Academy. <u>Id.</u> at ¶¶ 20, 22.

5. After his separation, Turley sent a letter to the Academy complaining of the culture at the Academy. <u>Id.</u> 136 at ¶ 26.

6. Powers and McKenzie arranged a meeting with Shattuck which took place the day that they received Turley's letter. Although they claimed that the meeting was already scheduled, they met to manage the "crisis created by [Turley's] allegations." <u>Id.</u> at ¶ 48.

7. McKenzie failed to produce an email that he sent to Powers. <u>Id.</u> at ¶ 238.

Turley has already conceded there is no direct evidence of agreement. He argues the facts support the inference Powers and/or Yee joined a conspiratorial agreement to violate Turley's First Amendment rights, but he lacks the evidence to support drawing any such inference. There is no evidence that Powers or Yee: knew of or approved of any of the allegedly

retaliatory acts; engaged in any hazing of a nature similar to the hazing Shattuck allegedly committed; or knew of or responded in any way to Turley's expressions of objection to the hazing. Even if McKenzie intentionally deleted the email he sent to Powers to avoid production, Powers was not "in on" McKenzie's scheme; and the Commonwealth produced the received version of McKenzie's email to Powers. Doc. No. 135 at 6 n.5. After Turley's separation from the Academy, Powers, and McKenzie [but not Yee] met with Shattuck and Cady to discuss the hot microphone incident and subsequent investigation. Doc. No. 136 at ¶ 48. A meeting of several instructors after the alleged retaliation transpired does not support an inference of conspiratorial agreement, whether considered alone or in conjunction with the entire summary judgment record. At this stage, Turley must go beyond "merely conclusory statements". Earle, 850 F.2d at 845.  For these reasons, Turley has failed to put forth sufficient facts for a reasonable factfinder to infer the existence of a conspiracy.

Accordingly, the Court ALLOWS Yee and Powers' motions for summary judgment as to Count I.

> b. McKenzie

McKenzie was the director of the Academy during Turley's tenure there. Doc. No. 136 at ¶ 10. McKenzie gave Turley his separation notice following his failure of the SFST, citing the "three strikes rule."  Doc. No. 136 at ¶¶ 22-23. Turley's failure of the SFST was his third test failure at the Academy. Id. at ¶ 23.

Turley concedes that he received a failing score on the SFST; but argues that the SFST was not a "test" within the meaning of the "three strikes rule," and that McKenzie changed the Academy's policy for the purpose of dismissing Turley from the Academy. Doc. No. 129 at 13-14. Turley contends that McKenzie was aware of the hazing at the Academy and of Turley's

expressed discontent. Doc. No. 136 at ¶¶ 35, 190-92. His theory is that McKenzie retaliated by issuing the separation notice and dismissing Turley from the Academy. Doc. No. 129 at 12-13. He claims that McKenzie used Turley's failure on the SFST as a pretext for the retaliatory dismissal. Id. at 12-14. McKenzie responds that Turley's dismissal was not retaliatory, that the dismissal was required by the three strikes rule, and that he was unaware of Turley's protected speech. Doc. No. 119 at 20.

To prevail on his First Amendment claim against McKenzie, Turley must show that McKenzie's adverse actions against Turley were "causally related to [Turley's] protected conduct." Abril-Rivera v. Johnson, 806 F.3d 599, 601 (1st Cir. 2015). This means showing that McKenzie was aware of Turley's protected conduct, See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (finding no causation where there was no indication that decisionmaker had knowledge of alleged protected activity); Taylor v. Chao, 516 F.Supp.2d 128, 137 (D.D.C. 2007) ("In order to show causation, a plaintiff must show that the official responsible for the alleged retaliatory act had knowledge of the protected activity."), and that Turley's protected "conduct was a substantial factor or a motivating factor" for McKenzie's involvement in Turley's dismissal from the Academy, Rosaura Bldg. Corp., 778 F.3d at 66.

McKenzie claims that he "could not have retaliated against the plaintiff when he dismissed him because he was not aware" of Turley's protected conduct, Doc. No. 119 at 19, but Turley argues otherwise. Doc. No. 136 at ¶ 35. The evidence that Turley offers to show that McKenzie was aware of Turley's protected speech includes: (1) a cadet's testimony that McKenzie likely had knowledge of what was transpiring at the academy because he oversaw

different portions of instruction, id. at ¶ 191; and (2) Shattuck's testimony that McKenzie was on the range for the majority of the time that firearms instruction was taught.[10] Id. at ¶ 192.

The facts that Turley has presented are not enough. The evidence might support an inference that McKenzie had general knowledge *of hazing*—which was allegedly pervasive—but the evidence is insufficient to support an inference that McKenzie had knowledge of Turley's protected activities, which were mostly objections expressed quietly through facial expressions and body language. Turley has offered no evidence as to when McKenzie was present on the range; what, if any, protected conduct Turley engaged in while McKenzie was on the range; or what McKenzie specifically saw or heard. McKenzie's general presence at the Academy does not support an inference that he was present when Turley made protected statements or that he was cognizant that such statements had been made. Because Turley has failed to make a sufficient showing that McKenzie was aware of Turley's protected conduct, he cannot establish that the protected conduct was a motivating factor in McKenzie's decision to dismiss Turley from the Academy. See Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir.2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").[11]

For these reasons, the Court ALLOWS McKenzie's motion for summary judgment as to Count I.

---

[10] Turley has also offered evidence that when he spoke out against hazing, another cadet told him that the staff were "listening to every word he said," Doc. 136 at ¶ 185. Turley's restatement is the only source of the cadet's statement; thus, the cadet's statement is hearsay and inadmissible for the truth. E.g., United States v. Benitez-Avila, 570 F.3d 364, 367 (1st Cir. 2009).

[11] Turley's conspiracy argument as to McKenzie fails for the same reasons that it fails as to Powers and Yee. Supra. 12-14.

c.   Shattuck

As a firearms instructor, Shattuck employed what he deemed a "legitimate method" of inducing stress in students "to teach them to handle weaponry effectively in traumatic encounters." Doc. No. 138 at ¶ 8. His method was to "to scream and swear" at students during weapon training. Id. Turley contends that Shattuck referred to students as "faggots, homos, and queers" and instructed the class with "vulgar diatribes." (e.g. "Stand like you're getting fucked in the ass, you should be used to it.") Doc. No. 1 at ¶¶ 28-29.

Turley contends that he voiced disapproval of Shattuck's behavior on the firing range on three specific instances: when he gave Shattuck an upset look after Shattuck asked a cadet if Shattuck's fingers "smelled like [the cadet's] wife"; when he approached Shattuck when Shattuck "grabbed [a cadet] and simulated intercourse"; and when he told Shattuck "that's not funny." Doc. No. 138 at ¶¶ 219-227. Turley further contends that this behavior was protected conduct and that Shattuck retaliated against him in violation of section 1983 by maliciously failing Turley on his firearms test. Doc. No. 138 at ¶¶ 237-51.

To prevail on a section 1983 retaliation claim, a plaintiff must show that the defendant took an adverse action against the plaintiff and that the plaintiff's protected conduct was a motivating factor for the defendant's action. Rosaura Bldg. Corp., 778 F.3d at 66. Shattuck's theory is that Turley has failed on both counts. He denies taking an adverse action against Turley. He claims that he was not the primary scorer of Turley's test and that he only confirmed another instructor's judgment that Turley had failed. Doc. No. 138 at ¶¶ 87, 240. He argues that, in any event, the adverse action was not motivated by Turley's protected conduct because Turley in fact failed the test. Id. at ¶ 240.

Turley has presented sufficient evidence to create a fact question as to whether Shattuck was responsible for scoring Turley's firearms test. Turley testified that he saw Shattuck score his targets, although he conceded that he does not know if an additional instructor assisted Shattuck. Doc. No. 138 at ¶ 244. Shattuck claims that Turley's concession establishes his story as unrebutted. Doc. No. 137 at 10. However, even if Shattuck and another person jointly scored Turley's target, which Turley admits is possible, Turley's testimony is sufficient to support an inference that Shattuck did participate in scoring the test. Cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (finding company liable for intentional discrimination when biased supervisor recommended that plaintiff be fired even though formal decision maker displayed no evidence of discriminatory bias); Staub v. Proctor Hosp., 562 U.S. 411, 420 (2011) (requiring, for purposes of liability for employment discrimination, only that biased actor play a causal role in adverse action); Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 148 (2d Cir. 2010) (finding causal connection "sufficiently demonstrated" when unbiased agent decided to impose adverse action "pursuant to encouragement" by biased actor).

Turley has likewise presented sufficient evidence to support an inference that he in fact passed the firearms test. Turley testified that he shot well enough to pass the test. Doc. 138 at ¶ 246. He was in a position to know because, throughout his career at the Suffolk County Sheriff's office, he never failed a firearms qualification. Doc. 136 at ¶ 136. Additionally, the weapon he used during his firearms test was the same weapon that he used to qualify while at the Sheriff's office. Doc. 138 at ¶ 65. During the firearms test, he says he shot "consistent with every other firearms test." Doc. 134 at 10. Turley's testimony creates a genuine issue of material fact as to whether he passed the test. See Campbell v. Casey, 166 F. Supp. 3d 144, 150 (D. Mass.

2016) (finding a genuine fact issue where defendant contended that plaintiff crossed over traffic line but plaintiff contended that he did no such thing).

Consequently, Shattuck's motion for summary judgment is DENIED.

IV. <u>THE TITLE IX CLAIM</u>

    a. Hostile environment

Title IX provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 280 (1998) (quoting 20 U.S.C. § 1681(a)). "[S]exual harassment can constitute sex discrimination." <u>Wills v. Brown Univ.</u>, 184 F.3d 20, 25 (1st Cir. 1999). One type of sexual harassment that is cognizable under Title IX is a hostile environment. <u>See</u> <u>id.</u> ("[T]he Supreme Court has endorsed two different . . . theories as to how such harassment can constitute sex discrimination . . . the other theory [is] under the rubric "hostile environment."). An institution is liable under Title IX for a hostile environment, when a victim is "subjected to [sex-based] harassment severe enough to compromise the victim's . . . educational opportunities," the institution "had actual knowledge of the harassment," yet "exhibited deliberate indifference to it." <u>Id.</u> at 26.

For purposes of Title IX, an institution has actual knowledge if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination in the [institution]'s programs." <u>Gebser</u>, 524 U.S. 274 at 290.  Deliberate indifference may be established if the official, who has been shown to have actual knowledge of sex-based harassment, "failed adequately to respond." <u>See</u> <u>Doe v. Fournier</u>, 851 F.Supp. 2d 207, 222 (D. Mass. 2012). "If the

institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." Wills, 184 F.3d at 26.

> b.   The Academy and the Commission

To succeed on his Title IX hostile environment claim, Turley must show that an official who had authority to address the alleged discrimination had actual knowledge of the discrimination and responded with "deliberate indifference to the discrimination." Gebser, 524 U.S. at 290. McKenzie, as the Academy's director, had authority to address the alleged discrimination. Doc. No. 119 at 23.  The Academy and the Commission's theory is that McKenzie had no knowledge of any sexual harassment until the plaintiff's post-dismissal letter. Doc. No. 136 at ¶ 35. They argue that once McKenzie received the letter, he did not display indifference but rather acted to remedy the alleged discrimination by initiating an investigation and ultimately firing Shattuck and another employee. Doc. No. 136 at ¶¶ 54-56. The plaintiff's theory is that, although Turley did not officially report the harassment at the Academy until after his dismissal, McKenzie was aware of the harassment well before he received Turley's letter. Doc. No. 136 at ¶ 35. Turley supports his theory with (1) testimony that McKenzie was present during some of the hazing and generally oversaw much of what transpired at the Academy; and (2) testimony from a cadet who attended the Academy's program the year before Turley and complained of hazing during his [the cadet's] tenure. Doc. No. 136 at ¶¶ 87, 191-92. The parties' dispute essentially turns on how much McKenzie knew of the harassment and when.

Turley has presented insufficient facts to support an inference of deliberate indifference. Deliberate indifference is a "stringent standard of fault." Bd. Of the County Comm'rs v. Brown, 520 U.S. 397, 410 (1997). In the educational setting, a school might be found deliberately indifferent "where it had notice of the sexual harassment, and either did nothing or failed to take

additional reasonable measures after it learned that its initial remedies were ineffective." Porto v. Town of Tewksbury, 488 F.3d 67, 74 (1st Cir. 2007). It cannot be said that McKenzie "did nothing" in response to allegations of misconduct at the Academy. Turley concedes that McKenzie addressed cadets after the hot microphone incident, Doc. No. 136 at ¶ 40-41, that McKenzie interviewed cadets and met with the firearms instructors once he received Turley's post-dismissal letter, Doc. No. 136 at ¶ 48, that McKenzie collected incident reports from thirteen cadets, Doc. No. 136 at ¶ 55, and that McKenzie fired Shattuck and Cady. 136 at ¶ 56. Even viewing the facts in the light most favorable to Turley, Turley has failed to set forth facts supporting an inference of either notice or that McKenzie acted with deliberate indifference.

Yet, Turley still argues that McKenzie acted with deliberate indifference. Turley's argument is two-fold: (1) McKenzie's investigation "was a sham" and (2) McKenzie had previous knowledge of similar behavior directed at other cadets and displayed deliberate indifference by not remedying the problem sooner.

The evidence Turley puts forth to show McKenzie's investigation was a sham is slim: no cadets were interviewed for over a month after the "hot microphone incident." Doc. No. 134 at 16-17. Although no cadets were interviewed for over a month after the incident, several instructors were interviewed within two weeks of the incident, Doc. No. 136 at ¶¶ 42-46. The entire investigation was completed in less than two months. Id. at ¶¶ 40-65. A delay of weeks between the initiation of the investigation and the interviewing of cadets with nothing more is insufficient to support a reasonable inference that the investigation was a sham. Cf. Ahmed v. Johnson, 752 F.3d 490, 497 (1st Cir. 2014) (explaining that, for purposes of summary judgment, plaintiff must present "a convincing *mosaic* of . . . evidence that would allow a jury to infer intentional discrimination.") Turley's assertion that it was a sham is "speculation," unsupported

by the mosaic of facts, and is therefore not enough to survive summary judgment. <u>Prescott</u>, 538 F.3d at 39.

Turley's argument that McKenzie displayed deliberate indifference because he did not act sooner is also deficient. Turley has failed to present facts to support an inference that McKenzie had prior notice of the kind of "severe" sexual harassment necessary to prevail on a hostile environment claim. <u>Doe v. D'Agostino</u>, 367 F.Supp.2d 157, 166 (D. Mass. 2005).

"A plaintiff may show that an institution had 'actual notice' by showing that the [*sic*] it was aware of complaints by other students regarding" the same type of sexual harassment as that complained of by the plaintiff. <u>Bloomer v. Becker Coll.</u>, No. CIV.A. 09-11342-FDS, 2010 WL 3221969, at *5 (D. Mass. Aug. 13, 2010); <u>Gebser</u>, 524 U.S. at 291. The prior complaints must put the institution on notice that students are at risk of experiencing harassment based on sex, <u>see Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 66 (1st Cir. 2002) ("discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case . . ."), and that the potential harassment is "severe enough to compromise [their] educational opportunities" <u>D'Agostino</u>, 367 F.Supp.2d at 166. Here, Turley has submitted only that "[a cadet from a prior class] complained to McKenzie about being hazed" and "McKenzie was present during many of the instances of [the cadet's] hazing." Doc. No. 136 at ¶¶ 86-87. He does not indicate which particular incidents McKenzie observed or of what type of hazing the cadet complained. <u>Id.</u> This evidence is insufficient to support an inference that McKenzie had "actual notice" that cadets were at risk of sexual harassment "severe enough to compromise [their] educational opportunities." <u>Wills</u>, 184 F.3d at 26. In <u>D'Agostino</u>, the court found that complaints by parents that their "child frequently cried in class" and that their child's teacher used "inappropriate incentives" were insufficient to provide actual notice of the teacher's "alleged propensity to sexually harass . . . students."

D'Agostino, 367 F.Supp.2d at 166-67. Likewise, here, a previous cadet's complaints of hazing and McKenzie's alleged presence during some incidents of hazing do not support a finding of actual knowledge. Moreover, McKenzie's general presence at the Academy is, without more, also insufficient to support an inference of actual knowledge of severe sexual harassment.

Consequently, summary judgment as to Count II's Title IX hostile environment claim is ALLOWED.

c. Retaliation

The plaintiff's second Title IX theory is that he was retaliated against for complaining of sex discrimination. "[W]hen a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 167 (2005). A person need not be a direct victim of sex discrimination to prevail on a retaliation claim. Id. at 179. "Where the retaliation occurs because the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied." Id. To prevail on a Title IX retaliation claim, a plaintiff must allege "facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002).

Turley acknowledges that he did not "formally report[] the misconduct" at the Academy until after his dismissal. Doc. Nos. 136 at ¶ 36; 129 at 24. Nevertheless, he claims that he "engaged in protected conduct when he objected to Shattuck's misconduct during the firearms

course" and that he was retaliated against when he was dismissed from the Academy. Doc. No. 129 at 24.

Turley alleges that he engaged in behavior protected under Title IX when:

1.  He expressed his disapproval through facial expressions and Shattuck responded asking "What's your fucking problem?" Doc. No. 136 at ¶ 177.

2.  He approached Shattuck to stop him when Shattuck grabbed another student and simulated intercourse. Id. at ¶¶ 178-180. He then told Shattuck "That's not funny." Id. 136 at ¶ 181.

3.  Turley "admonished other cadets for nervously laughing at Shattuck's inappropriate behavior." Id. at ¶ 185.

Plaintiff's retaliation theory is deficient. To prevail on a Title IX retaliation claim, the plaintiff must show that "he complained of sexual harassment, that [the Academy] knew [he] had complained of such, and that it took adverse action because of [his] complaints." Yan Yan v. Penn State Univ., 529 F. App'x 167, 171 (3d Cir. 2013). Even assuming that Turley's expressions and statements were complaints of sex discrimination,[12] Turley has alleged no facts supporting an inference that the Academy or Commission knew that Turley had complained of sex discrimination.  See generally Doc. Nos. 1 at ¶¶ 71-82; 136. Turley argues that McKenzie knew about his allegedly protected conduct because McKenzie was frequently on the firing

---

[12] When Turley was asked during his deposition "What did you intend to convey by [saying 'that's not funny']?" Turley did not claim that his comment was meant as a complaint of sex discrimination. Instead, he stated that his comment was meant to convey his "objection to [Shattuck's] felonious acts." Doc. No. 136 at ¶ 183. Even if Turley specifically voiced disapproval of sex harassment to Shattuck and other cadets, it is not clear that such disapproval would constitute a complaint for the purposes of Title IX. In Jackson, the Supreme Court found a cognizable claim of retaliation where the plaintiff repeatedly complained of the unequal treatment of boys' and girls' basketball teams to his supervisors. 544 U.S. at 167. Here, Turley acknowledges that he did not bring a complaint to his supervisors at any time during his tenure at the Academy. Doc. No. 136 at ¶ 37.

range, but Turley has set forth no facts establishing McKenzie saw or took notice of Turley's alleged comments, which were largely in the form of facial expressions and body language. See generally Doc. No. 136.[13]

Plaintiff complained of sexist comments in his dismissal letter. Doc. No. 136 at ¶ 186. His dismissal letter would therefore qualify as protected activity under Title IX. Jackson, 544 U.S. at 184. According to Turley's own account, the letter was submitted after he was separated from the Academy. Id. at ¶ 94. Adverse actions taken against Turley while he was at the Academy cannot be *because* of the letter. Consequently, Turley is unable to show that the alleged retaliatory actions were the result of his complaint of sex discrimination, and summary judgment is ALLOWED as to Turley's Title IX retaliation claim against the Academy and the Commission.

V. CHAPTER 214 SEXUAL HARASSMENT CLAIM

In Count III, Turley has alleged that he was subjected to a "hostile education environment" in violation of Mass. Gen. Laws chapter 214 and 151C. Doc. No. 1 at ¶¶ 83-86; Doc. No. 129 at 24, 28.

At the hearing on the motion for summary judgement, the Court *sua sponte* inquired whether the Eleventh Amendment barred Count III or any remaining count in the Complaint. Though the Commonwealth initially said no, promptly post-hearing, the Commonwealth filed a letter asserting that the Eleventh Amendment does apply, bars this Count, and may be invoked even at this late stage of the lawsuit. Doc. No. 144. Subsequently, the Commonwealth filed a

---

[13] Title IX prohibits sexual discrimination by recipients of federal funding—not sexual discrimination generally. 20 U.S.C. § 1681(a). To establish Title IX liability, Turley must make a showing that *the Academy*, through one of its officials with "authority to address the alleged discrimination," discriminated against Turley. Gebser, 524 U.S. 274 at 290. Turley does not contend that Shattuck had such authority. See Doc. 128-29 (arguing only that Powers and McKenzie had such authority).

supplemental memo addressing the Eleventh Amendment issues, Doc. No. 146, and Turley filed

an opposition, Doc. No. 147. The Court credits the candid and thoughtful opposition filed by

Turley, but nonetheless, concludes that the Eleventh Amendment requires the dismissal of Count

III for the reasons persuasively, thoroughly, and concisely stated by Judge Talwani in <u>Bradley v.</u>

<u>Cruz</u>, No. 1:13-CV-12927-IT, 2017 WL 3443212, at *1 (D. Mass. Aug. 10, 2017).[14]

 The Court therefore ALLOWS the motion for summary judgment as to Turley's Chapter

214 sexual harassment claim.


 VI. <u>CONCLUSION</u>

 For the foregoing reasons, the Commonwealth defendants' Motion for Summary

Judgment (Doc. No. 118) is ALLOWED as to Count I against Yee, Powers, and McKenzie AND

ALLOWED as to Count II against the Commission and the Academy; and ALLOWED as to

Count III against the Academy as this claim is barred in this Court by the Eleventh Amendment.

Shattuck's Motion for Summary Judgment (Doc. No. 120) is DENIED as to Count I.

 Within seven days, the parties shall file a joint status report stating (1) the estimated

duration of trial; and (2) whether the parties would like to go to mediation before any trial.

SO ORDERED.


 /s/ Leo T. Sorokin     
Leo T. Sorokin
United States District Judge

---

[14] One further point bears mention. At first blush the outcome appears manifestly unfair —
requiring Turley at this late date to refile in state court and resulting, possibly, in two trials.
However, the claim splitting implications are the same whether the Commonwealth invoked the
Amendment at the outset of the case or now. If the Commonwealth now asserted, in state court, a
statute of limitations defense which only became available as a result of the passage of time
before it invoked the Amendment then an unfairness might arise. Turley's counsel suggests that
no such concern is present due to the provisions of Mass. Gen. Laws chapter 260, § 32.